# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ZANDER SCHLACTER;

JILL TRAN,
    Montgomery County, Maryland;

LIA HEPLER-MACKEY;

DAVID DOE;

ROBERT ROE;

PETER POE,
    Prince George's County, Maryland; and

KRIS KOE,*

         *Plaintiffs*,

         v.

U.S. DEPARTMENT OF STATE,
    2201 C Street NW
    Washington, DC 20520;

MARCO RUBIO, in his official capacity as
Secretary of State,
    2201 C Street NW,
    Washington, DC 20520; and

UNITED STATES OF AMERICA,
    c/o Attorney General of the United States
    U.S. Department of Justice
    950 Pennsylvania Avenue NW
    Washington, DC 20530,

         *Defendants*.

Civil Action No.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

* Plaintiffs' motion to waive the requirement under Local Rule 102.2(a) to provide their addresses and to permit Plaintiffs David Doe, Robert Roe, Kris Koe, and Peter Poe to proceed under pseudonyms is being filed contemporaneously with this Complaint.

1.      On January 20, 2025, President Trump issued Executive Order 14168 (hereafter the **"Gender Order"**),[1] which sets a government-wide policy repudiating the very existence of transgender people by proclaiming that possessing a gender identity that is incongruent with a person's sex assigned at birth is a "false claim." Gender Order § 2(f).

2.      The Gender Order mandates a simplistic and scientifically inaccurate definition, to govern all federal law and administrative policy, that each person's sex is determined solely by whether a person "belong[ed], at conception" "to the sex that produces" either "the large" or "the small reproductive cell." *Id.* §§ 2(a), (d)-(e). But sex is much more complicated. There are myriad sex characteristics, including gender identity, and these may not all always align, as is the case for transgender and intersex people.

3.      This lawsuit addresses the State Department's implementation of the Gender Order denying transgender people, including nonbinary people, accurate passports with sex markers that are congruent with their gender identity and reflect the sex they live as.

4.      For decades, including during the first Trump administration, the United States has issued passports to transgender people that reflect who they are, rather than the sex they were assigned at birth. This prior longstanding policy was consistent with that of most states and many other countries, which permit transgender people to amend their government-issued identification documents to match their lived sex, consistent with their gender identity. More than half of the U.S. population lives in states in which "X" designations are available for those who are nonbinary.

5.      Yet, to advance the Gender Order's aims, the State Department has reversed longstanding passport policy. Secretary of State Marco Rubio ordered the State Department to implement the Gender Order's directive "to require that government-issued identification

---

[1] Exec. Order 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, 90 Fed. Reg. 8615 (Jan. 20, 2025).

documents, including passports, … accurately reflect the holder's sex," as defined by the Gender Order. *Id.* § 3(d). Consequently, the State Department mandated that all passport issuances and renewals comply with the Gender Order and updated its website to state that, "under the executive order," it "will only issue passports with an M or F sex marker that match the customer's biological sex at birth" and "will no longer issue U.S. passports . . . with an X marker."[2] Now, rather than issuing passports that correctly reflect the holder's sex, consistent with their gender identity, the State Department is issuing passports with incorrect sex designations of its choosing, even to people to whom it had previously issued passports congruent with their gender identity. Together, these actions and directives constitute the "**Passport Policy**" challenged herein.

6.    The Passport Policy has caused and is causing grave and immediate harm to transgender people like Plaintiffs, in violation of their constitutional rights to equal protection, travel, privacy, and speech, and the Administrative Procedure Act ("**APA**"), 5 U.S.C. §§ 500 *et seq.*

7.    While the State Department provides non-transgender (i.e., cisgender) people with accurate passports that reflect a sex consistent with their gender identity, the State Department categorically bars transgender people from obtaining the same.

8.    Having an accurate passport that is consistent with their gender identity is critical for transgender people's freedom and their social, economic, and general wellbeing. For many transgender people like Plaintiffs, having an inaccurate sex marker on their passport forces them to "out" themselves any time they need to use their passports, which can lead to serious harms, from exposure to discrimination, harassment, and even violence to the questioning of the validity of their passports and potential denial of the ability to enter or leave a country.

---

[2] *See* U.S. Dep't of State, Bureau of Consular Affairs, Sex Marker in Passports, https://perma.cc/TG9V-ZKTR.

9.    The Gender Order and Passport Policy, which seek to repudiate and deny the very existence of transgender people, are plainly motivated by impermissible animus.

10.    Accordingly, this suit seeks a declaration that the Passport Policy and Gender Order as applied to passports are unconstitutional, facially and as applied to Plaintiffs; a declaration that the Passport Policy violates the APA; and injunctive relief restoring the *status quo ante litem*.

## JURISDICTION AND VENUE

11.    This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1346, and 1361. The Court has jurisdiction to review final agency actions under 5 U.S.C. § 702.

12.    An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant the relief requested pursuant to 28 U.S.C. §§ 2201-2202, 5 U.S.C. §§ 702, 703, 705, and 706, and Federal Rules of Civil Procedure 57 and 65.

13.    Venue is proper in this District under 28 U.S.C. §§ 139l(b)(2) and 139l(e)(l). Each defendant is an agency or an officer of the United States; Plaintiffs Peter Poe and Jill Tran are residents of this District, namely, Prince George's County and Mongomery County; and a substantial part of the events or omissions giving rise to this Complaint occurred in this District.

## PARTIES

### A.    Plaintiffs

14.    Plaintiffs **Zander Schlacter**, **Jill Tran**, **Lia Hepler-Mackey**, **David Doe**, **Robert Roe**, **Peter Poe**, and **Kris Koe** are all United States citizens.[3]

### B.    Defendants

15.    Defendant **United States Department of State** (the "**State Department**") is a

---

[3] Plaintiffs David Doe, Robert Roe, Peter Poe, and Kris Koe are seeking to proceed using pseudonyms, rather than their legal names, to protect their privacy regarding their transgender status and related personal information, including medical diagnoses and treatment, as well as for their safety, as they fear that being public about their transgender status may lead to discrimination, harassment, and even violence.

3

federal executive department responsible for implementing the Gender Order. It is an agency within the meaning of the APA. *See* 5 U.S.C. § 551(1).

16.    Defendant **Marco Rubio** is the Secretary of State. He is responsible for supervising and directing the State Department. He is sued in his official capacity. The Secretary of State has authority to issue passports under rules prescribed by the president. *See* 22 U.S.C. § 211a. By executive order, the president has delegated the authority to prescribe the rules for passport issuance to the Secretary of State. *See* Exec. Order 11295, 31 Fed. Reg. 10,603 (Aug. 5, 1966).

17.    The State Department and Secretary Rubio are collectively referred to as the "**Agency Defendants**."

18.    Defendant **United States of America** is the government of the United States and includes all government agencies and officials responsible for implementing the Passport Policy and the Gender Order as applied to passports.

## FACTUAL ALLEGATIONS

### A.    Sex, Gender Identity, and Gender Dysphoria

19.    A person has multiple sex-related characteristics, including hormones, external and internal morphological features, external and internal reproductive organs, chromosomes, and gender identity. These characteristics are not always aligned.

20.    The phrase "sex assigned at birth" refers to the sex recorded on a person's birth certificate at birth, typically assigned based on the appearance of external genitalia. Other sex-related characteristics (such as a person's chromosomal makeup, hormones, or gender identity, for example) are typically not assessed or considered at birth. The term "biological sex" is less precise than "sex assigned at birth" because it does not account for intersex conditions and gender identity.

21.    External reproductive organs alone are not determinative of a person's sex and can

conflict with a person's gender identity.

22.    Gender identity refers to a person's core internal sense of their own gender. Every person has a gender identity, whether they are transgender or not, and that gender identity is the critical determinant of a person's sex, including for transgender people whose sex-related characteristics are not in typical alignment.

23.    Gender identity and transgender status are thus inextricably linked to a person's sex and are sex-related characteristics.

24.    There is a medical consensus that gender identity is innate, has a biological basis, and is generally fixed at an early age. As such, efforts to change a person's gender identity are unethical and harmful to a person's health, dignity, and well-being.[4]

25.    Living in a manner consistent with a person's gender identity, including by possessing identity documents that accurately reflect their sex, consistent with their gender identity, is critical to the health and well-being of all transgender people.

26.    The incongruence between a transgender person's gender identity and sex assigned at birth can cause gender dysphoria. Gender dysphoria refers to clinically significant distress that can result when a person's gender identity differs from the person's sex assigned at birth. Treatment for gender dysphoria is governed by evidence-based, well-established clinical guidelines considered authoritative by medical organizations. If left untreated, gender dysphoria may result in serious consequences including depression, self-harm, and even suicide.

27.    Depriving transgender people of passports that accurately reflect their sex, consistent with their gender identity, harms their health and well-being. This deprivation interferes with the international and accepted standard of care for gender dysphoria by impeding a

---

[4] United States Joint Statement Against Conversion Efforts (Aug. 23, 2023), available at https://perma.cc/5RL7-L958.

transgender person's ability to live in a manner consistent with their gender identity and can seriously aggravate the negative consequences for transgender people who have gender dysphoria.

### B.    Transgender and Intersex People

#### 1.    Transgender People

28.    Transgender people have a gender identity that differs from their sex assigned at birth. Cisgender people have a gender identity that aligns with their sex assigned at birth. Approximately 1.6 million (or 0.6% of) Americans are transgender.[5]

29.    Within the umbrella of transgender people are nonbinary people. The term "nonbinary" refers to people whose gender identity falls outside the gender binary of male or female. Nonbinary people are a subset of transgender people because their gender identity does not conform to the sex they were assigned at birth. According to an analysis of population surveys, approximately one third (32.1%) of transgender people identify as nonbinary.[6]

#### 2.    Intersex People

30.    "Intersex" is a term used to describe people born with a wide range of natural variations in their physical sex characteristics, also known as "differences of sex development." These variations in sex characteristics that do not fit typical binary notions of "male" or "female" include variations in chromosomes, external genitalia, internal reproductive organs, and hormones. Some intersex traits are visible at birth, others are not apparent until puberty, and some may not be visibly apparent at all. Between 0.05% and 1.7% of the population have intersex traits.[7]

31.    Some intersex people do not produce the "large reproductive cell" (i.e., ovum) or

---

[5] Jody Herman et al., *How Many Adults and Youth Identify as Transgender in the United States?*, Williams Institute, UCLA School of Law 1 (2022), https://perma.cc/5ZCC-MUG5.

[6] Bianca D.M. Wilson et al., *Nonbinary LGBTQ Adults in the United States,* Williams Institute, UCLA School of Law 2 (June 2021), https://perma.cc/W24U-NLDY.

[7] "Intersex People," Off. of the U.N. High Comm'r for Hum. Rts.1 (2024), https://perma.cc/BZ7S-ZFX2.

"small reproductive cell" (i.e., sperm), and some may produce both. While some intersex people may produce either sperm or ovum, they may possess genitalia or chromosomes typically associated with a sex that differs from that associated with the "reproductive cell" they produce.

32.    Intersex people are not necessarily transgender. Some intersex people, however, are considered transgender because their gender identity is different from their sex assigned at birth.

### C.    Gender Transition

33.    Living in a manner consistent with their gender identity is critical to transgender people's health and wellbeing. The process by which transgender people come to live in a manner consistent with their gender identity, rather than their sex assigned at birth, is known as transition. The steps that transgender people take to transition, as well as to treat gender dysphoria, vary with the needs of each person, but generally include one or more of the following: (1) social; (2) legal; and (3) medical.

34.    Social transition entails a transgender person living in a manner consistent with their gender identity. For example, social transition for a transgender man may include, among other things, changing his name to one typically associated with men; using male pronouns; changing his identity documents to indicate his male gender; wearing clothing and adopting grooming habits typically associated with men; and otherwise living as a man in all aspects of life.

35.    Legal transition represents an important part of a transgender person's ability to live their day-to-day life in a manner consistent with their gender identity. This may include securing a legal name change and updating the gender marker on a person's identity documents, such as a driver's license, birth certificate, or passport, and updating the person's educational, financial, and employment records with the correct name and sex.

36.    Medical transition, a critical part of transitioning for many transgender people,

includes treatments that bring the sex-specific characteristics of a transgender person's body into alignment with their gender identity, such as hormone replacement therapy or surgery.

37.     Whether medical treatment is necessary or appropriate depends on a person's particularized needs. Like all healthcare decisions, medical transition is a profoundly personal decision, done in consultation with medical professionals.

38.     The various components associated with transition—social, legal, or medical—do not change a person's sex, but instead bring a person's physical appearance and lived experience into better alignment with their sex, as determined by their gender identity.

**D.     The Need for Accurate Passports Matching a Person's Gender Identity**

39.     A passport is an essential government-issued document used for multiple important purposes. It is legally necessary for U.S. citizens to enter and leave most foreign countries and is required for international air travel. It is also commonly used to prove citizenship for employment, education, government benefits, and even to participate in the U.S. democratic process.

40.     Because the State Department has decided to include sex designations on passports, a passport reflects the government's recognition of a person's sex. The State Department's refusal to provide transgender people with passports matching their lived sex, consistent with their gender identity, is a stigmatizing refusal to acknowledge their gender that deprives them of equal dignity.

41.     With rare exception, passports are required for U.S. citizens to travel outside of, and reenter, the United States. *See* 8 U.S.C. § 1185(b). Foreign countries generally bar entrance by U.S. citizens without a valid U.S. passport and/or require proof of one for any visa issuance.

42.     U.S. passports often are the only form of identification recognized by foreign authorities or private citizens in foreign countries. When U.S. citizens travel or live abroad, they frequently need their passports to check in to a hotel, use a bank, receive medical services, and

access many other critical and even common services.

43.    If there is an emergency while abroad, a valid passport is the primary way for U.S. citizens to identify themselves to officials at a U.S. embassy or consulate.

44.    Passports can also be useful or necessary for travel within the United States. A passport can always be used for domestic airline travel and is helpful if a traveler lacks other accepted forms of identification. And once the REAL ID Act becomes effective on May 7, 2025, even more people will rely on passports for domestic travel when certain state identification documents will no longer be accepted.

45.    Passports are used as primary identification documents to determine eligibility for employment, to enroll in government programs, and to engage in financial transactions.

46.    Passports are used to obtain other important forms of identification and can be used as an "identification of last resort" due to their widespread acceptance and the weight accorded a federal government document. Passports can be used to obtain driver's licenses, as proof of age, as proof of citizenship, and for educational registration.

47.    Forcing transgender people to carry and use identity documents that do not accurately reflect their sex, consistent with their gender identity, is harmful. For transgender people, it is inconsistent with accepted medical protocols regarding social transition and can cause serious psychological injury, including significant anxiety and mental and emotional distress. Having to use identity documents that do not align with their gender identity is also dangerous and can result in discrimination and violence against transgender people.

48.    Recognizing the importance of accurate identity documents to transgender people, the American Medical Association "supports every individual's right to determine their gender identity and sex designation on government documents" and urges that governments "allow for a

sex designation or change of designation on all government IDs to reflect an individual's gender identity, as reported by the individual and without need for verification by a medical professional."[8]

49.    For some transgender people, depriving them of passports that accurately reflect their sex, consistent with their gender identity, forcibly discloses private and sensitive information about them in contexts where it would otherwise remain undisclosed (such as when traveling or seeking employment), regardless of whether a person's transgender status may otherwise be known by others (for example, by friends or family), and regardless of a person's desire not to disclose that personal information to strangers.

50.    Being compelled to present a passport that inaccurately reflects a transgender person's sex exposes that person to serious invasions of privacy. A person's transgender status (and medical diagnosis of gender dysphoria) constitutes deeply personal and sensitive information over which a transgender person has a reasonable expectation of privacy, and the disclosure of which can jeopardize a person's safety and risk bodily harm.

51.    Transgender people denied an accurate passport are thus deprived of significant control over the circumstances surrounding disclosure of their transgender status and related deeply personal information.

52.    Requiring nonbinary people who need an "X" sex designation, instead of an "M" or "F" designation, on their passport forces them to disclose deeply personal information, such as their classification according to the Gender Order's definition of female or male. That is a profoundly private piece of information in which they have a reasonable expectation of privacy.

53.    As a result of being forced to use identity documents that are inconsistent with who they are, transgender people experience high rates of discrimination, harassment, and violence. A

---

[8] Am. Med. Ass'n, Conforming Sex and Gender Designation on Government IDs and Other Documents H-65.967 (2021), https://perma.cc/9MDB-TVFX.

2022 national survey of 92,329 transgender people revealed that nearly a quarter of respondents who had shown an identity document with a name or gender that did not match their gender presentation were verbally harassed, denied benefits or services, asked to leave a public accommodation, or verbally or physically assaulted.[9] The lack of access to accurate identity documents can thus be a barrier to the full and safe engagement of transgender people in society and deter them from equal participation in public life.

54.    More generally, transgender people have long experienced discrimination and harassment in a variety of contexts, including employment, education, public accommodations, health care, housing, and interactions with the government, including law enforcement. Transgender people are also disproportionately targeted for hate crimes.[10] These realities make the involuntary disclosure of a person's transgender status particularly harmful and dangerous.

55.    Furthermore, denying transgender people accurate passports, consistent with their gender identity, undermines rather than serves the purpose of verifying that a transgender person is, in fact, the same person reflected on the passport. For example, a transgender woman who has aligned her body and external gender presentation with her female gender identity and is correctly perceived as female by others is outed and has her identity called into question by a passport with a male sex designation. This in turn causes border officials to question whether she is the same person reflected on the passport, thus exposing her to invasions of privacy, prejudice, discrimination, public and private humiliation, harassment, stigma, and at worst, physical violence.

### E.    The Passport Application and Issuance Process

56.    A U.S. passport is an identity document issued under the authority of the State

---

[9] S.E. James et al., Nat'l Ctr. for Transgender Equal., *Early Insights: A Report of the 2022 U.S. Transgender Survey* (2024), https://perma.cc/9AXM-JMKB.

[10] *See* Jamie Wareham, *Beaten, Stabbed and Shot: 320 Trans People Killed in 2023 - New Monitoring Report*, Forbes (Nov. 13, 2023), https://perma.cc/7VXA-RJ53.

Department used for travel, *inter alia*, that attests to the identity and nationality of the bearer.

57.     Before a U.S. passport can be issued, the applicant "shall subscribe to and submit a written application which shall contain a true recital of each and every matter of fact which may be required by law or by any rules authorized by law to be stated as a prerequisite to the issuance of any such passport." 22 U.S.C. § 213. A passport application must be signed under penalty of perjury. It is a criminal offense to willfully and knowingly make false statements in a passport application with intent to induce or secure issuance of a passport. *See* 18 U.S.C. §1542.

58.     A U.S. citizen applying for a passport for the first time must submit a Form DS-11, "Application for a U.S. Passport." A U.S. citizen applying for a renewal of an existing passport must submit a Form DS-82, "Renewal Application." Citizens can also request corrections or changes to a passport, including, until the Passport Policy prevented it, changes to the sex designation on their passports, using Form DS-5504.

59.     Form DS-11 contains a field for sex designation entitled "Sex." In this field, "M" indicates male, and "F" indicates female.

60.     In 1971—before passports even listed a sex designation—the State Department adopted a policy noting that name changes "indicating a change of sex" were allowed.[11]

61.     In 1976, the State Department first introduced sex as a required identity attribute on passport application forms in conformity with a new international standard.

62.     Since at least 1992, the State Department began permitting applicants to select a sex designation that differs from their sex assigned at birth.[12]

63.     From 2010 until 2021, per applicable State Department policy, transgender people

---

[11] *See* U.S. Passport Off., Passport Instruction 2510.9C, Attach. A, General Guideline No. 10, "Use of Names Indicating a Change of Sex" (May 4, 1971).
[12] *See* U.S. Dep't of State, Passport Bulletin 92-22, "Procedures for Handling Requests for a Change in Gender in Passports" (Oct. 1, 1992).

were able to obtain passports with correct gender designations by submitting a physician's certification that they were undergoing gender transition.

64.    Starting in 2021, transgender people were able to obtain passports with the correct gender designations, under a revised State Department policy, based on their own affirmation, without a physician's certification.

65.    Also in 2021, the State Department began allowing citizens to select an "X" sex designation, which the Department's form described as denoting "unspecified or another gender identity." This designation generally signifies that the bearer does not identify as male or female.

66.    The International Civil Aviation Organization ("ICAO") sets international standards for air transport, including for travel documents. ICAO specifications for machine-readable travel documents have for decades required passports to display the "[s]ex of the holder, to be specified by … the capital letter 'F' for female, 'M' for male, or 'X' for unspecified."[13]

67.    Numerous other countries permit individuals to select the sex designation most appropriate for themselves on their passports, including Australia, Denmark, Argentina, Greece, Brazil, Norway, Portugal, Ireland, and others. Many of these countries also permit an "X" designation on their passports, including Germany, Pakistan, Taiwan, Austria, Canada, and Colombia.

F.    **The Gender Order**

68.    The Gender Order is attached as **Exhibit A** and is incorporated herein.

69.    As its source of authority, the Gender Order cites only 5 U.S.C. § 7301, which permits the President to issue regulations for employee conduct in the Executive Branch.

70.    The Gender Order expresses and imposes on others a disparaging, demeaning, and

---

[13] ICAO, *Doc 9303, Machine Readable Travel Documents* 14 (8th ed. 2021), https://perma.cc/LM35-EE44.

irrational viewpoint about transgender people and gender identity, repudiates the existence of transgender and intersex people, and deems transgender people's identities to be "false." It also mandates that transgender people be excluded from government recognition and protection in numerous aspects of their lives.

71. Per the Gender Order, "[i]t is the policy of the United States to recognize two sexes, male and female," which "are not changeable." Gender Order § 2.

72. The Gender Order is unmoored from scientific reality: transgender people exist. Scientific and medical authorities have recognized this undeniable fact, as have multiple courts.

73. The Gender Order declares that its "definitions shall govern all Executive interpretation of and application of Federal law and administration policy." *Id.* § 2.

74. It defines "sex" as "an individual's immutable biological classification as either male or female," which it states "is not a synonym for and does not include the concept of 'gender identity.'" *Id.* § 2(a). It further defines "female" as "a person belonging, at conception, to the sex that produces the large reproductive cell," and "male" as "a person belonging, at conception, to the sex that produces the small reproductive cell." *Id.* § 2(d)-(e).

75. The Gender Order also defines "gender ideology," which purportedly "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa," and "includes the idea that there is a vast spectrum of genders that are disconnected from one's sex." *Id.* § 2(f).

76. The Gender Order defines "gender identity" as "reflect[ing] a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex." *Id.* § 2(g).

77.    Per its "purpose," the Gender Order defends against those it calls "ideologues who deny the biological reality of sex [who] have increasingly used legal and other socially coercive means to permit men to self-identify as women." *Id.* § 1. It declares the mere existence of transgender people a threat, claiming that "[t]his unhealthy road is paved by an ongoing and purposeful attack against the ordinary and longstanding use and understanding of biological and scientific terms, replacing the immutable biological reality of sex with an internal, fluid, and subjective sense of self unmoored from biological facts." *Id.* It calls gender identity an "inchoate social concept." *Id.*

78.    The Gender Order directs the Secretary of State to "implement changes to require that government-issued identification documents, including passports, visas, and Global Entry cards, accurately reflect the holder's sex, as defined under section 2 of th[e] order." *Id.* § 3(d).

79.    The Gender Order requires that "the Secretary of Health and Human Services shall provide to the U.S. Government, external partners, and the public clear guidance expanding on the sex-based definitions set forth in this order." *Id.* § 3(a). The Department of Health and Human Services issued said guidance on February 19, 2025, adopting the Gender Order's definitions.[14]

80.    The Gender Order requires that all federal agencies and employees "enforce laws governing sex-based rights, protections, opportunities, and accommodations to protect men and women as biologically distinct sexes." *Id.* § 3(b).

81.    The Gender Order also requires that all agencies "remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology," and "cease issuing such statements, policies, regulations,

---

[14] U.S. Dep't of Health and Human Servs., Defining Sex: Guidance for Federal Agencies, External Partners, and the Public Implementing Executive Order 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government (Feb. 19, 2025), https://perma.cc/2AUV-8W7E.

forms, communications or other messages" and that agencies' "forms that require an individual's sex shall list male or female, and shall not request gender identity." *Id.* § 3(e).

82.     The Gender Order imposes various other rules related to gender, including with respect to federal employees' records, interpretation of various federal laws, recission of various agency policies, and proposals for legislation on the topic. *See Id.* §§ 3-7.

**G.    The State Department Implements the Gender Order.**

83.     On information and belief, on January 23, 2025, Secretary Rubio directed the State Department to implement the Gender Order, instructing in an internal State Department cable that "[t]he policy of the United States is that an individual's sex is not changeable" and that "sex, and not gender, shall be used" on passports.[15, 16] It further instructed to "suspend any application where the applicant is seeking to change their sex marker" and "suspend any application requesting an 'X' sex marker."

84.     As of April 24, 2025, the DS-11 form available online does not permit users to select an "X" in the Sex field.[17] It includes only two boxes, "M" and "F." The online fillable form that populates the application likewise permits selecting only "M" or "F" in the Sex field and provides no "X" option. The posted DS-11 form has an expiration date of December 31, 2023. On information and belief, the State Department has replaced the currently approved version of the form with an older version. The same is now true of the DS-82 and DS-5504 forms, which include

---

[15] *See* Joseph Gedeon, *Rubio Instructs Staff To Freeze Passport Applications with 'X' Sex Markers*, Guardian  (Jan. 23, 2025), https://perma.cc/AJ84-RVYW.

[16] *See, e.g.*, Jo Yurcaba et al., *State Department To Suspend Passport Applications Seeking Sex- Marker Changes*, NBC News (Jan. 24, 2025), https://tinyurl.com/ycumehzj; Shannon K. Kingston et al., *State Department Halts 'X' Passport Gender Marker Applications*, ABC News (Jan. 24, 2025), https://perma.cc/X8C7-7QA3.

[17] *See* U.S. Dep't of State, Application for a U.S. Passport, OMB Control No. 1405-0004 (exp. Dec. 31, 2023), https://eforms.state.gov/Forms/ds11_pdf.PDF (saved at https://perma.cc/6X86-M2F8). *See also* U.S. Dep't of State, Passport Forms, https://perma.cc/53UA-MQ6X (last accessed Apr. 24, 2025).

only "M" and "F" and have expiration dates of March 31, 2023, and November 30, 2022.[18]

85.     On information and belief, on or about February 8, 2025, an internal State Department communication was issued to all employees and all consular offices providing further guidance about the processing of passport applications, pursuant to the Gender Order.[19]

86.     Shortly after, the State Department's website Travel.State.Gov included a new web page entitled "Sex Marker in Passports." The page discusses the Gender Order and states that U.S. passports will no longer be issued with "X" markers, and instead the Department will "only issue passports with an M or F sex marker that match the customer's biological sex at birth." The page warns that "if you submit a passport application requesting an X marker or requesting a sex marker that differs from the sex marker at your birth, you may experience delays getting your passport. You may receive a letter or email requesting more information." It continues, stating that the State Department will issue passports with sex markers of its choosing, not necessarily the sex maker indicated on the sworn application, "[w]e will issue you a new passport that matches your biological sex at birth, based on your supporting documents and our records about your previous passports."

87.     The Passport Policy means that passports may only be issued, renewed, or amended to comply with the Gender Order's definitions of male and female, and that transgender people, including nonbinary people, will no longer be able to obtain passports that reflect their identity.

88.     The State Department has also removed references to transgender people from some of its public webpages. For instance, the webpage previously entitled "LGBTQI+ Travelers"

---

[18] *See* U.S. Dep't of State, U.S. Passport Renewal Application for Eligible Individuals, OMB Control No. 1405-0020 (exp. Mar. 31, 2023), https://eforms.state.gov/Forms/ds82_pdf.PDF (saved at https://perma.cc/EX4P-N2KR); U.S. Dep't of State, Application for a U.S. Passport for Eligible Individuals, Correction, Name Change to Passport Issued 1 Year Ago or Less, and Limited Passport Replacement, OMB Control No. 1405-0160 (exp. Nov. 30, 2022), https://eforms.state.gov/Forms/ds5504_pdf.PDF (saved at https://perma.cc/A7DC-YZ8F).

[19] *See* Ken Klippenstein (@KenKlippenstein), Substack (Feb. 10, 2025), available at https://tinyurl.com/5azmf57m.

has been retitled "Lesbian, Gay, and Bisexual" travelers and has removed travel information related to transgender people.[20] The Transportation Security Administration ("**TSA**") has also removed webpages discussing screening procedures for transgender people and whether nonbinary individuals could apply for TSA PreCheck.

89.    The State Department Foreign Affairs Manual (the "FAM") previously recognized that some individuals "do[] not fit typical definitions of male or female,"[21] but, although the FAM generally is available online, the section with that reference is no longer accessible.[22]

### H.    The Gender Order Is Based on Animus Against Transgender People.

90.    The Gender Order reflects an unprecedented degree of animus towards transgender people. It does so on its face and based on the broader context in which it was adopted.

91.    President Trump has referred to transgender identities as "transgender insanity"[23] and has referred to transgender people with derogatory labels, describing them as "deranged," "sick," and as drug users.[24] He issued the Gender Order within hours of the inauguration, listing protection from "radical gender ideology" among his Day One "America First Priorities."[25]

92.    Pursuant to and in addition to the Gender Order, the Trump Administration has taken a series of actions seeking to eliminate or restrict existing protections for transgender people; has sought to erase any mention or recognition of transgender people from and by any part of the federal government, including federal contractors and grantees; and has enacted myriad affirmative

---

[20] *Compare* U.S. Dep't of State, Bureau of Consular Affairs, Lesbian, Gay, and Bisexual Travelers, https://perma.cc/MP2V-ABZD, *with* Michael K. Lavers, *Transgender people removed from State Department travel page*, Washington Blade (Jan. 31, 2025), https://perma.cc/6V4E-682G.

[21] *See* 7 Foreign Affairs Manual, 1350 Appendix M (as of 2015).

[22] *See* 7 Foreign Affairs Manual, https://fam.state.gov/Volumes/Details/07FAM (1300s section is inactive).

[23] Bill Barrow, *Trump and Vance Make Anti-Transgender Attacks Central to Their Closing Argument Before Election Day*, PBS (Nov. 1, 2024), https://perma.cc/RJ2F-LTR5.

[24] GLAAD, *Fact Sheet: Donald Trump on LGTBQ Issues: Transgender Americans* (Aug. 20, 2024), https://perma.cc/AF9L-AY4B.

[25] The White House, President Trump's America First Priorities (Jan. 20, 2025), https://perma.cc/AGC8-VJ3R.

policies to discriminate against transgender people in all aspects of public life, including education, employment, health care, and housing, to name a few.

93.    Through the Gender Order, President Trump has directed all federal agencies to "remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology, and shall cease issuing such statements, policies, regulations, forms, communications[,] or other messages." § 3(e). Following this directive, the National Park Service has removed any mention of transgender people in relation to the Stonewall National Monument despite their central role in the Stonewall Riots.[26]

94.    Our Nation's researchers and scientists have also been ordered to remove any mention of transgender people or recognition of gender identity from any federally funded research.[27] The CDC has instructed its scientists to remove references to or mentions of "forbidden" terms like "gender," "transgender," "LGBT," "transsexual," and "nonbinary."

95.    Mere days into office, President Trump issued a barrage of orders targeting transgender people.[28] One bans transgender people from serving in the military and states that being transgender "conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life."[29] As justification, the order declares that "expressing a false

---

[26] *See* Juliana Kim, *Park Service erases 'transgender' on Stonewall website, uses the term 'LGB' movement*, NPR (Feb. 14, 2025), https://perma.cc/TTX3-WXKW; Minyvonne Burke, *References to transgender and queer removed from Stonewall National Monument's web page*, NBC News (Feb. 14, 2025), https://tinyurl.com/mcvftf5m.

[27] Carla K. Johnson, *Health info wiped from federal websites following Trump order targeting transgender rights*, PBS News (Jan. 31, 2025), https://perma.cc/556N-Q5DX; Jeremy Faust, *BREAKING NEWS: CDC orders mass retraction and revision of submitted research across all science and medicine journals. Banned terms must be scrubbed*, Inside Medicine (Feb. 1, 2025), https://tinyurl.com/53bztu6h (accessed Apr. 25, 2025).

[28] These include: Exec. Order 14148, Initial Rescissions of Harmful Executive Orders and Actions, 90 Fed. Reg. 8237 (Jan. 20, 2025) (rescinding Biden Administration executive orders protecting transgender people); Exec. Order 14170, Reforming the Federal Hiring Process and Restoring Merit to Government Service, 90 Fed. Reg. 8621 (Jan. 20, 2025) (prohibiting governmental employers from considering gender identity in hiring); Exec. Order 14190, Ending Radical Indoctrination in K-12 Schooling, 90 Fed. Reg. 8853 (Jan. 29, 2025) (prohibiting teaching of transgender-related topics in schools); Exec. Order 14201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (Feb. 5, 2025) (barring transgender girls from playing school sports).

[29] Exec. Order 14183, Prioritizing Military Excellence and Readiness, 90 Fed. Reg. 8757 (Jan. 27, 2025).

'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service" and "is not consistent with the humility and selflessness required of a service member." Another order directs the immediate defunding of medical institutions that provide gender-affirming medical care to transgender people under the age of nineteen, declaring that such treatment "will be a stain on our Nation's history."[30] Such language, like the Gender Order's, expressly and unequivocally evidences discriminatory animus toward transgender people.

## I.    Harm to Plaintiffs

### 1.    Zander Schlacter

96.     Zander Schlacter is a 29-year-old man who currently resides in New York. He works as a textile artist and designer and owns a small business where he works on commission for various clients and creates and sells his work to the public.

97.     Mr. Schlacter is a transgender man and uses the pronouns "he" and "him." He was diagnosed with gender dysphoria in 2018.

98.     Mr. Schlacter lives his life as a man. Many people who meet him for the first time assume that he is a cisgender man.

99.     Mr. Schlacter has traveled internationally for work on many past occasions and will likely have more opportunities for international work travel within the next year. He has also traveled internationally with his spouse for vacations or to visit friends.

100.     Mr. Schlacter's ability to travel outside of the United States is contingent upon his possession of a valid and accurate passport that correctly reflects his identity.

101.     In 2024, Mr. Schlacter completed a legal name and gender change in New York, and then promptly updated his New York driver's license to reflect his name and male identity. He

---

[30] Exec. Order 14187, Protecting Children from Chemical and Surgical Mutilation, 90 Fed. Reg. 8771 (Jan. 28, 2025).

also updated the sex marker on his passport and his legal name with the Social Security Administration.

102.    Mr. Schlacter's last passport was issued in 2024 with a male sex marker, prior to his legal name change. On or about January 14, 2025, Mr. Schlacter sent an expedited application to update his legal name on his passport, using form DS-5504.

103.    In February 2025, Mr. Schlacter received a passport, which expires in 2035. The passport has his correct legal name, but now has an incorrect sex marker of "F" or "female." Mr. Schlacter also received a letter from the State Department notifying him that "the date of birth, place of birth, name, or sex was corrected on your passport application," with "sex" circled in red. The stated reason was "to correct your information to show your biological sex at birth."

104.    Given Mr. Schlacter's male identity and appearance, having an "F" sex marker on his passport discloses private information to anyone who views his passport.

105.    In addition, presenting a passport with an "F" sex marker would force Mr. Schlacter to communicate an ideological message with which he disagrees and expose him to harassment, discrimination, and increased scrutiny, including additional screening, interrogation, and physical pat-downs or examinations.

106.    As a result of these and other safety concerns caused by the incorrect sex marker on his recently issued passport, Mr. Schlacter has determined that for his and his family's safety, he cannot travel internationally until his passport sex marker is corrected back to male.

## 2.    Jill Tran

107.    Jill Tran is a 27-year-old woman who lives in Maryland and currently works part-time in a salon.

108.    Ms. Tran is a transgender woman who uses the pronouns "she" and "her." She was

21

diagnosed with gender dysphoria in 2022.

109.    In 2023, Ms. Tran updated the sex designations on her state and federal identity documents to reflect her female identity. She completed a legal name and gender change in January 2023 and changed the name and sex designation on her Maryland driver's license and with the Social Security Administration. She is in the process of updating her Maryland birth certificate to reflect her legal name and female identity.

110.    Since completing her undergraduate degree, Ms. Tran has lived openly as a woman. She enjoys playing board games with friends and has a partner. She has a good relationship with her parents, who are supportive of her.

111.    Ms. Tran wants to be able to travel internationally, so she submitted a DS-84 form to update her previous passport, along with a copy of her legal name and gender change, and expedited the application.

112.    In late February 2025, Ms. Tran received a passport with her correct legal name but with an incorrect sex marker of "M" or "male." She also received a letter from the State Department notifying her that "the date of birth, place of birth, name, or sex was corrected on your passport application," with "sex" circled in red. The stated reason was "to match our records."

113.    To date, Ms. Tran still has not received back the copy of her legal name and gender change that she submitted to the State Department.

114.    Given Ms. Tran's female identity and appearance, having an "M" sex marker on her passport discloses private information to anyone who views her passport.

115.    In addition, presenting a passport with an "M" sex marker would force Ms. Tran to communicate an ideological message with which she disagrees and expose her to harassment, discrimination, and increased scrutiny, including additional screening, interrogation, and physical

pat-downs or examinations.

116.    Ms. Tran has determined that for her safety, she will not be able to travel until her passport has the "F" sex marker.

### 3.    Lia Hepler-Mackey

117.    Lia Hepler-Mackey is a 24-year-old woman who lives in California and is employed teaching middle school and high school-aged young people how to code.

118.    Ms. Hepler-Mackey is a transgender woman and uses the pronouns "she" and "her." She was diagnosed with gender dysphoria in 2022.

119.    In 2024, Ms. Hepler-Mackey updated the sex designations on her state and federal identity documents to reflect her female identity. She completed a legal name change in June 2024, changed the name and sex marker on her California driver's license and updated her name and sex designation with the Social Security Administration. She also changed her California birth certificate to reflect her legal name and female sex.

120.    Since moving to her current city after completing her undergraduate degree, Ms. Hepler-Mackey has lived openly as a woman. Her students know her as a woman. She is involved in her local swing dancing community where people know and accept her as a woman.

121.    Ms. Hepler-Mackey wants to be able to travel internationally, so she submitted a DS-11 form for her first passport in early 2025 and elected to have the application expedited. When she submitted her application, she did not yet have her updated birth certificate, so she included her old birth certificate with a copy of her name and gender change court order.

122.    In late February 2025, Ms. Hepler-Mackey received a passport, which expires in 2035, with an incorrect sex marker of "M" or "male." She also received a letter from the State Department notifying her that "the date of birth, place of birth, name, or sex was corrected on your

passport application," with "sex" circled in red. The stated reason was "to match our records."

123.    Given Ms. Hepler-Mackey's female identity and appearance, having an "M" sex marker on her passport discloses private information to anyone who views her passport.

124.    Presenting a passport with an "M" sex marker would force Ms. Hepler-Mackey to communicate an ideological message with which she disagrees and expose her to harassment, discrimination, and increased scrutiny, including additional screening, interrogation, and physical pat-downs or examinations.

125.    Ms. Hepler-Mackey has determined that for her safety, she will not be able to travel until her passport sex marker is "F."

### 4.    David Doe

126.    David Doe is a 55-year-old man living in Pennsylvania with his wife and children and is employed as an attorney.

127.    Mr. Doe is a transgender man who uses the pronouns "he" and "him." He was diagnosed with gender dysphoria in 2004.

128.    In 2005, Mr. Doe updated the sex marker on his Pennsylvania driver's license and with the Social Security Administration. In May of 2006, he updated the sex markers on his birth certificate and on his U.S. passport. He has had a correct male sex marker on multiple U.S. passports for almost twenty years.

129.    Mr. Doe has lived and been known only and exclusively as male in all aspects of his life for nearly twenty years. He is an attorney and is known as male to his clients, colleagues, and in the courts in which he practices. Except for his family, a few close friends, and his doctors, very few people know about Mr. Doe's transgender status.

130.    Mr. Doe's elderly parents-in-law, who are not in good health, live in another country

that can only be reached by plane. As such, Mr. Doe and his wife are prepared to travel on a moment's notice to attend to their health concerns.

131.    Mr. Doe has also planned international travel with his family this summer.

132.    Mr. Doe's ability to travel outside of the United States to attend to his in-laws, or for any other reason, is contingent upon his possession of a valid and accurate passport that correctly reflects his identity, including his sex.

133.    Mr. Doe's last passport, which he obtained in 2017, had a male sex marker. On January 28, 2025, he applied to renew his passport using form DS-84. On February 13, 2025, Mr. Doe received a passport, which expires in 2035, with an incorrect sex marker of "F" or "female." He also received a letter from the State Department notifying him that "the date of birth, place of birth, name, or sex was corrected on your passport application," with "sex" circled in red. The stated reason was "to correct your information to show your biological sex at birth."

134.    Given Mr. Doe's male identity and appearance, having an "F" sex marker on his passport discloses private information to anyone who views his passport.

135.    Presenting a passport with an "F" sex marker would force Mr. Doe to communicate an ideological message with which he disagrees and expose him to harassment, discrimination, and increased scrutiny, including additional screening, interrogation, and physical pat-downs or examinations.

136.    These fears are particularly acute for Mr. Doe because his in-laws, whom Mr. Doe may need to immediately attend due to their ill health, live in a country where airport security is extremely thorough and intense, and where any inconsistency in his passport could expose him to additional searches, detention, or even refusal of entry.

137.    Mr. Doe has spent most of his adult life being hyper-aware of the dangers faced by

transgender people in the world and so has actively avoided all situations where his transgender status could be discovered by strangers. He even goes so far as to not provide his undergraduate alma mater to avoid someone searching records there and determining that he is transgender.

138.    As a result of these many concerns caused by the incorrect sex marker on his recently issued passport, Mr. Doe has determined that for his and his family's safety, he will not be able to travel internationally until his passport sex marker is corrected back to male.

### 5.    Robert Roe

139.    Robert Roe is a 42-year-old man who lives in Europe and is employed as a Foreign Service Officer for the United States Department of State.

140.    Mr. Roe is a transgender man and uses the pronouns "he" and "him." He was diagnosed with gender dysphoria in 2022.

141.    In 2023, Mr. Roe updated his name and the sex markers on his relevant identity documents to correctly reflect his male identity. In the fall of 2023, he completed a legal name change and updated the sex marker on his driver's license and residency card. He also updated the sex marker on his personal use U.S. passport and in 2024, he updated his name and sex designation with the Social Security Administration. In February 2025, he updated his name and sex designation on his birth certificate.

142.    Mr. Roe has lived and been known only and exclusively as male in all aspects of his life since 2022. He is known only as male to his colleagues, friends, and acquaintances in the community in which he lives. Mr. Roe does not share his transgender status with many people and lives a private life.

143.    In 2010, Mr. Roe was issued a diplomatic passport, an official government identification document that all foreign service officers must possess to travel as employees of the

State Department. Mr. Roe's current diplomatic passport expires in July 2025, and he has orders for a new assignment beginning in August 2026. Mr. Roe needs to renew his diplomatic passport in order to report to his new assignment and secure a visa and a diplomatic ID in the country where he will next be stationed.

144.    Mr. Roe was not previously eligible to renew and update the sex marker on his diplomatic passport until January 2025. The Passport Policy, however, currently bars that update.

145.    To be present in the country of his new assignment, Mr. Roe needs to secure an official visa. Officials in that county will review his diplomatic passport for accuracy and reference it when issuing his visa. If Mr. Roe's diplomatic passport incorrectly lists his sex as female, it will out him as transgender and may also frustrate or prevent him from receiving an official visa. If he cannot receive an official visa, then Mr. Roe will be unable to fulfill his employment obligations.

146.    If the country of his new assignment issues him an official visa despite an inaccurate sex marker on his diplomatic passport, it will use the visa information to issue him a diplomatic ID, which will also have the same incorrect sex marker. A diplomatic ID is issued by most host country governments and presented as evidence of diplomatic status, like a residence card. Mr. Roe will then possess three diplomatic documents that all out him as transgender and expose him to harassment, discrimination, and further scrutiny.

147.    Mr. Roe risks discrimination, harassment, and increased scrutiny at any point where he must present his diplomatic passport to his host country or other foreign officials. Presenting a passport with an "F" sex marker would force Mr. Roe to communicate an ideological message with which he disagrees.

### 6.    Peter Poe

148.    Peter Poe is a 22-year-old man who lives in Maryland where he attends college

studying environmental science and entomology (the study of bugs).

149.    Mr. Poe is a transgender man and uses the pronouns "he" and "him." He was diagnosed with gender dysphoria in 2021.

150.    In 2024, Mr. Poe undertook efforts to update the sex designations on his state and federal identity documents to reflect his male identity. He completed a legal name and gender change in November 2024, and then promptly updated his Maryland driver's license and Social Security record to reflect those changes. He has updated his name and gender on his Maryland birth certificate and is waiting for his updated birth certificate to be mailed to him.

151.    Mr. Poe lives his life as a man. His friends know that he is transgender, but people who meet him for the first time assume that he is a cisgender man.

152.    In the summer of 2025, Mr. Poe plans to travel with his family to visit his father's birthplace in Europe. A member of Mr. Poe's extended family passed away, and the family decided to use the inheritance money she left to hold a once-in-a-lifetime family trip. Mr. Poe's grandmother is elderly and because of her physical limitations, the family believes this trip may be her last chance to visit her homeland alongside her grandchildren, including Mr. Poe. This trip would be Mr. Poe's first time traveling to his father's home country.

153.    However, Mr. Poe is worried about traveling if he cannot get a passport with an accurate "M" sex designation. He has applied for a passport reflecting his new name and "M" designation, but under the current policy, Mr. Poe knows that he cannot obtain a correct passport. Mr. Poe's parents, especially his father, do not want to make the family trip without Mr. Poe.

154.    Given Mr. Poe's male identity and appearance, having an "F" sex marker on his passport discloses private information to anyone who views his passport.

155.    Presenting a passport with an "F" sex marker would force Mr. Poe to communicate

28

an ideological message with which he disagrees and expose him to harassment, discrimination, and increased scrutiny, including additional screening, interrogation, and physical pat-downs or examinations.

156.    Mr. Poe is very aware of the consequences of using documentation that does not align with his identity. Prior to updating his driver's license, Mr. Poe experienced multiple instances of people questioning his identity or the validity of his identification. For instance, in November 2024, Mr. Poe's identity was questioned by poll workers because his physical appearance did not match his driver's license, which at that time had his birth name and an "F" sex marker.

157.    Mr. Poe wants to travel to Europe with his family and see his father's birthplace but fears traveling with a passport with an incorrect sex marker.

### 7.    Kris Koe

158.    Kris Koe is 23 years old and lives in Connecticut where they attend college full-time and work part-time as a tutor, babysitter to their niece, and grocery co-op clerk.

159.    Mx. Koe is a nonbinary transgender person who uses "they" and "them" pronouns.

160.    For eight years, Mx. Koe has understood their gender identity to lie outside of the male/female binary and, like all transgender people, they do not identify with their birth-assigned sex. They came out as nonbinary to their friends and family in 2022.

161.    In the summer of 2022, Mx. Koe updated the sex marker on their Connecticut driver's license to an X to reflect their sex as nonbinary, consistent with their gender identity. In March 2025, Mx. Koe updated their sex designation to X on their birth certificate.

162.    Mx. Koe plans to apply for graduate study program admission at a German university in May 2025. To apply for admission and secure a student visa, Mx. Koe will need to

supply citizenship documents including their birth certificate and U.S. passport.

163.    Mx. Koe's last passport, issued in 2018, reflected their assigned sex at birth. They applied to renew their passport and update their sex marker to X on January 20, 2025.

164.    On February 14, 2025, Mx. Koe received a passport back with an incorrect sex marker of "F" or "female," which expires in 2035. They also received a letter from the State Department notifying them that "the date of birth, place of birth, name, or sex was corrected on your passport application," with "sex" circled in red. The stated reason was "to match our records."

165.    Given Mx. Koe's nonbinary identity and physical appearance, having a passport with an "F" sex designation discloses private information to anyone who views their passport.

166.    Presenting a passport with an "F" sex marker would force Mx. Koe to communicate an ideological message with which they disagree and expose Mx. Koe to harassment, discrimination, and increased scrutiny, including additional screening, interrogation, and physical pat-downs or examinations.

167.    This fear is particularly acute for Mx. Koe, who has already experienced increased scrutiny while returning to the United States from Canada in 2024 and using their previous passport, which had an "F" sex marker.

168.    Mx. Koe is concerned that because their gender expression and appearance is regularly perceived as incongruent with either binary sex, government officials including those responsible for security screening, immigration, and customs may invasively scrutinize their body, using tactics as invasive as a "strip search," to "verify" the sex marker on their current passport.

### CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Fifth Amendment – Equal Protection

169.    Plaintiffs restate and reallege paragraphs 1 to 168 set forth above.

170. All Plaintiffs state this cause of action against all Defendants, seek declaratory and injunctive relief, and challenge the Passport Policy, the Gender Order as applied to passports, and any additional agency action seeking to implement them, both facially and as applied to Plaintiffs.

171. The Fifth Amendment provides that "[n]o person shall. . . be deprived of life, liberty, or property, without due process of law." Inherent within the Fifth Amendment's Due Process Clause is a guarantee of equal protection of the laws applicable to the federal government.

172. The Passport Policy and the Gender Order as applied to passports violate the Fifth Amendment's equal protection guarantee by discriminating based on sex and transgender status and because they are motivated by animus towards transgender people.

**Discrimination Based on Sex**

173. The Gender Order and Passport Policy draw facial sex-based classifications that cannot be justified under the requisite heightened scrutiny or any standard of constitutional review.

174. The Gender Order and Passport Policy restrict sex markers on passports to the Gender Order's definitions of "male" and "female," which is textbook sex classification.

175. The Gender Order and Passport Policy discriminate against Plaintiffs based on their sex, including their sex assigned at birth, because it denies transgender people, but not cisgender people, a passport consistent with the sex they live as and with their gender identity.

176. By allowing passports with a female sex marker for women who meet the Gender Order's definition of female but denying it to women who do not, and by allowing passports with a male sex marker for men who meet the Gender Order's definition of male but denying it to men who do not, the Gender Order and Passport Policy facially classify based on sex.

177. The Gender Order and Passport Policy also classify based on sex in their treatment of people who seek an "X" sex designation, facially enforcing the Gender Order's binary sex

definition by requiring that nonbinary transgender people's sex marker conform to those definitions of female or male rather than their identities.

178.    The Gender Order and Passport Policy were adopted and implemented in part because of, and not simply in spite of, their adverse effects on people who depart from the Gender Order's sex definitions. That, too, warrants heightened scrutiny as a sex classification.

179.    In addition, the Gender Order and Passport Policy are impermissibly premised on sex-based stereotypes, precluding Plaintiffs from obtaining passports that accurately reflect their identities because of the stereotypes that a person defined by the Gender Order as male must live and present as male, and a person so defined female must live and present as female.

**Discrimination Based on Transgender Status**

180.    The Gender Order and Passport Policy draw facial transgender status classifications that cannot be justified under the requisite heightened scrutiny or any level of constitutional review.

181.    By expressly rejecting that people may have a gender identity that differs from their sex assigned at birth, the Gender Order and Passport Policy classify based on transgender status.

182.    The Gender Order and Passport Policy deny transgender people a passport that accurately reflects their sex, consistent with their gender identity, and can be used safely for all purposes, while granting them for cisgender people. The Gender Order and Passport Policy therefore facially treat people differently based on being transgender.

183.    Even if the Gender Order and Passport Policy did not facially classify based on transgender status, they were implemented at least in part because of, and not simply in spite of, their adverse effects on transgender people.

184.    The Gender Order's and Passport Policy's sex and transgender status classifications fail any level of scrutiny. Reversing established policy allowing passport sex markers consistent

with a person's gender identity regardless of sex assigned at birth and instead mandating sex markers that do not reflect Americans' identities does not rationally advance any legitimate state interest, let alone substantially advance an important governmental objective. Conditioning a person's passport's sex marker on whether they could produce a particular reproductive cell at conception cannot survive rational basis review or more exacting scrutiny.

**Motivated by Animus**

185.    The Gender Order and Passport Policy fail any level of Equal Protection review because they were issued and adopted for the openly discriminatory purpose of expressing governmental disapproval of transgender people, repudiating the very existence of transgender people, and excluding transgender people from government recognition, including on identification documents. They are rooted in a status-based classification of people undertaken for the purpose of making transgender people unequal, something the Constitution's Equal Protection guarantee does not permit.

186.    The Gender Order and Passport Policy impose a broad and undifferentiated disability on a single named group: transgender people. They are inexplicable by anything but animus toward the class they affect, which can never constitute a legitimate governmental interest.

### SECOND CAUSE OF ACTION
### Fifth Amendment – Right to Travel

187.    Plaintiffs restate and reallege paragraphs 1 to 168 set forth above.

188.    Plaintiffs state this cause of action against all Defendants, seek declaratory and injunctive relief, and challenge the Passport Policy, the Gender Order as applied to passports, and any additional agency action seeking to implement them, both facially and as applied to Plaintiffs.

189.    The liberties protected by the Due Process Clause of the Fifth Amendment include fundamental rights to free movement and travel, including travel abroad.

190.    The Gender Order and Passport Policy infringe the constitutional rights of Plaintiffs to free movement and travel, both facially and as applied.

191.    Federal law generally prohibits U.S. citizens from traveling out of or into the country without a valid U.S. passport. *See* 8 U.S.C. § 1185(b). Foreign countries likewise generally bar entrance by U.S. citizens without a valid U.S. passport and/or condition issuance of a necessary visa on holding a valid U.S. passport. When traveling abroad, U.S. passports are necessary for numerous purposes and are often the only form of identification carried by a U.S. citizen that will be recognized or acknowledged by foreign authorities or private citizens abroad.

192.    The Gender Order and Passport Policy infringe the fundamental right of Plaintiffs to free movement and travel.

193.    The Gender Order and Passport Policy will prevent or deter transgender people like Plaintiffs from traveling to, from, or even within the United States by preventing transgender people from obtaining passports that accurately reflect their sex, consistent with their gender identity.

194.    Forcing Plaintiffs to carry passports that do not align with their identities or the ways they present to the world places them at risk of psychological and physical harm, harassment, discrimination, and increased scrutiny, including questions about the validity of their documents, and detention by government authorities. The Gender Order and Passport Policy thus directly and foreseeably result in substantial barriers to the exercise of Plaintiffs' fundamental rights to free movement and travel.

195.    Reversing established policy allowing passport sex markers consistent with a person's gender identity regardless of sex assigned at birth and instead mandating sex markers that do not reflect Americans' identities does not rationally advance any legitimate state interest, let

34

alone substantially advance an important governmental objective.

### THIRD CAUSE OF ACTION
### Fifth Amendment – Right to Privacy

196.    Plaintiffs restate and reallege paragraphs 1 to 168 set forth above.

197.    All Plaintiffs state this cause of action against all Defendants, seek declaratory and injunctive relief, and challenge the Passport Policy, the Gender Order as applied to passports, and any additional agency action seeking to implement them, both facially and as applied to Plaintiffs.

198.    The liberties protected by the Due Process Clause of the Fifth Amendment include avoiding forced disclosure of private and intimate information.

199.    The Gender Order and Passport Policy infringe upon the constitutional liberty interests of Plaintiffs, including the right to maintain intimate information as private.

200.    Whether a transgender person "belong[ed] to" "the sex that produces the large" or "small reproductive cell" "at conception" is deeply personal, intimate medical information.

201.    Requiring transgender people to be identified as "male" or "female" as defined by the Gender Order on their passports, when that is not the sex they identify as, live as, or express, is deeply intrusive, and reveals private, sensitive information about them to others without their consent. Specifically, the Gender Order and Passport Policy force disclosure of Plaintiffs' sex assigned at birth and their transgender status against their will. Given the prevalence of discrimination, harassment, and violence against transgender people, such forced disclosure can put their safety and wellbeing at risk. Conversely, allowing sex markers that align with their gender identities does not divulge this private, sensitive information.

202.    Because the Gender Order and Passport Policy infringe a fundamental right, strict scrutiny applies. They fail that scrutiny because they are not narrowly tailored to advance a compelling government interest. They do not even survive rational basis review.

## FOURTH CAUSE OF ACTION
### First Amendment – Right to Free Speech

203.    Plaintiffs restate and reallege paragraphs 1 to 168 set forth above.

204.    Plaintiffs state this cause of action against all Defendants, seek declaratory and injunctive relief, and challenge the Passport Policy, the Gender Order as applied to passports, and any additional agency action seeking to implement them, both facially and as applied to Plaintiffs.

205.    The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST. Amend. I.

206.    The Gender Order and Passport Policy violate the First Amendment rights of Plaintiffs to free speech and expression.

207.    The Gender Order and Passport Policy force transgender people to express the government's erroneous, dogmatic message that their sex is what the Gender Order defines it to be when they apply for, renew, or present their passport—a message with which they strongly disagree. The Gender Order and Passport Policy therefore impermissibly compel speech.

208.    A passport is associated with an individual and, when presented to another party, the personal information it conveys is attributed to the passport holder. Thus, the government forces the passport bearer to communicate the government's message every time they present their passport, violating their First Amendment rights by forcing them to disseminate an ideological message with which they do not agree.

209.    Because the Gender Order and Passport Policy force individuals to communicate an ideological message with which they disagree, they are subject to strict scrutiny. The Gender Order and Passport Policy engage in this infringement of free speech without any meaningful justification, let alone a compelling government interest. They are not narrowly tailored to achieve any such interest. Even if a lower level of scrutiny applied, the Gender Order and Passport Policy

36

would fail because they lack an important governmental objective, and the means employed are not substantially related to achieving any legitimate and sufficient objective.

**FIFTH CAUSE OF ACTION**
**Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq.*, 706 –**
**Contrary to Constitutional Right, Power, Privilege, or Immunity**

210.    Plaintiffs restate and reallege paragraphs 1 to 209 set forth above.

211.    Plaintiffs state this cause of action against the Agency Defendants, seek declaratory and injunctive relief, and challenge the Passport Policy and any additional agency action to implement it or the Gender Order as applied to passports, both facially and as applied to Plaintiffs.

212.    The APA provides that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity . . . ." 5 U.S.C. § 706(2).

213.    Agency Defendants are bound by the plain terms of the Gender Order and, on information and belief, have already taken concrete steps to implement it. Those steps, including the Passport Policy, constitute final agency action under the APA. As a result of such action, each Plaintiff either has attempted or will attempt to obtain a passport with a sex marker that aligns with their sex, consistent with their gender identity, that has been or will necessarily be denied due to the Gender Order in violation of Plaintiffs' rights, leaving them with inaccurate passports that subject them to risk of significant harm. Further, because of agency action, Plaintiffs cannot renew existing passports with their appropriate sex marker without fear that it is confiscated or its processing suspended.

214.    The Passport Policy and any agency actions taken under the Gender Order are "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), for the reasons described in the First through Fourth Causes of Action and incorporated here. Because these actions violate the First and Fifth Amendments, they must therefore be held unlawful and set

37

aside.

## SIXTH CAUSE OF ACTION
### Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq.*, 706 –
### Arbitrary, Capricious, and Abuse of Discretion

215.    Plaintiffs restate and reallege paragraphs 1 to 168 set forth above.

216.    Plaintiffs state this cause of action against the Agency Defendants, seek declaratory and injunctive relief, and challenge the Passport Policy and any additional agency action to implement it or the Gender Order as applied to passports, both facially and as applied to Plaintiffs.

217.    The APA provides that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . .arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2).

218.    Agency Defendants are bound by the plain terms of the Gender Order and, on information and belief, have already taken concrete steps to implement it. Those steps, including the Passport Policy, constitute final agency action under the APA. As a result of such action, each Plaintiff either has attempted or will attempt to obtain a passport with a sex marker that aligns with their gender identity that has been or will necessarily be denied due to the Gender Order in violation of Plaintiffs' rights, leaving them with inaccurate passports that subject them to risk of significant harm. Further, because of agency action, Plaintiffs cannot renew existing passports with their appropriate sex designation without fear that it is confiscated or its processing suspended.

219.    Agency actions under the Gender Order, like the Passport Policy, are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

220.    The challenged agency actions are arbitrary, capricious, and an abuse of discretion because they are irrational and unreasonable, including because:

   a.    The classifications imposed by the Gender Order and Passport Policy are divorced from scientific or medical knowledge or evidence. They ignore and contradict

both scientific and medical understandings and the practical reality that transgender people exist in favor of an animus-laden view of sex, gender identity, and being transgender.

      b.    The Gender Order's definitions incorporated into the Passport Policy that define "male" and "female" as people who "at conception" "belong" to the sex that produces the large or small reproductive cell ignore the biological realities that all embryos have undifferentiated reproductive cells during the initial period after conception and that some people may not produce either reproductive cell at any point.

      c.    Requiring sex designations based upon the sex a person "belong[s]" to "at conception" based upon the reproductive cells they are likely to produce to further an alleged interest in accurately identifying passport holders is irrational.

221.    Further, the challenged agency actions are arbitrary, capricious, and an abuse of discretion because Agency Defendants have failed to support them with any reasoned or meaningful explanations, including for the following:

      a.    Agency Defendants offer no support for their removal of the option to designate a person's sex in accordance with their gender identity, whether "M," "F," or "X," nor does the Gender Order do so.

      b.    Agency Defendants offer no support for pronouncing that transgender people do not exist. Neither the Gender Order nor Passport Policy address any of the medical, scientific, and practical evidence demonstrating the importance of legal recognition of transgender people and accurate identification.

      c.    Agency Defendants offer no support for whether and what alternatives— including less restrictive and nondiscriminatory alternatives—were considered to address

any legitimate interests the Passport Policy could serve, and the Gender Order has none.

       d.     Agency Defendants offer no support for why the *status quo* under the decades-long prior policy allowing transgender people to obtain passports consistent with their identity was so flawed as to warrant this total about-face, nor does the Gender Order do so.

222.    Agency Defendants have also failed to consider or address critical aspects of the policy change, as does the Gender Order. Most significantly, they failed to consider or address the effects on actual people—the transgender people being foreseeably, obviously, and directly harmed by the Gender Order and Passport Policy; the reliance interests of those who previously had accurate passports aligned with their gender identities; and the effects on the operations of the federal government and their own employees.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs respectfully request that the Court grant the following relief:

A.     Issue a declaratory judgment that (i) the Passport Policy and Gender Order as applied to passports violate Plaintiffs' constitutional rights; and (ii) the Passport Policy is arbitrary, capricious, an abuse of discretion, and otherwise contrary to law in violation of the APA;

B.     Issue preliminary and permanent injunctive relief enjoining Agency Defendants and their agents, employees, representatives, successors, and any other person acting directly or indirectly in concert with them, from enforcing the Gender Order as applied to passports or the Passport Policy;

C.     Award reasonable attorney's fees, costs, and expenses in accordance with law; and

D.     Grant all such other and further relief as the Court may deem just and proper.

Dated this 25th day of April, 2025.

Respectfully submitted,

/s/ Jonathan I. Gleklen

Jonathan I. Gleklen, Bar No. 21350
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, NW
Washington, DC 20001
Tel: (202) 942-5454
Fax: (202) 942-5999
jonathan.gleklen@arnoldporter.com

Lori B. Leskin*
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
Tel: (212) 836-8541
Fax: (212) 836-8689
lori.leskin@arnoldporter.com

Allissa Pollard*
ARNOLD & PORTER KAYE SCHOLER LLP
700 Louisiana Street, Ste. 4000
Houston, TX 77002
Tel.: (713) 576-2451
Fax: (713) 576-2499
allissa.pollard@arnoldporter.com

Carl S. Charles*
LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
1 West Court Square, Suite 105
Decatur, GA 30030
Tel: (404) 897-1880
Fax: (855) 535-2236
ccharles@lambdalegal.org

Karen L. Loewy*
LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
815 16th Street NW, Suite 4140
Washington, DC 20006
Tel: (202) 804-6245
Fax: (855) 535-2236
kloewy@lambdalegal.org

Peter Renn*
LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
800 South Figueroa Street, Suite 1260
Los Angeles, CA 90017
Tel: (213) 382-7600
Fax: (855) 535-2236
prenn@lambdalegal.org

Omar Gonzalez-Pagan*
LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
Tel: (212) 809-8585
Fax: (855) 535-2236
ogonzalez-pagan@lambdalegal.org

* Motion for admission *pro hac vice*
forthcoming.