# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ZANDER SCHLACTER; *et al.*,

*Plaintiffs*,

v.

U.S. DEPARTMENT OF STATE; *et al.*,

*Defendants*.

Civil Action No. 1:25-CV-01344

## MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................. 4

    A.    Sex, Gender Identity, and Transgender People........................................... 4

    B.    The Significance of Accurate Passports for Transgender People. ........................ 5

        1.    The Purpose of Passports ............................................................ 5

        2.    Having Accurate Sex Markers, Consistent with Their Lived Sex and Gender Identity, on Passports Is Critical to Transgender People's Health and Wellbeing, Privacy, and Safety. ....................................... 6

    C.    The Use of Sex Markers in U.S. Passports Prior to the Policy. ........................... 10

    D.    The Gender Order and the Administration's Erasure of Transgender People. ...... 12

    E.    The State Department Implements the Gender Order. .......................................... 14

    F.    The Passport Policy Has Caused Irreparable Harm to Plaintiffs. ......................... 16

LEGAL STANDARD ...................................................................................................... 17

ARGUMENT ................................................................................................................... 18

    I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS. .................. 18

        A.    The Passport Policy Violates Plaintiffs' Right to Equal Protection. ......... 18

            1.    The Passport Policy's Discrimination Triggers Heightened Scrutiny. ......................................................... 18

            2.    The Passport Policy Fails Any Level of Constitutional Scrutiny. 20

        B.    The Passport Policy Unconstitutionally Burdens Plaintiffs' Right to Travel. ................................................................. 26

        C.    The Passport Policy Violates Plaintiffs' Constitutional Right to Privacy. 28

        D.    The Passport Policy Violates the APA. ...................................................... 31

            1.    The Passport Policy Is a Final Agency Action. ............................ 31

            2.    The Passport Policy Is Reviewable. ............................................. 32

i

3.    The Agency Defendants' Actions Violate the APA Because They Are Unconstitutional. .................................................................... 34

4.    The Passport Policy Is Arbitrary and Capricious. .......................... 34

II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM. ................................... 37

III.    THE BALANCE OF HARMS AND PUBLIC INTEREST FAVOR PLAINTIFFS. .................................................................................................. 39

**CONCLUSION** ........................................................................................................ 400

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Evac EMS, Inc. v. McVey*,
37 F.4th 89 (4th Cir. 2022) ...................................................38

*Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*,
No: 1:25-cv-00702-JRR, 2025 WL 833917 (D. Md. Mar. 17, 2025)....................................40

*Am. Fed'n of State, Cnty. & Mun. Emps. v. Soc. Sec. Admin.*,
2025 WL 1206246 (D. Md. Apr. 17, 2025) ...........................................33

*Am. Fed'n of Tchrs. v. Bessent*,
No. DLB-25-0430, 2025 WL 895326 (D. Md. Mar. 24, 2025) ............................39

*Anderson v. Blake*,
469 F.3d 910 (10th Cir. 2006) ...................................................29

*Aptheker v. Sec'y of State*,
378 U.S. 500 (1964)...................................................28, 29

*Arroyo Gonzalez v. Rossello Nevares*,
305 F. Supp. 3d 327 (D.P.R. 2018)...................................................30, 31, 39, 40

*Att'y Gen. of New York v. Soto-Lopez*,
476 U.S. 898 (1986)...................................................26, 27

*Aziz v. Trump*,
234 F. Supp. 3d 724 (E.D. Va. 2017) ...................................................40

*Bostic v. Schaefer*,
760 F.3d 352 (4th Cir. 2014) ...................................................21, 25

*Carcaño v. McCrory*,
203 F. Supp. 3d 615 (M.D.N.C. 2016) ...................................................39

*CASA, Inc. v. Trump*,
No. DLB-25-201, 2025 WL 408636 (D. Md. Feb. 5, 2025)...................................................38

*Dep't of Com. v. New York*,
588 U.S. 752 (2019)...................................................34

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)...................................................35, 36

*Dickson v. Sec'y of Defense*,
    68 F.3d 1396 (D.C. Cir. 1995) .............................................................35

*Doe v. Jaddou*,
    No. TDC-24-0650, 2024 WL 2057144 (D. Md. May 8, 2024) ................................39

*Dunn v. Blumstein*,
    405 U.S. 330 (1972).........................................................................28

*El Ali v. Barr*,
    473 F. Supp. 3d 479 (D. Md. 2020) ...................................................27, 28

*Elhady v. Kable*,
    993 F.3d 208 (4th Cir. 2021) .........................................................27, 28

*F.C.C. v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009).....................................................................35, 36

*F.C.C. v. Prometheus Radio Project*,
    592 U.S. 414 (2021).........................................................................35

*Fed. Trade Comm'n. v. Standard Oil Co. of Cal.*,
    449 U.S. 232 (1980).........................................................................32

*Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*,
    313 F.3d 852 (4th Cir. 2002) ...............................................................32

*Fowler v. Stitt*,
    104 F.4th 770 (10th Cir. 2024) .................................................19, 25, 26

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) (plurality opinion) ...................................................32

*Friends of Back Bay v. U.S. Army Corps of Eng'rs*,
    681 F.3d 581 (4th Cir. 2012) ...............................................................37

*Frontiero v. Richardson*,
    411 U.S. 677 (1973).........................................................................25

*Grimm v. Gloucester Cnty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) ..................................................... *passim*

*H.R. v. Cunico*,
    745 F. Supp. 3d 842 (D. Ariz. 2024) .......................................................26

*Haig v. Agee*,
    453 U.S. 280 (1981).........................................................................10

*HIAS, Inc. v. Trump*,
    985 F.3d 309 (4th Cir. 2021) .................................................................................18

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
    174 F.3d 411 (4th Cir. 1999) ...............................................................................41

*K.L. v. State Dep't of Admin., Div. of Motor Vehicles*,
    No. 3AN-11-05431-CI, 2012 WL 2685183 (Alaska Super. Ct. Mar. 12, 2012) ....................30

*Kadel v. Folwell*,
    100 F.4th 122 (4th Cir. 2024) .............................................................19, 20, 21, 23

*Kashem v. Barr*,
    941 F.3d 358 (9th Cir. 2019) ...............................................................................27

*Kent v. Dulles*,
    357 U.S. 116 (1958).......................................................................................27, 34

*Kerry v. Din*,
    576 U.S. 86 (2015).............................................................................................27

*Lawson v. Kelly*,
    58 F. Supp. 3d 923 (W.D. Mo. 2014) ...................................................................24

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
    2 F.4th 330 (4th Cir. 2021) .............................................................................38, 40

*Legend Night Club v. Miller*,
    637 F.3d 291 (4th Cir. 2011) ...............................................................................41

*Love v. Johnson*,
    146 F. Supp. 3d 848 (E.D. Mich. 2015).............................................................26, 30

*M.A.B. v. Bd. of Educ. of Talbot Cnty.*
    , 286 F. Supp. 3d 704 (D. Md. 2018).................................................................19, 20

*Maryland v. United States Dep't of Agric.*,
    No. JKB-25-0748, 2025 WL 800216 (D. Md. Mar. 13, 2025)................................40

*Massachusetts v. U.S. Dep't of Health and Human Servs.*,
    682 F.3d 1 (1st Cir. 2012)...................................................................................21

*Milligan v. Pompeo*,
    502 F. Supp. 3d 302 (D.D.C. 2020).....................................................................33

*Mohamed v. Holder*,
    No. 1:11–cv–50, 2015 WL 4394958 (E.D. Va. July 16, 2015) ...............................27

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .................................................................................................35

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*,
    915 F.3d 197 (4th Cir. 2019) ...............................................................................38

*Nat'l Cable & Telecomm. Ass'n v. F.C.C.*,
    555 F.3d 996 (D.C. Cir. 2009) .............................................................................31

*New York v. Trump*,
    133 F.4th 51 (1st Cir. 2025) .................................................................................33

*Nken v. Holder*,
    556 U.S. 418 (2009) .............................................................................................18

*Orr v. Trump*,
    No. 1:25-cv-10313-JEK, 2025 WL 1145271 (D. Mass. Apr. 18, 2025) ..................... *passim*

*Payne v. Taslimi*,
    998 F.3d 648 (4th Cir. 2021) ...............................................................................29

*PFLAG, Inc. v. Trump*,
    No. 25-337-BAH, 2025 WL 685124 (D. Md. Mar. 4, 2025)..........................................*passim*

*Planned Parenthood S. Atl. v. Baker*,
    941 F.3d 687 (4th Cir. 2019) ...............................................................................39

*Powell v. Schriver*,
    175 F.3d 107 (2d Cir. 1999)..................................................................................29

*Pub. Citizen v. U.S. Trade Representative*,
    5 F.3d 549 (D.C. Cir. 1993) .................................................................................33

*Romer v. Evans*,
    517 U.S. 620 (1996)..........................................................................22, 23, 24, 25

*Ross v. Meese*,
    818 F.2d 1132 (4th Cir. 1987) .............................................................................38

*Saenz v. Roe*,
    526 U.S. 489 (1999)..............................................................................................26

*Sessions v. Morales-Santana*,
    582 U.S. 47 (2017)................................................................................................20

*St. Michael's Media, Inc. v. Mayor & City Council of Balt.*,
    566 F. Supp. 3d 327 (D. Md. 2021) .....................................................................41

*Stanley v. Illinois*,
    405 U.S. 645 (1972).................................................................................25

*State v. Su*,
    121 F.4th 1 (9th Cir. 2024) ....................................................................33

*Talbott v. United States*,
    No. 25-cv-00240, 2025 WL 842332 (D.D.C. Mar. 18, 2025) ................23

*U.S. Army Corps of Engineers v. Hawkes Co.*,
    578 U.S. 590 (2016).................................................................................32

*United States v. Guest*,
    383 U.S. 745 (1966).................................................................................27

*United States v. Kravet*,
    706 F.3d 47 (1st Cir. 2013).....................................................................29

*United States v. Virginia*,
    518 U.S. 515 (1996).................................................................................19

*United States v. Windsor*,
    570 U.S. 744 (2013).........................................................................23, 24

*Walls v. City of Petersburg*,
    895 F.2d 188 (4th Cir. 1990) ..................................................................29

*Washington v. Reno*,
    35 F.3d 1093 (6th Cir. 2016) ..................................................................40

*Washington v. Trump*,
    No. 25-807, 2025 WL 553485 (9th Cir. Feb. 19, 2025) ........................41

*West Virginia v. Thompson*,
    475 F.3d 204 (4th Cir. 2007) ..................................................................35

*Whalen v. Roe*,
    429 U.S. 589 (1977).................................................................................29

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001).................................................................................31

*Williams v. Kincaid*,
    45 F.4th 759 (4th Cir. 2022) ...................................................................23

*Windsor v. United States*,
    699 F.3d 169 (2d Cir. 2012)...............................................................21, 25

*Zemel v. Rusk*,
    381 U.S. 1 (1965) ................................................................28, 29, 34

*Zzyym v. Pompeo*,
    958 F.3d 1014 (10th Cir. 2020) ..................................................34

**Statutes**

5 U.S.C. § 704 ..............................................................................31

5 U.S.C. § 706(2)(A) .....................................................................31

5 U.S.C. § 706(2)(B) .....................................................................34

8 U.S.C. § 1185(b) ..........................................................................5

22 U.S.C. § 211a ...........................................................................33

Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq* ......................... *passim*

Health Insurance Portability and Accountability Act (HIPAA), 42 U.S.C.
    §§ 1320d-6(a)(3), (b) ................................................................30

Passport Act, 22 U.S.C. § 211a ................................................33, 34

**Other Authorities**

U.S. CONST. amend. I .......................................................................2

U.S. CONST. amend. V ..............................................................18, 24, 27

**Ex. 1**, Exec. Order No. 14168, *Defending Women from Gender Ideology
Extremism and Restoring Biological Truth to the Federal Government*, 90
Fed. Reg. 8615 (Jan. 20, 2025) ..............................................1, 13

**Ex. 20-1**, Exec. Order No. 14183, *Prioritizing Military Excellence and Readiness*,
90 Fed. Reg. 8757 (Jan. 27, 2025) ...............................................14

**Ex. 20**, Exec. Order No. 14187, *Protecting Children from Chemical and Surgical
Mutilation*, 90 Fed. Reg. 8771 (Jan. 28, 2025) ...............................14

**Ex. 20-2**, Exec. Order No. 14190, *Ending Radical Indoctrination in K-12
Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025) ...............................14

**Ex. 20-3**, Exec. Order No. 14201, *Keeping Men Out of Women's Sports*, 90 Fed.
Reg. 9279 (Feb. 5, 2025) ...........................................................14

1 W. Blackstone, *Commentaries on the Laws of England* 130 (1769) ..........................27

## INTRODUCTION

On his first day in office, President Trump issued Executive Order 14168 (hereafter the "Gender Order")[1] and set a government-wide policy repudiating the very existence of transgender people by proclaiming that possessing a gender identity incongruent with a person's sex assigned at birth is a "false claim." **Ex. 1**, Gender Order at 8615 (§ 2(f)). Through the instant motion, Plaintiffs, all of whom are transgender United States citizens, seek to prevent the irreparable harm inflicted upon them through the State Department's implementation of this animus-laden order, which prevents them from obtaining accurate passports that reflect who they are.

The Gender Order directs that a simplistic and scientifically inaccurate definition of sex—purportedly determined solely by whether a person "belong[ed], at conception" "to the sex that produces" either "the large" or "the small reproductive cell," *id*. §§ 2(a), (d)–(e)—apply to all federal law and administrative policy. But sex is much more complicated. There are myriad sex characteristics, including gender identity. And these may not all always align, as is the case for transgender and intersex people.

For decades, the United States issued passports to transgender people with sex markers that are congruent with their gender identity, rather than their sex assigned at birth. That longstanding policy is consistent with that of most states as well as many other countries, each of which permit transgender people to amend their government-issued identification documents to match their lived sex, consistent with their gender identity. And for several years, the United States has allowed nonbinary individuals to select an "X" sex designation on their passports, as several states and other countries do. Indeed, more than half of the U.S. population lives in such states. **Ex. 2**,

---

[1] **Ex. 1**, Exec. Order No. 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025). Unless otherwise specified, all numeric Exhibits cited herein are Exhibits to the Declaration of Carl S. Charles filed herewith as Exhibit A.

Movement Advancement Project, *Identity Document Law and Policies* (as of May 13, 2025)**.**

Reversing the longstanding policy, Secretary of State Marco Rubio ordered the State Department to implement the Gender Order's directive "to require that government-issued identification documents, including passports,…accurately reflect the holder's sex," as defined by the Order. **Ex. 1** at 8616 (§ 3(d)). As a result, the State Department has mandated that all passport issuances and renewals comply with the Gender Order and updated its website to state that, "under the executive order," it "will only issue passports with an M or F sex marker that match the customer's biological sex at birth" and "will no longer issue U.S. passports . . . with an X marker." **Ex. 3**, U.S. Dep't of State, *Sex Marker in Passports* (last accessed May 13, 2025). Now, rather than issuing passports that correctly reflect the holder's lived sex, consistent with their gender identity, the State Department is issuing passports to transgender Americans with incorrect sex designations *of its choosing*. It is doing so even for people to whom it had previously issued passports with accurate sex markers, congruent with their gender identity. Together, these actions constitute the "Passport Policy" (or "Policy") challenged herein.[2]

The Passport Policy has caused and is causing grave and immediate harm to Plaintiffs, in violation of their constitutional rights to equal protection, travel, and privacy, and in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500 *et seq.*[3] Having an accurate passport consistent with their gender identity is critical for transgender people's freedom and their social, economic, and general wellbeing. For many transgender people like Plaintiffs, having an inaccurate sex marker on their passport forcibly "outs" them when they use their passports, which

---

[2] As used herein, except for the Administrative Procedure Act claim, the term "Passport Policy" is inclusive of Section 3(d) of the Gender Order.

[3] Plaintiffs' Complaint includes a First Amendment claim. *See* Compl., ECF No. 1 ¶¶ 203–209. While Plaintiffs do not seek a preliminary injunction on such basis at this time, they do not waive the claim nor the ability to seek relief based on it.

can lead to serious harms: from exposure to discrimination, harassment, and even violence to questioning the validity of their passports and potential denial of entry to or exit from a country.

As another court recognized, the Passport Policy fails heightened scrutiny. While the State Department provides non-transgender (i.e., cisgender) people accurate passports that reflect their sex in accordance with their gender identity, the State Department categorically bars transgender people from obtaining the same, violating Plaintiffs' right to equal protection. The Policy also violates Plaintiffs' rights to travel and to informational privacy. But the Policy fails even the slightest scrutiny. It advances no legitimate governmental interest; rather, the Gender Order and Policy implementing the order are plainly motivated by impermissible animus. The Policy also violates the APA, not only because it is contrary to Plaintiffs' statutory and constitutional rights, but also because it is an arbitrary and capricious reviewable final agency action.

Because Plaintiffs are likely to succeed on their claims that the Passport Policy is unconstitutional, facially and as applied to Plaintiffs, and violates the APA, and because the Passport Policy is causing immediate and irreparable harm to Plaintiffs, Plaintiffs are entitled to a preliminary injunction. Plaintiffs seek relief preventing Defendants from applying the Passport Policy as to them and restoring the *status quo ante litem*.

Plaintiffs will suffer irreparable injury absent a preliminary injunction. Under the Policy, six Plaintiffs have received inaccurate passports from the State Department, with sex makers that conform to the Passport Policy's inaccurate and exclusionary definitions, not Plaintiffs' identities. One Plaintiff, Robert Roe, has not yet applied for a passport in light of the futility of doing so under current policy. Each engages in international travel or has plans or needs to do so soon. The resulting harm is therefore immediate and ongoing.

## FACTUAL BACKGROUND

### A.    Sex, Gender Identity, and Transgender People.

"Sex" is complex and multifaceted. Ex. B, Adkins Decl. ¶ 20; Ex. C, Ettner Decl. ¶ 87.[4] Multiple characteristics comprise a person's sex, including chromosomes, gonads and internal reproductive organs, external genitalia, hormonal makeup, secondary sex characteristics, brain morphology, and gender identity. Ex. B ¶ 19; Ex. C ¶¶ 24, 87. None of these characteristics exists in a binary. Ex. B ¶ 19. "Gender identity" refers to a person's core, internal sense of belonging to a particular sex. Ex. B ¶ 50; Ex. C ¶¶ 25–26. Everyone has a gender identity. Ex. B ¶ 52; Ex. C ¶ 26. Indeed, it is a well-established, long-recognized concept in medicine. Ex. C ¶ 25. The medical consensus is that gender identity is innate, has a biological basis, and that attempts to change a person's gender identity are unethical and harmful to the person's health and well-being. Ex. B ¶¶ 51, 56; Ex. C ¶¶ 35, 38–39, 97. The phrase "sex assigned at birth" refers to the sex recorded on a person's birth certificate at the time of birth. Ex. B ¶¶ 33, 37; Ex. C ¶ 22. Typically, individuals are assigned a sex based solely on the appearance of external genitalia at the time of birth. Ex. B ¶ 33; Ex. C ¶ 22.

For most people, their sex characteristics are aligned. Ex. B ¶¶ 34, 53; Ex. C ¶ 22. However, for a minority of people, their sex characteristics may not be aligned. Ex. B ¶¶ 19, 43, 54; Ex. C ¶ 22. A cisgender person is someone whose gender identity aligns with the sex they were assigned at birth. Ex. B ¶ 53; Ex. C ¶ 30. A transgender person is someone whose gender identity diverges from the sex they were assigned at birth. Ex. B ¶ 54; Ex. C ¶ 28. A nonbinary person is someone whose gender identity does not fit within a binary gender classification as male or female. Ex. B

---

[4] Plaintiffs incorporate by reference the Declarations of Dr. Deanna Adkins, M.D., attached as Exhibit B, and Dr. Randi C. Ettner, Ph.D., attached as Exhibit C, as though fully set forth herein.

¶ 55; Ex. C ¶ 29. Because a nonbinary person's gender identity is incongruent with their sex assigned at birth, nonbinary people fall within the definition of transgender. Ex. B ¶ 55; Ex. C ¶ 29.

The term "intersex" refers to people born with differences in sex development ("DSDs"). Ex. B ¶ 7; Ex. C ¶ 91. These individuals are born with sex characteristics that do not fit typical binary notions of "male" or "female." Ex. B ¶¶ 39, 43; Ex. C ¶ 91. DSD conditions include variations in chromosomal makeup, external genitalia, internal reproductive organs, or hormonal makeup. Ex. B ¶¶ 44–47; Ex. C ¶¶ 91–92. Some people with DSD do not produce the "large reproductive cell" (i.e., the ovum) or the "small reproductive cell" (i.e., sperm) at the core of the definitions of female and male in the Gender Order, while others produce both. Ex. B ¶¶ 44, 63.

The ability to live in a manner consistent with one's gender identity is critical to any person's health and wellbeing. Ex. C ¶ 43. Accordingly, gender identity is the critical and only appropriate determinant of sex when sex assignment is necessary for social and legal purposes. Ex. B ¶ 85; Ex. C ¶¶ 27, 94.

### B.     The Significance of Accurate Passports for Transgender People.

#### 1.     The Purpose of Passports.

Passports are government-issued identification documents necessary for travel abroad and for reentry into the United States. *See* 8 U.S.C. § 1185(b). For travelers abroad, passports are often the only identification recognized by foreign authorities, businesses, and public services, including access to hotel accommodations. **Ex. 4**, U.S. Dep't of State, *Passports and Visas: Understanding the Key U.S. Travel Documents*; **Ex. 4-1**, Immigration (Hotel Records) Order 1972, SI 1972/1689 (requiring a U.S. citizen traveling in the United Kingdom to present their U.S. passport at hotel check-in); **Ex. 4-2**, Bundesmeldegesetz [Federal Act on Registration] §§ 3, 29 (2017) (establishing certain registration requirements for requiring U.S. citizens traveling and/or residing in Germany necessitating presentment of their U.S. passport. Passports are the primary identification U.S.

officials use at embassies, where a traveler may need to seek assistance in an emergency—such as when legal status is at issue in a foreign jurisdiction. Beyond facilitating travel, passports also serve as an ultimate and independent verifier of identity and citizenship, in many cases superseding other government-issued identification that lacks a photograph. For example, a passport is sufficient by itself as I-9 documentation while onboarding for a new job. **Ex. 5**, U.S. Citizenship and Immigration Services, *Form I-9 Acceptable Documents*.

In all cases, a passport's purpose is to provide proof of identity: that is, to prove that a given person is the U.S. citizen reflected on the passport. For transgender people, that purpose is not served by a sex marker tied to the passport holder's sex assigned at birth—which is based on external genitalia at birth—as opposed to their lived sex, consistent with their gender identity.

### 2. Having Accurate Sex Markers, Consistent with Their Lived Sex and Gender Identity, on Passports Is Critical to Transgender People's Health and Wellbeing, Privacy, and Safety.

The importance of having accurate sex markers on transgender people's passports cannot be overstated. Having accurate identification, whether for crossing borders or otherwise proving identity and citizenship, is necessary for transgender people's full engagement in society, and for their health and overall wellbeing, privacy, and safety.

*Health and Wellbeing:* Along with other identity documents, updated passports are a profoundly important step in conferring recognition of transgender people's identities. Ex. C ¶ 68. Having a sex marker on a passport that accurately reflects a transgender person's gender identity confers social and legal recognition of their lived sex, allowing the person to be recognized and perceived in alignment with their gender identity. Ex. C ¶¶ 68, 81; Ex. B ¶ 80. It is crucial to the transgender person's gender transition and, for some, to the treatment for their gender dysphoria. Ex. B ¶ 80; Ex. C ¶ 81.

Social transition—an aspect of gender transition that includes updates to the sex marker on

identity documents, including passports—is strongly associated with improved mental health, greater life and job satisfaction, and reduced symptoms of depression and anxiety. Ex. C ¶¶ 61, 78. Being socially and legally recognized in accord with their gender identity is vital to transgender people's health and wellbeing. Ex. B ¶ 78; Ex. C ¶¶ 43, 96. A passport that accurately reflects the individual's sex as determined by their gender identity is a crucial aspect of that recognition. Ex. B ¶ 80; Ex. C ¶ 68. Whereas congruent identity documentation permits a transgender person to navigate society as who they are and confers privacy, uncorrected identity documents serve as constant reminders that one's identity is perceived by society and government as "illegitimate." Ex. C ¶ 81. Likewise, being forced to present a passport that inaccurately reflects a transgender person's lived sex can cause profound psychological distress. Ex. C ¶ 67.

Moreover, for some transgender people, the misalignment between their gender identity and the sex they are assigned at birth can create significant distress, known as gender dysphoria. Ex. B ¶ 67; Ex. C ¶ 44. Gender dysphoria is a serious, highly treatable medical condition. Ex. B ¶ 69; Ex. C ¶¶ 49, 53. Its treatment includes changes in gender expression and role, including updating identity documents to accurately reflect the person's sex, consistent with their identity and lived experience. Ex. B ¶ 78; Ex. C ¶ 52. Thus, the American Medical Association "'supports every individual's right to determine their . . . sex designation on government documents' and urges that governments 'allow for a sex designation or change of designation on all government IDs to reflect an individual's gender identity, as reported by the individual.'" Ex. D, Scheim Decl. ¶ 20.[5]

Research focused on transgender people has demonstrated that "those who had changed

---

[5] Plaintiffs incorporate by reference the Declaration of Dr. Ayden Scheim, Ph.D., attached as Exhibit D, as though fully set forth herein.

the gender marker on their passport were 18% less likely to meet criteria for serious psychological distress, 16% less likely to have seriously considered suicide in the past year, and 34% less likely to have attempted suicide in the past year, as compared to those who had the correct gender on some of their documents but had not corrected their passport." Ex. D ¶ 38. Other recent studies emphasize that affirming a transgender person's identity through social transition, such as correcting legal names and gender markers, is integral to personal well-being, and social and occupational functioning. Ex. C ¶¶ 59–61.

Conversely, having inaccurate sex markers on passports has an equally negative impact on transgender people. For those who experience gender dysphoria, being denied the ability to correct the sex marker on their passports interferes with their medical treatment and increases their dysphoria and distress. Ex. C ¶¶ 68–70. Being forced to present identity documents that are misaligned with their gender identity and lived experience generates "profound psychological distress, increases vulnerability to discrimination and victimization, and undermines the therapeutic goals of gender-affirming treatment." Ex. C ¶ 67; *see also* Ex. D ¶¶ 29–44. It is well documented that untreated gender dysphoria can lead to an increased risk of anxiety, depression, and suicidality, as well as affect the ability of people to adequately function in various areas of life. Ex. C ¶ 49; Ex. B ¶ 70. The exacerbation of gender dysphoria symptoms from the inability to access accurate identity documents can cause transgender people to isolate for fear of exposure in situations that might evoke ridicule, discrimination, accusations of fraud, or harassment. Ex. C ¶ 70. This in turn degrades coping strategies and can cause the emergence of major psychiatric disorders. *Id*. Where these experiences are repeated, transgender people's resilience to withstand the ongoing trauma is eroded, leading to worsened mental health outcomes. Ex. C ¶¶ 72, 76.

***Privacy:*** Privacy, and the ability to control whether, when, how, and to whom to disclose

one's transgender status, is essential to all transgender people, as well as to accomplishing the aims of treatment for gender dysphoria. Ex. C ¶ 82. A person's transgender status and the information regarding a transgender or intersex person's medical condition (e.g., information relating to birth-assigned sex, ability to produce the large or small reproductive cell, and gender dysphoria), are highly personal and sensitive information. Ex. C ¶¶ 82, 84. For example, David Doe does not volunteer the fact that he is transgender to anyone who he does not know and deeply trust. Ex. J ¶ 9. With a passport that contains an F sex designation, he cannot travel without disclosing intensely private information. *Id.* ¶¶ 19, 22–23.

Given that the goal of gender transition is to live in a manner consistent with and be perceived as the sex with which a transgender person's identifies, having a sex marker in a passport incongruent with a person's lived sex and gender identity, as required by the Passport Policy, takes away this control and outs transgender people to anyone who looks at the passport, including individuals whom one might not trust or wish to know such information. Ex. D ¶¶ 16, 23–24; Ex. C ¶ 84. Presenting a passport with a sex marker required by the Policy would out Plaintiffs to a new employer or immigration and security officials, including at international border crossings. Travel, interactions with law enforcement or other government employees, and employment can all be affected by forced disclosure of transgender or intersex status. Ex. D ¶¶ 22–24.

***Safety:*** Transgender people often experience violence, harassment, discrimination, and stigma from both private individuals and government actors when their transgender status is made public. Ex. D ¶¶ 16–17, 22–23; Ex. C ¶ 84; *see also* **Ex. 6**, Nat'l Ctr. for Transgender Equality, *The Report of the 2015 Transgender Survey*; **Ex. 7**, Nat'l Ctr. for Transgender Equal., *Early Insights: A Report of the 2022 U.S. Transgender Survey*. They are thus at heightened risk of harassment, discrimination, and violence when they are forced to disclose their transgender status

against their will.

National surveys and research studies have documented how transgender people are at heightened risk of harassment, discrimination, and violence when they are forced to disclose their transgender status against their will. Ex. D ¶¶ 22–25; Ex. C ¶ 79; *see also* **Exs. 6–7**. For example, recent data from a national survey of over 92,000 transgender people found that nearly one in four of all respondents were verbally harassed, assaulted, asked to leave a location, or denied services when they showed someone an identity document with a name or sex designation that did not match their gender presentation. **Ex. 7** at 22. This is consistent with similar survey data from seven years prior showing that 25% to 32% of respondents reported the same. **Ex. 6** at 89–90. For transgender people of color, these forms of mistreatment are even more common. *Id.*

A passport with the incorrect sex designation therefore puts transgender people at risk of many different harms, including discrimination, harassment, bodily harm, and arrest/imprisonment while traveling abroad. Ex. D ¶ 22. This stark reality animates Plaintiffs' fears, like David Doe, who is "hyper aware of the high incidence of discrimination, harassment, and violence faced by transgender people in the United States and the world, particularly when the sex they live as is not reflected on their official identity documents." Ex. J ¶ 25.

**C.    The Use of Sex Markers in U.S. Passports Prior to the Policy.**

While passports have been issued "since the earliest days of the Republic," *Haig v. Agee*, 453 U.S. 280, 293 (1981), it was not until "1976 [that] the State Department first introduced sex as a required identity attribute on passports." *Orr v. Trump*, No. 1:25-cv-10313-JEK, 2025 WL 1145271, at *2 (D. Mass. Apr. 18, 2025) (quotation and citation omitted). Since at least 1971— before passports even listed a sex designation—the Department adopted a policy allowing name changes "indicating a change of sex" were allowed. **Ex. 8**, U.S. Passport Off., Passport Instruction 2510.9C, Attach. A, General Guideline No. 10, *Use of Names Indicating a Change of Sex* (May 4,

10

1971). And since at least 1992, the State Department has permitted transgender Americans to obtain passports with a sex marker that differed from their sex assigned at birth. *See, e.g.*, **Ex. 9**, U.S. Dep't of State, Passport Bulletin 92-22, *Procedures for Handling Requests for a Change in Gender in Passports* (Oct. 1, 1992). From 2010 until 2021, per applicable State Department policy, transgender people obtained passports with correct gender designations by submitting a physician's certification that they were undergoing gender transition. **Ex. 9-1**, U.S. Dep't of State, 7 FAM 1300 App. M, "Gender Change" (June 10, 2010); **Ex. 9-2**, U.S. Dep't of State Media Note, *New Policy on Gender Change in Passports Announced* (Jun. 9, 2010). Starting in 2021, revised State Department policy allowed transgender people to obtain passports with the correct gender designations based on their own affirmation, without a physician's certification. **Ex. 9-3**, U.S. Dep't of State, Press Release, *Proposing Changes to the Department's Policies on Gender on U.S. Passports and Consular Reports of Birth Abroad* (Jun. 30, 2021). Also in 2021, the Department began allowing citizens to select an "X" sex designation, described on the Department's form as denoting "unspecified or another gender identity." **Ex. 9-4**, U.S. Dep't of State, Press Release, *X Gender Marker Available on U.S. Passports Starting April 11* (Mar. 31, 2022).

And the International Civil Aviation Organization, which sets international standards for aviation, has for decades required passports to display the "[s]ex of the holder, to be specified by . . . the capital letter F for female, M for male, or X for unspecified." **Ex. 10**, Int'l Civil Aviation Org., *Doc 9303, Machine Readable Travel Documents* at Part 4, Specifications for Machine Readable Passports [MRPs] and other TD3 Size MRTDs (8th ed. 2021); **Ex. 11**, Int'l Civil Aviation Org., *Doc 9303, Machine Readable Travel Documents Part 4*, *Specifications for Machine Readable Passports [MRPs] and other TD3 Size MRTDs* (7th ed. 2015); **Ex. 11-1**, Int'l Civil Aviation Org., *Doc 9303, Machine Readable Travel Documents* at Part 3, Vols. 1–2 (6th ed. 2006).

**D.    The Gender Order and the Administration's Erasure of Transgender People.**

During his campaign, President Trump repeatedly referred to transgender people in disparaging and demeaning ways. He described the acknowledgement of transgender people as "gender insanity" and promised to "STOP transgender lunacy."[6] He consistently attacked transgender people, calling them "sick" and "deranged," **Ex. 14**, falsely claimed that transgender identity was "never heard of in all of human history," **Ex. 13,** and described transgender healthcare as "sexual mutilation," *id*. His campaign devoted extraordinary resources to attacking transgender people and policies that protect them.[7]

On day one of his presidency, President Trump made good on his threats, issuing the Gender Order. The Gender Order falsely states that a person's sex is an "immutable biological classification as either male or female" that "does not include the concept of 'gender identity,'" and orders that it is the "policy of the United States to recognize two sexes, male and female," which "are not changeable." **Ex. 1**, Gender Order at 8615 (§§ 2, 2(a)). "Female" is defined as "a person belonging, at conception, to the sex that produces the large reproductive cell." *Id.* § 2(d). "Male" is defined as "a person belonging, at conception, to the sex that produces the small reproductive cell." *Id.* § 2(e). The Gender Order asserts that "gender ideology" "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting

---

[6] **Ex. 12**, ABC Action News, *Former President Trump announces 2024 presidential bid*, YouTube (Nov. 15, 2022), at 48:40-49:13; **Ex. 12-1**, Donald J. Trump, Tweet (Dec. 22, 2024); **Ex. 12-2**, The Arizona Republic, *Turning Point USA Donald Trump full speech: The 'golden age of America' begins now, says Trump*, YouTube at 57:02-24 (Dec. 23, 2024); **Ex. 13**, Donald J. Trump, *President Trump's Plan to Protect Children from Left-Wing Gender Insanity, Trump Vance: Make America Great Again! 2025*, (Feb. 1, 2023), at 0:15-0:47 and Plan No. 2; **Ex. 14**, Gabriel Bertrand, *Trump's Shocking Admission Exposes GOP's Bigoted Agenda*, Medium (June 17, 2023)**.**

[7] *See, e.g.*, **Ex. 15**, Audrey Kemp, *What Trump's win – and $215m worth of anti-trans ads – mean for the future of advertising*, The Drum (Nov. 6, 2024); **Ex. 16**, Lauren Barrón-López, et al., W*hy anti-transgender political ads are dominating the airwaves this election*, PBS News (Nov. 2, 2024); **Ex. 17**, The Associated Press, *Trump and Vance make anti-transgender attacks central to their campaign's closing argument*, NBC News (Nov. 1, 2024, 10:23 AM); **Ex. 18**, Madison Pauly & Sarah Szilagy, *What the "Most Anti-LGBTQ" Election in Decades Means for Trans People*, Mother Jones (Nov. 5, 2024).

the false claim that males can identify as and thus become women and vice versa, and requiring

all institutions of society to regard this false claim as true." *Id.* § 2(f). It describes "gender identity"

as "a fully internal and subjective sense of self, disconnected from biological reality." *Id.* § 2(g).

Per the Gender Order, "the Executive Branch will enforce all sex-protective laws to

promote this reality" and the above definitions shall govern the application of Federal law and

administration policy. *Id.* § 2. Accordingly, the Gender Order directs the Secretary of State to

"implement changes to require that government-issued identification documents, including

passports, visas, and Global Entry cards, accurately reflect the holder's sex, as defined under

section 2 of th[e] order." *Id.* § 3(d).

Within days of the order, President Trump highlighted his administration's erasure of

transgender people, stating to the World Economic Forum that he had "made it official, an official

policy of the United States that there are only two genders, male and female," belittling the life

experiences of transgender people by stating that "transgender operations" were simply something

that "became the rage." **Ex. 19**, Donald J. Trump, Davos 2025: *Special address by Donald J.

Trump, President of the United States of America* (Jan. 23, 2025)**.**

The Gender Order is one of many executive actions undertaken by the current

administration seeking to eliminate or restrict existing protections for transgender people or to

discriminate against them in all aspects of public life, from education and employment to health

care and housing. For example, Executive Order 14183 bars transgender people from serving in

the military and declares that "expressing a false 'gender identity' divergent from an individual's

sex cannot satisfy the rigorous standards necessary for military service" and "is not consistent with

the humility and selflessness required of a service member." **Ex. 20-1**, Exec. Order No. 14183,

*Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 § 1 (Jan. 27, 2025). Executive

Order 14187 declares that "it is the policy of the United States that it will not fund, sponsor, promote, assist, or support the so-called 'transition' of a child from one sex to another," and directs the immediate defunding of medical institutions that provide gender-affirming medical care to transgender people under nineteen.[8] Other executive policies strip transgender people from protections in employment, housing, and education,[9] or erase the very existence of transgender people, from government websites to national monuments.[10]

### E. The State Department Implements the Gender Order.

Mere days after the Gender Order was issued, Secretary Rubio directed the State Department to implement it, instructing in an internal State Department cable that "[t]he policy of the United States is that an individual's sex is not changeable" and that "sex, and not gender, shall be used" on passports. *See* **Ex. 29**, Joseph Gedeon, *Rubio Instructs Staff To Freeze Passport Applications with 'X' Sex Markers*, The Guardian (Jan. 23, 2025)**.** The cable further instructed staff to "suspend any application where the applicant is seeking to change their sex marker" and "suspend any application requesting an 'X' sex marker." *Id.*; *see also* **Ex. 30**, Shannon K. Kingston, et al., *State Department Halts 'X' Passport Gender Marker Applications*, ABC News (Jan. 24, 2025). Shortly after, the State Department removed existing passport application forms,

---

[8] **Ex. 20**, Exec. Order No. 14187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771 §§ 1, 4 (Jan. 28, 2025); **Ex. 1**, Gender Order at 8617 (§ 4(c)).

[9] **Ex. 1**, Gender Order at 8616–17 (§§ 3(f), 4(b), 7(b)–(c)); **Ex. 20-2**, Exec. Order No. 14190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025); **Ex. 20-3**, Exec. Order No. 14201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (Feb. 5, 2025); **Ex. 21**, EEOC Press Release, *Removing Gender Ideology and Restoring the EEOC's Role of Protecting Women in the Workplace* (Jan. 28, 2025); **Ex. 22**, Claire Savage, *EEOC instructs staff to sideline all new transgender discrimination cases, employees say*, Associated Press (Apr. 18. 2025); **Ex. 23**, Heather Hollingsworth & Sally Ho, *In battle against transgender rights, Trump targets HUD's housing policies*, Associated Press (May 5, 2025).

[10] **Ex. 1**, Gender Order at 8616 (§ 3(e)); *see also* **Ex. 24**, Jarrett Renshaw & David Shepardson, *Trump orders agencies to scrub 'gender ideology' from contracts, websites*, Reuters (Jan. 29. 2025); **Ex. 25**, Danielle Kurtzleben, *Some federal web pages still down as agencies implement order "defending women,"* National Public Radio (Feb. 1, 2025); **Ex. 26,** Jo Yurcaba, *Government agencies scrub LGBTQ web pages and remove info about trans and intersex people*, NBC News (Feb. 3, 2025); **Ex. 27,** Minyvonne Burke, *References to transgender and queer removed from Stonewall National Monument's web page*, NBC News (Feb. 14, 2025); **Ex. 28,** Jonathan J. Cooper, *A List of Government Web Pages That Have Gone Dark to Comply With Trump Orders*, AP News (Jan. 31, 2025).

DS-11 (new passport application), DS-82 (renewal application), and DS-5504 (data corrections form), from its website and replaced them with older versions that do not offer an X sex marker. *Compare* **Ex. 31**, DS-11 (OMB Control No. 1405-0004, Exp. Date 12-31-2023), DS-82 (OMB Control No. 1405-0020, Exp. Date 3-31-2023), and DS-5504 (OMB Control No. 1405-0160, Exp. Date 11-30-2022) Forms *with* **Ex. 32**, DS-11 (OMB Control No. 1405-0004, Exp. Date 4-30-2025), DS-82 (OMB Control No. 1405-0020, Exp. Date 4-30-2025), and DS-5504 (OMB Control No. 1405-0160; Exp. Date 4-30-2025) Forms**;** *see also* **Ex. 33**, U.S. Dep't of State, *Travel.State.Gov – Passport Forms*; **Ex. 3**. On February 8, 2025, an internal State Department communication to all employees and consular offices further ordered that all passport issuances and renewals comply with the Gender Order. **Ex. 34**, Ken Klippenstein (@KenKlippenstein), Substack (Feb. 10, 2025). Four days later, the State Department's website was updated, stating that it "will only issue passports with an M or F sex marker that match the customer's biological sex at birth as defined in the executive order" and "will no longer issue U.S. passports…with an X marker." **Ex. 3**. The State Department's reference to "biological sex at birth" differs from the Gender Order's definition of sex referring to "sex at conception," but it is just as discriminatory and scientifically imprecise. *See* Ex. B ¶¶ 37–38, 86.

The State Department has also removed references to transgender people from some of its public webpages. For instance, the webpage previously entitled "LGBTQI+ Travelers" has been retitled "Lesbian, Gay, and Bisexual" travelers and has removed travel information related to transgender people. *Compare* **Ex. 36**, U.S. Dep't of State, *Travel.State.Gov – Before You Go – Lesbian, Gay, and Bisexual Travelers* (as of May 2, 2025), *with* **Ex. 37**, U.S. Dep't of State, *Travel.State.Gov – Before You Go – LGBTQI+ Travelers* (as of Mar. 22, 2022); *see also* **Ex. 38**, Michael K. Lavers, *Transgender people removed from State Department travel page*, Washington

Blade (Jan. 31, 2025). In March, President Trump touted that "the United States will no longer allow 'X' gender marker on Government forms, and the United States Passport Office will now only issue passports with a 'M' or 'F' sex marker matching an individual's biological sex at birth," and flaunted his administration's purported success at erasing transgender people's identities from the federal government. **Ex. 39**, *White House: Proclamation from President Donald J. Trump on Women's History Month* (Mar. 6, 2025).

     **F.**     **The Passport Policy Has Caused Irreparable Harm to Plaintiffs.**

     The Policy has caused imminent and irreparable harm to Plaintiffs. Zander Schlacter, Lia Hepler-Mackey, Jill Tran, Kris Koe, and Peter Poe sought passports that reflected their identities and instead received passports with incorrect sex markers. Ex. E, Schlacter Decl. ¶ 14; Ex. F, Hepler-Mackey Decl. ¶ 16; Ex. G, Tran Decl. ¶ 14; Ex. H, Koe Decl. ¶ 14; Ex. I, Poe Decl. ¶ 16. David Doe, who has consistently had an "M" sex marker on his passports since 2006, received a passport with an "F" sex marker after filing for a simple renewal. Ex. J, Doe Decl. ¶¶ 16, 18–19. Many Plaintiffs received a letter from the State Department stating that their sex had been "corrected" to "match [the State Department's] records." Ex. E ¶ 15; Ex. F ¶ 16; Ex. G ¶ 14; Ex. J ¶ 19; Ex. H ¶ 14. Peter Poe, Kris Koe, and Robert Roe have travel plans soon but now must worry about their safety while using an incorrect passport. Ex. I ¶ 15; Ex. H ¶ 11; Ex. K, Roe Decl. ¶14.

     Plaintiffs face concrete harm by being forced to present an incorrect passport. For example, they risk harassment, increased scrutiny, or even detention while traveling. *See supra* pp. 5–10. These discriminatory experiences can cause serious psychological harm: "Being stripped of one's dignity, privacy, and the ability to move freely in society can … cause major psychiatric disorders, including generalized anxiety disorder, major depressive disorder, posttraumatic stress disorder, emotional decompensation, and suicidality." Ex. C ¶ 70.

     Mx. Koe has already faced increased scrutiny because of an inaccurate sex marker on their

passport. Ex. H ¶ 16. In 2024, they were returning to the United States from Canada with a passport that reflected their sex assigned at birth. *Id.* When they presented their passport to a border officer, he reviewed it repeatedly until asking for a second form of identification. *Id.* Ultimately, the officer accepted Koe's driver's license with an X sex marker. *Id.* Mx. Koe fears this experience will become "the norm for me at any time that I have to cross an international border." *Id*. Mx. Koe is applying to graduate school abroad and their incorrect passport is a "significant obstacle" to achieving that goal; aside from the harms of invasive screening at the border, Mx. Koe may also experience difficulty securing a student visa. *Id.* ¶¶ 11, 15.

Other Plaintiffs similarly describe increased fear and anxiety about traveling with an inaccurate passport based on their personal experience and/or knowledge of issues transgender people commonly face while traveling. Mr. Doe is "worried and fearful" to the extent that he cancelled planned international travel, Mr. Schlacter's fear of harm has dissuaded him from pursuing and traveling to promote work abroad, Ms. Tran is "terrif[ied]" about reactions from TSA and border officials, and Mr. Roe believes that the Policy will "jeopardize [his] safety and career." Ex. J ¶¶ 21–23; Ex. E ¶ 20; Ex. G ¶ 17; Ex. K ¶ 18. Ms. Hepler-Mackey has already experienced "invasive and harassing" additional screening by Transportation Security Administration ("TSA") staff while traveling domestically. Ex. F ¶ 17. She finds it "impossible" to face the heightened risk posed by her inaccurate passport given her past experiences and has resolved not to travel until her passport has the correct sex marker. *Id*.

## LEGAL STANDARD

Plaintiffs seek a preliminary injunction. Courts weigh four factors in considering a motion for a preliminary injunction: "(1) the party is likely to succeed on the merits of the claim; (2) the party is likely to suffer irreparable harm in the absence of an injunction; (3) the balance of

17

hardships weighs in the party's favor; and (4) the injunction serves the public interest." *HIAS, Inc. v. Trump*, 985 F.3d 309, 318 (4th Cir. 2021). In considering whether to grant a preliminary injunction, "the first two factors…are the most critical," and when the government is the party opposing the injunction, the final two factors merge. *Nken v. Holder*, 556 U.S. 418, 434–35 (2009).

## ARGUMENT

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS.

### A.    The Passport Policy Violates Plaintiffs' Right to Equal Protection.

The Passport Policy violates Plaintiffs' right to equal protection guaranteed by the Fifth Amendment. It triggers heightened scrutiny in at least three separate ways: (1) it classifies based on sex, (2) it classifies based on transgender status, and (3) it was motivated by animus. The Policy cannot survive such demanding scrutiny, nor any level of review.

#### 1.    The Passport Policy's Discrimination Triggers Heightened Scrutiny.

***Discrimination Based on Sex.*** First, the Policy discriminates based on sex, regardless of how sex is defined. *United States v. Virginia*, 518 U.S. 515, 555 (1996) ("All gender-based classifications today warrant heightened scrutiny.") (cleaned up). Plaintiffs are denied what others are afforded—a passport consistent with their gender identity and expression—because of their sex assigned at birth. A transgender man like Mr. Schlacter, whose gender identity is male, cannot access a male-designated passport, whereas a cisgender man, whose gender identity is also male, can do so. The reason for the difference in treatment is the sex they were assigned at birth. *See Orr*, 2025 WL 1145271, at *10. Where a policy "cannot be applied 'without referencing sex'" because whether an individual suffers harm depends on their assigned sex, that constitutes "textbook sex discrimination." *Kadel v. Folwell*, 100 F.4th 122, 153 (4th Cir. 2024) (citation omitted). Indeed, the Fourth Circuit has squarely addressed a similar issue, holding that the government's refusal to amend high school records to match a student's gender identity

unconstitutionally discriminated based on sex. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 615, 619 (4th Cir. 2020) (noting the harm to plaintiff from having to present a transcript and other documentation inconsistent with his gender identity when applying to college); *see also Fowler v. Stitt*, 104 F.4th 770, 789 (10th Cir. 2024) (holding that refusal to provide plaintiffs with amended birth certificates consistent with gender identity discriminated based on sex). The same reasoning controls here.

The Policy also discriminates based on sex on its face because it enforces sex stereotypes and gender conformity. "Discrimination against a transgender individual because of [their] gender-nonconformity"—including nonconformity here to the definition of "male" and "female" as imposed by the Gender Order—"is sex discrimination under the Equal Protection Clause." *M.A.B. v. Bd. of Educ. of Talbot Cnty.*¸ 286 F. Supp. 3d 704, 719 (D. Md. 2018) (cleaned up). Heightened scrutiny applies when the government acts based on "overbroad generalizations about the way men and women are" or should be. *Sessions v. Morales-Santana*, 582 U.S. 47, 57 (2017). "[B]ecause gender stereotypes can be so ingrained, we must be particularly careful in order to keep them out of our Equal Protection jurisprudence." *Kadel*, 100 F.4th at 154. These stereotypes need not be based on appearance and behavior; policies that are "based on biology alone" may constitute impermissible sex stereotyping. *M.A.B.*, 286 F. Supp. 3d at 715–16. The Policy treats transgender people differently *because they are transgender* and do not conform to the sex-based stereotypes tied to their sex assigned at birth, including the expectation that all people defined as either "male" or "female" under the Gender Order will live, identify, and express themselves as that sex.

***Discrimination Based on Transgender Status.*** Second, the Policy triggers heightened scrutiny because it discriminates based on transgender status. It categorically denies transgender people passports consistent with their gender identity that can be used safely for all purposes, while

granting them for cisgender people. That discrimination based on transgender status is facially apparent—after all, who else does the Policy's ban on changing the sex designation on a passport injure? *See Kadel*, 100 F.4th at 151. Even if the Policy were facially neutral, its intent to discriminate is evident from its impact on transgender people, its departure from prior policy, and the administration's vocal and coordinated attacks on transgender people. The Fourth Circuit has held that discrimination against transgender people constitutes a quasi-suspect classification requiring heightened scrutiny. *See Grimm*, 972 F.3d at 610; *Kadel*, 100 F.4th at 143. This Court has similarly held that heightened scrutiny must be applied to policies that discriminate against transgender people. *See PFLAG, Inc. v. Trump*, No. 25-337-BAH, 2025 WL 685124, at *25 (D. Md. Mar. 4, 2025); *M.A.B.*, 286 F. Supp. 3d at 722.

*Discrimination Based on Animus.* Third, and independent of the foregoing, the Policy triggers more searching review at the very least because it was motivated by animus toward an unpopular group (and, indeed, is also unconstitutional on that basis alone, *infra* § III.A.2.a). *Cf. Windsor v. United States*, 699 F.3d 169, 180 (2d Cir. 2012). One "cannot fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist." *PFLAG*, 2025 WL 685124, at *23. In such circumstances, courts have "undertaken a more careful assessment of the justifications than the light scrutiny offered by conventional rational basis review." *Massachusetts v. U.S. Dep't of Health & Human Servs.*, 682 F.3d 1, 11 (1st Cir. 2012).

> **2.    The Passport Policy Fails Any Level of Constitutional Scrutiny.**
>
> **a)    The Passport Policy Cannot Be Justified By Its Actual Purposes.**

The Policy cannot be justified by the actual purposes that motivated its adoption. Discrimination based on sex or transgender status requires "the government [to] show that 'the

classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" *Kadel*, 100 F.4th at 156 (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)). Satisfying this burden demands an exceedingly persuasive justification. *Id.* Critically, the government's justification for such discrimination "must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Id.* (quoting *Virginia*, 518 U.S. at 533). In other words, under heightened scrutiny, the government is limited to justifying a policy by its "actual purposes." *Bostic v. Schaefer*, 760 F.3d 352, 377 (4th Cir. 2014) (cleaned up). The same is true for the strict scrutiny required by Plaintiffs' privacy and right to travel claims.

The actual purposes for the Policy are laid bare by the Gender Order—and they wholly fail to justify its adoption. The overarching purpose laid out in the Gender Order is the denigration of transgender women as purported threats to cisgender women. It claims that "permit[ting] men to self-identify as women" allows them to "gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers." **Ex. 1**, Gender Order at 8165 (§ 1) (claiming that "[e]fforts to eradicate the biological reality of sex fundamentally attack women by depriving them of their dignity, safety, and well-being"). But even if such demeaning statements could constitute valid interests, the Policy "has no relation" to them. *Orr*, 2025 WL 1145271, at *11. Transgender women may or may not be able to access sex-separated spaces and activities designated for women; but the sex designation listed on their passports lacks a substantial or even rational connection to such access. Furthermore, the government's objection to the mere presence of transgender people in spaces consistent with their gender identity is not a legitimate interest. *Grimm*, 972 F.3d at 620. And the Policy is massively over-inclusive even by its own terms: it equally applies to transgender men. Such gross lack of

means-ends fit is fatal, even under rational basis review. *Romer v. Evans*, 517 U.S. 620, 632 (1996).

The Policy cannot be justified by reliance on the notion that "[t]he erasure of sex in language and policy has a corrosive impact…on the validity of the entire American system," including "scientific inquiry, public safety, morale, and trust in government itself." **Ex. 1**, Gender Order at 8165 (§ 1). Vaguely gesturing to such broad interests is not enough. There is no basis for concluding that Defendants' years-long policy of allowing transgender people to obtain passports consistent with their gender identity ever thwarted "scientific inquiry" or "public safety." "With no foundation for the conclusion that such harmful outcomes would occur," the Fourth Circuit has "similarly reject[ed] this institutional-harm type argument" as a basis for denying transgender people basic recognition of their gender identity. *Grimm*, 972 F.3d at 618 n.17 (recognizing similarly unfounded arguments that allowing same-sex couples to marry would harm the institution of marriage) (quotation marks omitted). The Fourth Circuit has reiterated the need for "reasoned analysis rather than on the mechanical application of traditional, often inaccurate, assumptions" about transgender people. *Kadel*, 100 F.4th at 156 (cleaned up). The government cannot explain how the Policy addresses purported harms to the "validity of the entire American system," and "[a]ny such argument would strain logic." *Orr*, 2025 WL 1145271, at *3, *11.

Far from justifying it, the Policy's actual purpose—which is animus—dooms it. The Gender Order declares that transgender people do not exist and that their identities are "false." **Ex. 1**, Gender Order at 8165 (§ 2(f)). One "cannot fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist." *PFLAG*, 2025 WL 510050, at *19. The Gender Order does so notwithstanding that "transgender Americans…have always existed and have long been recognized in, among other fields, law and the medical profession." *Orr*, 2025 WL 1145271, at *13. Indeed, "on its face, the

Executive Order announces that, for each and every purpose under federal law—regardless of medical nuance, reliance interests, or policy objectives—transgender women are not women and transgender men are not men." *Id.* The Policy is thus "soaked in animus." *Talbott v. United States*, No. 25-cv-00240, 2025 WL 842332, at *31 (D.D.C. Mar. 18, 2025). Its "language is unabashedly demeaning, its policy stigmatizes transgender persons…and its conclusions bear no relation to fact." *Id.*

The Constitution does not tolerate government action where "the principal purpose and the necessary effect are to demean" a politically unpopular group. *Windsor*, 570 U.S. at 774 (invalidating federal government's stigmatizing refusal to recognize marriages of same-sex couples); *see also Romer*, 517 U.S. at 634; *cf. Williams v. Kincaid*, 45 F.4th 759, 773 (4th Cir. 2022) (holding that, apart from animus, there is no reason why Congress would intend to exclude transgender people with gender dysphoria from disability protections). That precisely describes the Policy, which strips transgender people of their basic dignity to live in accordance with their identity. *See Orr*, 2025 WL 1145271, at *13 (finding the Gender Order facially demeans transgender people and imposes a sweeping, undifferentiated disadvantage upon them for all federal purposes). "The Equal Protection Clause protects us" from government "distinctions between classes of people out of a bare desire to harm." *Grimm*, 972 F.3d at 606–07 (cleaned up). Thus, the Policy fails any level of scrutiny if for no other reason than it was motivated by animus.

### b)    The Passport Policy Cannot Be Justified By Any Other Interest.

While heightened scrutiny requires that the Policy be justified by its actual purposes, the Policy would still fail even if other justifications created for litigation were considered.

The Policy cannot be justified by a purported interest in maintaining a uniform definition of sex across the federal government. As a threshold matter, uniformity is not a freestanding

justification. The mere fact that a policy is uniform does not establish that it is rational. For instance, "a rule restricting marriage to those with one-syllable names promotes consistency, uniformity and predictability"—but it would plainly fail even rational basis review. *Lawson v. Kelly*, 58 F. Supp. 3d 923, 933 (W.D. Mo. 2014). A uniform federal policy that the government recognizes only two races would be equally irrational. Likewise, the Supreme Court struck down the so-called Defense of Marriage Act, notwithstanding the law's uniform definition of marriage excluding same-sex couples for all federal purposes across "various administrative bureaus and agencies." *United States v. Windsor*, 570 U.S. 744, 752 (2013) (quoting 1 U.S.C. § 7); *Windsor*, 570 U.S. at 774 (acknowledging Congress' authority to develop "national policy" but holding that such authority is constrained by the Fifth Amendment). *Romer v. Evans* similarly invalidated a statewide ban on nondiscrimination protections for sexual orientation that sought to preempt differing local policies. 517 U.S. at 623–24. In other words, any justification for the Policy must be sufficient in its own right; it cannot rest on mere purported consistency with other policies, which would otherwise justify any government action through mere tautology. *Cf. Bostic*, 760 F.3d at 380 (maintaining consistency for the sake of tradition does not insulate a policy from constitutional attack).

An interest in uniformity fares no better even if couched in terms of administrative efficiency, such as the purported sharing of passport sex designation data with other federal agencies. *See Orr*, 2025 WL 1145271, at *11. As a legal matter, "the Constitution recognizes higher values than speed and efficiency." *Frontiero v. Richardson*, 411 U.S. 677, 690 (1973) (citing *Stanley v. Illinois*, 405 U.S. 645, 656 (1972)). The constitutional promises of equality and liberty "were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials."

*Stanley*, 405 U.S. at 656. There is no indication that the Policy was enacted because of any data sharing problems caused by the prior policy of allowing applicants to obtain passports consistent with their gender identity. *Orr*, 2025 WL 1145271, at *11 (noting the absence of factual support to substantiate the government's data uniformity arguments). And even if the government could substantiate an interest in maintaining information about individuals' birth-assigned sex, e.g., in an electronic database, it fails to explain why such information would also need to be displayed on individuals' passports. *Cf. Fowler*, 104 F.4th at 795 (holding the government's refusal to issue amended birth certificates was irrational where the government could simultaneously retain access to original certificates). The Policy also creates administrative burdens that did not previously exist by requiring the State Department to adjudicate each individual's sex rather than rely on self-attestation as before. *Orr*, 2025 WL 1145271, at *5; *cf. Windsor*, 699 F.3d at 186 ("The uniformity rationale is further undermined by inefficiencies that it creates.").

Perhaps most revealing, Defendants cannot justify the Policy by arguing that it advances the very purpose for which identity documents exist in the first place: identity verification. When a transgender man attempts to prove that he is the person reflected on his passport, and the passport indicates that the holder is female, that discordance impedes the goal of verifying his identity. Ex. D ¶ 24. Courts have recognized that when transgender people "furnish their [identity document] to third-persons for purposes of identification, the third-person is likely to conclude that the furnisher is not the person described on the [identity document]." *Love v. Johnson*, 146 F. Supp. 3d 848, 856 (E.D. Mich. 2015) (quotation marks omitted); *H.R. v. Cunico*, 745 F. Supp. 3d 842, 852 (D. Ariz. 2024) (identity documents discordant with gender identity "would be misleading and likely unhelpful in accurately verifying identity"); *Fowler*, 104 F.4th at 776 ("[T]ransgender people may have difficulty proving their identity because of a visible discord

between their gender identity and their sex designation."); *Grimm*, 972 F.3d at 619 (recognizing harm from being forced to furnish high school records with inconsistent sex designation when applying to college). That the Policy undermines, rather than furthers, the *raison d'etre* for identity documents shows its irrationality.

### B.    The Passport Policy Unconstitutionally Burdens Plaintiffs' Right to Travel.

In depriving Plaintiffs of a usable passport that accurately reflects their identities and how they live their lives, the Policy substantially and unjustifiably burdens their constitutionally protected right to travel. The Supreme Court has long recognized that this multifaceted right derives from several constitutional sources, declining to locate the right to travel in any singular constitutional provision. *See Saenz v. Roe*, 526 U.S. 489, 500–04 (1999) (right to travel "embraces at least three different components" protected by multiple constitutional provisions); *Att'y Gen. of New York v. Soto-Lopez*, 476 U.S. 898, 901–02 (1986). Specifically, the Policy infringes Plaintiffs' freedom of movement, a form of the right to travel recognized as "an important aspect of the citizen's 'liberty,'" guaranteed by the Due Process Clause of the Fifth Amendment. *Kent v. Dulles*, 357 U.S. 116, 127 (1958); *see also Elhady v. Kable*, 993 F.3d 208, 220 (4th Cir. 2021).

This formulation of the right to travel is "deeply engrained in our history," dating back to Anglo-Saxon Law and the Magna Carta, in which the Due Process Clause has its origin. *Kent*, 357 U.S. at 125–26; *Kerry v. Din*, 576 U.S. 86, 91 (2015). Describing the rights protected by the Magna Carta, Blackstone noted that the "personal liberty of individuals" "consist[ed] in the power of locomotion, of changing situation, or removing one's person to whatsoever place one's own inclination may direct; without imprisonment or restraint." 1 W. Blackstone, *Commentaries on the Laws of England* 130 (1769). Plainly, "[t]his right's lineage is ancient." *Elhady*, 993 F.3d at 219.

While much of the case law relates to interstate travel, *see, e.g., Soto-Lopez*, 476 U.S. at 902 (referring to "the right of free interstate migration"); *United States v. Guest*, 383 U.S. 745,

757–58 (1966), the Supreme Court has also applied these principles to international travel:

> Freedom of movement across frontiers in either direction, and inside frontiers as well, was a part of our heritage. Travel abroad, like travel within the country, may be necessary for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values.

*Kent*, 357 U.S. at 126. Other courts, including this one, have done so as well. *See El Ali v. Barr*, 473 F. Supp. 3d 479, 507–08 (D. Md. 2020) (recognizing "a clear liberty interest in domestic travel,…as well as international travel"); *Kashem v. Barr*, 941 F.3d 358, 378 (9th Cir. 2019) (U.S. citizens "have a strong liberty interest in domestic and international travel"); *Mohamed v. Holder*, No. 1:11–cv–50, 2015 WL 4394958, at *6 (E.D. Va. July 16, 2015) ("[A] meaningful right of travel in today's world cannot be understood as cleanly divided between interstate and international travel…").

Restrictions on passports directly implicate this aspect of the right to travel. *See, e.g.*, *Zemel v. Rusk*, 381 U.S. 1, 14 (1965) (right to travel impacted by Secretary of State's refusal to validate a passport for travel to Cuba as it "acts as a deterrent to travel to that area"); *Aptheker v. Sec'y of State*, 378 U.S. 500, 507 (1964) (denial of passport "is a severe restriction upon, and in effect a prohibition against, world-wide foreign travel"). The Passport Policy at issue here similarly impinges on Plaintiffs' constitutionally protected right to travel.

Though minor burdens or restrictions may not violate the right to travel, substantial or unreasonable burdens do. *Elhady*, 993 F.3d at 221. The Policy's burdens on Plaintiffs' right to travel far exceed the kinds of minor airport delays travelers commonly experience, instead depriving them of the ability to provide the required documentation that would authenticate their identities for any form of international travel. The Policy mandates inaccurate documentation for transgender citizens that broadcasts their transgender status and subjects them to discrimination,

harassment, and harm. The Policy "'actually deters travel,…when it uses a classification that serves to penalize the exercise of the right,'" such that "an individual suffers a deprivation of constitutional dimension." *El Ali*, 473 F. Supp. 3d at 508 (quoting *Soto-Lopez*, 476 U.S. at 903).

Infringement of the Plaintiffs' right to travel warrants heightened scrutiny. *See Dunn v. Blumstein*, 405 U.S. 330, 339 (1972) ("[S]ince the right to travel [i]s a constitutionally protected right, 'any classification which serves to penalize the exercise of that right, unless shown to be necessary to promote a compelling governmental interest, is unconstitutional.'") (quoting *Shapiro v. Thompson*, 394 U.S. 618, 634 (1969), *overruled on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974)). As the Supreme Court noted in *Aptheker v. Secretary of State*, "precision must be the touchstone" for restrictions "so affecting basic freedoms" like the right to travel, which must be "narrowly drawn to prevent the supposed evil." 378 U.S. at 514 (cleaned up); *see also Zemel*, 381 U.S. at 14, 16 (noting that the "requirements of due process are a function not only of the extent of the governmental restriction imposed, but also of the extent of the necessity for the restriction"; and holding passport restriction could only be justified when "supported by the weightiest considerations of national security"). For the reasons set forth above, the Passport Policy cannot survive any level of scrutiny.

### C.    The Passport Policy Violates Plaintiffs' Constitutional Right to Privacy.

The Constitution guarantees a right to informational privacy. *See Whalen v. Roe,* 429 U.S. 589, 599–600 (1977); *Payne v. Taslimi*, 998 F.3d 648, 655 (4th Cir. 2021); *Walls v. City of Petersburg,* 895 F.2d 188, 192 (4th Cir. 1990) ("Personal, private information in which an individual has a reasonable expectation of confidentiality is protected by one's constitutional right to privacy."). The Fourth Circuit's controlling test asks "(1) whether a 'reasonable expectation of privacy' in the information exists to entitle it to privacy protection and, if so, (2) whether 'a compelling governmental interest in disclosure outweighs the individual's privacy interest.'"

*Payne*, 998 F.3d at 657. A reasonable expectation of privacy exists when "the person has an actual (subjective) expectation of privacy and the expectation is one that society is prepared to recognize as reasonable." *Id.* at 656 (cleaned up).

Courts have held that intimate, personal information like sexual or health information, including transgender status, plainly warrants this protection. *See*, *e.g.*, *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999) (concluding "that the Constitution does indeed protect the right to maintain the confidentiality of one's" transgender status, and that "[t]he excrutiatingly [sic] private and intimate nature of [one's transgender status] for persons who wish to preserve privacy in the matter, is really beyond debate"); *Anderson v. Blake*, 469 F.3d 910, 914–15 (10th Cir. 2006); *United States v. Kravet*, 706 F.3d 47, 63 (1st Cir. 2013). More specifically, courts have held that the forced disclosure of a person's transgender status through inaccurate identity documents violates the fundamental right to informational privacy. *See*, *e.g.*, *Ray v. McCloud*, 507 F. Supp. 3d 925, 939-40 (S.D. Ohio 2020) (transgender status is "highly personal" information "protected by the due process clause's informational right to privacy"); *Arroyo Gonzalez v. Rossello Nevares,* 305 F. Supp. 3d 327, 333 (D.P.R. 2018) ("[T]here are few areas which more closely intimate facts of a personal nature than one's transgender status.") (internal quotation omitted); *Love v. Johnson*, 146 F. Supp. 3d 848, 856 (E.D. Mich. 2015); *cf. K.L. v. State Dep't of Admin., Div. of Motor Vehicles*, No. 3AN-11-05431-CI, 2012 WL 2685183, at *6 (Alaska Super. Ct. Mar. 12, 2012).

Plaintiffs have a reasonable expectation of privacy in the information of their transgender status that entitles them to constitutional protection. Their transgender status is of a highly personal and private nature and involves direct association with a person's physical anatomy, external and internal genitalia configuration, and other private sexual and medical information. *See* Ex. C ¶ 84; *supra* pp. 8–9. By its very nature, some of this information is entitled to statutory protections from

disclosure. *E.g.*, Health Insurance Portability and Accountability Act (HIPAA), 42 U.S.C. §§ 1320d-6(a)(3), (b). Plaintiffs have expressed their actual expectation of privacy in their transgender status by explaining that they are known in accordance with their expressed gender identity in their day-to-day lives and do not share that information with everyone with whom they meet or interact. Ex. E ¶ 10; Ex. G ¶ 10; Ex. F ¶ 10; Ex. K ¶ 9; Ex. J ¶ 8; Ex. I ¶ 9. Because this information is entitled to privacy protection, the Policy's compelled disclosure of it through inaccurate sex makers on Plaintiffs' passports violates a fundamental right, triggering heightened scrutiny.

That some Plaintiffs might be open about their transgender status in some parts of their lives does not undermine their right to informational privacy. *See Ray*, 507 F. Supp. 3d at 934 ("Plaintiffs do not lose their informational right to privacy by choosing to share the private information at certain times with certain people."). "Privacy deals with determining for oneself when, how and to whom personal information will be disclosed to others." *Nat'l Cable & Telecomm. Ass'n v. F.C.C.*, 555 F.3d 996, 1001 (D.C. Cir. 2009). The Policy robs Plaintiffs of the right to determine whether and when to disclose their private, sensitive personal information to border officials and other strangers who may view their passport. *See* Ex. C ¶¶ 82, 84.

Discrimination and harm experienced by transgender people when forced to disclose their transgender status are myriad. *See Ray*, 507 F. Supp. 3d at 933; *Arroyo Gonzalez*, 305 F. Supp. 3d at 332–33; *see also supra* pp. 9–10. For example, Peter Poe had trouble voting in the 2024 general election because the poll worker reviewing his outdated driver's license did not believe that his name and gender marker, which were not yet updated, showed him. Ex. I ¶ 12. After Mr. Poe disclosed his transgender status to explain the perceived mismatch, the poll worker called him a "he/she" before returning his identification and finally allowing him to vote. *Id.*

The Policy's forced disclosure of highly intimate and personal information implicates

Plaintiffs' fundamental right to privacy and cannot survive heightened scrutiny.

### D.    The Passport Policy Violates the APA.

Under the APA, courts must set aside final agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

### 1.    The Passport Policy Is a Final Agency Action.

Courts may review "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. First, the Policy is "agency action" within the scope of the APA because the term "is meant to cover comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). Second, the Policy is "final." Courts take a "pragmatic approach to finality." *U.S. Army Corps of Eng's v. Hawkes Co*., 578 U.S. 590, 599 (2016) (cleaned up). In determining whether an action is a "final agency action" subject to APA review, "the critical issue is whether the [agency's action] gives rise to legal consequences, rights, or obligations." *Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852, 858 (4th Cir. 2002). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) (plurality opinion).

There is no question that Secretary Rubio and the State Department (the "Agency Defendants") have, in the words of *Franklin v. Massachusetts*, "completed [their] decisionmaking process" and that the "result of that process" has already "directly affect[ed] the parties." *Id.* The State Department's website is explicit that "[u]nder the executive order, [it] will no longer issue U.S. passports…with an X marker" and "will only issue passports with an M or F sex marker that match the customer's biological sex at birth." **Ex. 34**. The train has left the station; there is no risk that judicial intervention at this time would deny the State Department the "opportunity to correct its own mistakes and to apply its expertise." *Fed. Trade Comm'n. v. Standard Oil Co. of Cal.*, 449

U.S. 232, 242 (1980). And, as Plaintiffs' declarations show, the Policy has "directly affect[ed] the parties." *Franklin,* 505 U.S. at 797. Six Plaintiffs have already received passports that do not accurately indicate their sex and are inconsistent with their sworn applications. Ex. E ¶ 14; Ex. F ¶ 16; Ex. G ¶ 14; Ex. J ¶ 19; Ex. H ¶ 14; Ex. I ¶ 16. The Policy is a final agency action.

### 2. The Passport Policy Is Reviewable.

Defendants may argue that the Policy is not reviewable under the APA because Presidential actions are not reviewable and the Policy merely implements the Gender Order. The *Orr v. Trump* court properly rejected this argument, 2025 WL 1145271, at *15, and this Court should, too. "[E]ven if an agency's actions are based on a President's Executive Order, this does not 'insulate them from judicial review under the APA, even if the validity of the Order were thereby drawn into question.'" *Am. Fed'n of State, Cnty. & Mun. Emps. v. Soc. Sec. Admin.*, No. ELH-25-0596, 2025 WL 1206246, at *42 (D. Md. Apr. 17, 2025) (quoting *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996)). *Accord New York v. Trump*, 133 F.4th 51, 70 n.17 (1st Cir. 2025) (rejecting that OMB directive was unreviewable because "the District Court did not review the President's actions for consistency with the APA. Rather, it reviewed—and ultimately enjoined—the Agency Defendants' actions under the Executive Orders"); *State v. Su*, 121 F.4th 1, 15 (9th Cir. 2024) ("[F]inal agency actions, even if implementing an executive order, are subject to judicial review under the APA.").

Defendants may also argue that the Policy is unreviewable because the Passport Act provides that "[t]he Secretary of State may grant and issue passports…under such rules as the President shall designate and prescribe for and on behalf of the United States," 22 U.S.C. § 211a, and that the President's broad discretionary authority under the Passport Act is unreviewable. But as *Orr* recognized, 2025 WL 1145271, at *16, the bar on review of discretionary presidential action "is limited to those cases in which the President has final constitutional or statutory responsibility

for the final step necessary for the agency action directly to affect the parties," *Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993), and the APA challenge here is to the Policy, not the Gender Order. Because the State Department exercised judgment in interpreting and complying with the Gender Order, review under the APA is available. *See Orr*, 2025 WL 1145271, at *16 (citing government submitted declaration describing State Department's exercise of discretion to interpret and comply with the Executive Order); *Milligan v. Pompeo*, 502 F. Supp. 3d 302, 314 (D.D.C. 2020) (permitting APA review where the State Department needed "to exercise its judgment" implementing a presidential proclamation).

The Passport Policy is "not one of those areas traditionally committed to agency discretion." *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019). "[W]hile the power of the Secretary of State over the issuance of passports is expressed in broad terms," Congress did not "give him unbridled discretion to grant or withhold a passport from a citizen for any substantive reason he may choose." *Kent*, 357 U.S. at 127–28. Indeed, the Tenth Circuit has evaluated the State Department's compliance with the APA on the very issue of sex markers on passports, ordering the State Department to reconsider its denial of a nonbinary, intersex passport applicant's request to use an "X" designation for sex on their passport. *Zzyym v. Pompeo*, 958 F.3d 1014, 1024–25 (10th Cir. 2020). The Agency Defendants have no more unreviewable discretion under the Passport Act to require incorrect sex markers on passports than they do to order that all Jewish passport applicants use the name Israel or Sara.[11]

Finally, Defendants cannot avoid judicial review by claiming that passports implicate

---

[11] *Cf.* **Ex. 35**, Zweite Verordnung zur Durchführung des Gesetzes über die Änderung von Familiennamen und Vornamen [Second Decree Implementing the Law on the Alteration of Family and Personal Names], *Deutsches Reichsgesetzblatt I* (decree issued by Nazi Minister of the Interior and Minister of Justice requiring Jews to adopt the name Israel for men and Sara for women), *reprinted in English translation in* Office of the United States Chief Counsel for Prosecution of Axis Criminality, *Nazi Aggression and Criminality Vol. IV* 185-88 (1946).

foreign affairs. The Supreme Court has distinguished cases involving "passport refusals based on the character of the particular applicant" from those implicating "foreign policy considerations affecting all citizens." *Zemel*, 381 U.S. at 13; *Orr*, 2025 WL 1145271, at *17.

### 3. The Agency Defendants' Actions Violate the APA Because They Are Unconstitutional.

The APA provides that courts must "hold unlawful and set aside agency action…found to be…contrary to constitutional rights, power, privilege, or immunity[.]" 5 U.S.C. § 706(2)(B). As explained above, the Passport Policy violates Plaintiffs' constitutional rights to equal protection, travel, and privacy. *See supra* Sections I.A–C. As such, it also violates the APA.

### 4. The Passport Policy Is Arbitrary and Capricious.

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *F.C.C. v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Agency action is thus arbitrary and capricious where an agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *West Virginia v. Thompson*, 475 F.3d 204, 212 (4th Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The Passport Policy fails to meet this standard.

#### a) Defendants Lack a Reasoned Explanation for the Policy Change.

"The arbitrary and capricious standard of the APA mandates that an agency take whatever steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision." *Dickson v. Sec'y of Defense*, 68 F.3d 1396, 1404 (D.C. Cir. 1995) (cleaned up). An agency is required to "display awareness that it is changing position" and "show that there are good reasons" for its new policy. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515

(2009) ("An agency may not…depart from a prior policy *sub silentio*."). It must also "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020). Failing to acknowledge a change is evidence that the government has "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

As noted, the new Passport Policy reverses prior State Department policy allowing people to update their passport's sex marker to reflect their gender identity that has been in place *for over 30 years*, and that since 2021, has permitted an X designation. Agency Defendants have failed to "show that there are good reasons" for the new policy, *Fox Television Stations*, 556 U.S. at 515, or "assess whether there were reliance interests…and weigh any such interests against competing policy concerns," *Regents of the Univ. of Cal.*, 591 U.S. at 33. There is no administrative record whatsoever justifying the policy change, other than an assertion that the change complies with the Gender Order. *See* **Ex. 34**; *see also Orr*, 2025 WL 1145271, at *18 ("The Passport Policy—posted on the Department of State's website—does not make factual findings, does not explain why the facts supporting the Department's prior passport policy no longer carry weight, and does not address reliance interests affected by its reversal of the prior policy.").

The Gender Order lacks the "reasoned analysis" necessary to support the Policy. Beyond its failure to acknowledge the change in policy or address reliance interests, the Gender Order offers ambiguous and unsupported assertions about an objective to "defend women's rights," "defend[] women from gender ideology," and prevent transgender people from "gain[ing] access to intimate single-sex spaces and activities designed for women." **Ex. 1**, Gender Order at 8615 (§ 1). Even if these were legitimate goals, as opposed to animus-fueled ideological positions where "the cruelty is the point," **Ex. 40**, Adam Serwer, *The Cruelty is the Point*, THE ATLANTIC (Oct. 3,

2018), misidentifying Plaintiffs' sex on their passports does not advance any of the purported objectives of the Gender Order. It cannot conceivably advance a nebulous goal of "protecting women." Cisgender women are not made safer by a policy that prevents transgender and intersex people from obtaining accurate sex markers on their passports; instead, such a policy ensures that transgender and intersex individuals are unnecessarily exposed to increased risks of harassment, discrimination, and violence. *See supra* pp. 9–10.

### b) Undermining Identity Verification Is Arbitrary and Capricious.

"A material misapprehension of the baseline conditions existing in advance of an agency action can lay the groundwork for an arbitrary and capricious decision." *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 588 (4th Cir. 2012). The Policy is arbitrary and capricious because it fails to consider the problems that will be created when the sex designation on a person's passport conflicts with their gender identity and lived sex undermining the usefulness of a passport in establishing that a given individual is the same individual reflected on a given passport. In other words, the Policy undermines the very purpose of identity verification that passports exist to serve. *See supra* I.A.2.b.

At a minimum, the fact that the government recognizes passports from other countries that allow transgender people to obtain passports consistent with their gender identity, including by self-attestation, and that allow X sex designations, illustrates that the Policy is not necessary to serve the purpose of identity verification. Similarly, the Policy fails to consider that many Americans live in states that permit such designations, thereby undermining any assertion that the Policy is necessary for purposes of identity verification. And in contrast to a policy permitting such corrections to sex designations in identity documents, including foreign passports, or relying upon self-attestation, the Policy fails to consider the burden imposed on those State Department

employees reviewing passport applications in determining an individual's sex, who are required to assign a sex marker based on a review of "all available evidence establishing biological sex at birth by a preponderance of evidence," **Exs. 29 & 34**, as well as the public fisc.

### c)    The Passport Policy's Reliance on the Gender Order's Illogical Definition of Sex Is Arbitrary and Capricious.

The Gender Order defines female and male based on whether, "at conception," the person "belong[s]" to the sex that produces either "the large" or "the small reproductive cell." **Ex. 1**, Gender Order at 8615 (§§ 2(d)–(e)). But notably, "at conception," there is only a newly fertilized cell, called a "zygote," which may have sex chromosomes but does not have gonadal, hormonal, or anatomic sex characteristics such that their reproductive cell production system is clearly established or identifiable. Ex. B ¶¶ 21–26. This definition of course ignores the scientific and biological reality that some intersex individuals do not, and may never, produce either a large or small reproductive cell, or could produce both. *Id.* ¶¶ 44, 63. Unable to use the Gender Order's illogical definition, Agency Defendants seek to implement the Gender Order by using the framework of "biological sex at birth" in order to issue sex markers on passports. **Ex. 34.** Guidance implementing the Policy references applicants needing to submit evidence of their sex assigned at birth, which are designations made at the time of birth based on an infant's externally observable genitalia and which may not be reflective of a person's other sex characteristics nor relate to their reproductive capacity. Ex. B ¶¶ 33, 41–49, 53–54, 65–66.

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM.

Irreparable harm is likely absent an injunction. "[T]he denial of a constitutional right…constitutes irreparable harm for purposes of equitable jurisdiction." *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987); *see also Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022); *CASA, Inc. v. Trump*, No. DLB-25-201, 2025 WL 408636, at *15 (D. Md. Feb. 5, 2025).

Because Plaintiffs have shown "there is a likely constitutional violation, the irreparable harm factor is satisfied." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021).

In addition, Plaintiffs will suffer "actual and imminent" harm that will not "be fully rectified by the final judgment after trial" if the Policy is not enjoined. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (citations omitted). ***First***, the Policy endangers Plaintiffs' safety and places them at imminent risk of physical harm. Ms. Hepler-Mackey has been subject to "invasive and harassing" searches by TSA officials. Ex. F ¶ 17. Before updating her driver's license, Ms. Tran deeply feared the simple act of driving her car due to the mere possibility of having to show "a license that did not reflect [her] female presentation and identity." Ex. G ¶ 16. Plaintiffs need usable passports with updated sex markers to safely navigate spaces where they are required. Ex. E ¶ 16; Ex. J ¶ 22; Ex. H ¶ 16; Ex. K ¶ 12; Ex. I ¶ 17. The Policy thus causes irreparable harm. *See Carcaño v. McCrory*, 203 F. Supp. 3d 615, 650 (M.D.N.C. 2016) (irreparable harm found where plaintiffs showed "that they cannot use multiple occupancy facilities that match their birth certificates for fear of harassment and violence"); *cf. Doe v. Jaddou*, No. TDC-24-0650, 2024 WL 2057144, at *16 (D. Md. May 8, 2024) (irreparable harm shown where plaintiff was "subjected to verbal threats, threats with guns, and physical assaults" and would face "credible threats of death or serious bodily harm" absent preliminary injunction).

***Second***, the Policy endangers Plaintiffs' health and wellbeing, *see supra* pp. 6–8, which constitutes irreparable harm. *See PFLAG*, 2025 WL 685124, at *29 (plaintiffs would suffer irreparable harm because Order would exacerbate "severe distress,…uncertainty about how to obtain medical care, [and] impediments to maintaining a social life"); *see also Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 707 (4th Cir. 2019).

*Third*, the Policy violates Plaintiffs' privacy rights, forcibly "outing" them through their passports. *See* Ex. E ¶ 16; Ex. F ¶ 18; Ex. K ¶ 16; Ex. J ¶ 16; *supra* I.C; *Arroyo Gonzalez*, 305 F. Supp. 3d at 333. This "violation of the plaintiffs' privacy interests cannot be redressed by a final judgment of money damages or by permanent injunctive relief." *Am. Fed'n of Tchrs. v. Bessent*, No. DLB-25-0430, 2025 WL 895326, at *31 (D. Md. Mar. 24, 2025).

*Fourth*, Plaintiffs had or have imminent travel plans that the Policy has thwarted or thrown into limbo. Because of his incorrect passport, David Doe cancelled a planned international family trip and cannot travel to take care of his elderly in-laws should their health deteriorate. Ex. J ¶ 21. In July 2025, Peter Poe is traveling to his father's home country with his whole family, including his elderly grandmother, Ex. I ¶ 15, and now must do so with a passport that misidentifies him and exposes him to additional scrutiny and "a substantial risk of stigma, discrimination, intimidation, violence, and danger," *Arroyo Gonzalez*, 305 F. Supp. 3d at 333. Thus, the Policy has and will continue to cause unreasonable uncertainty, stress, and impediments that constitute irreparable harm absent injunctive relief. *Cf. Aziz v. Trump*, 234 F. Supp. 3d 724, 737 (E.D. Va. 2017) (policy implementing travel ban that "significantly strain[ed] freedom of movement" constituted irreparable injury); *see also PFLAG*, 2025 WL 685124, at *29.

## III.      THE BALANCE OF HARMS AND PUBLIC INTEREST FAVOR PLAINTIFFS.

The final two factors considered when assessing a motion for a preliminary injunction are the balance of the harms and whether the injunction serves the public interest. "When, as here, the Government is the party opposing a motion for preliminary injunction, the balance of equities and public interest factors merge." *Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, No: 1:25-cv-00702-JRR, 2025 WL 833917, at *23 (D. Md. Mar. 17, 2025). "[I]t is well-established that the public interest favors protecting constitutional rights." *Leaders of a Beautiful Struggle*, 2 F.4th at 346. Plaintiffs each face ongoing and serious harms. And likewise, "the public undoubtedly has an

interest in seeing its governmental institutions follow the law." *Maryland v. United States Dep't of Agric.*, No. JKB-25-0748, 2025 WL 800216, at *21 (D. Md. Mar. 13, 2025) (cleaned up); *see also Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 2016).

By contrast, there is no harm to Defendants should a preliminary injunction be issued. The injunction requested here would simply require that the government continue following the federal policy as it existed for years. Indeed, maintenance of the *status quo ante litem* as to Plaintiffs is "insufficient" to tip the balance of the equities towards Defendants. *Washington v. Trump*, No. 25-807, 2025 WL 553485, at *1 (9th Cir. Feb. 19, 2025) (Forrest, J., concurring). "It is routine for both executive and legislative policies to be challenged in court, particularly where a new policy is a significant shift from prior understanding and practice." *Id.* The Policy the government now seeks to enforce is unconstitutional and the government "is in no way harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions." *Legend Night Club v. Miller*, 637 F.3d 291, 302–03 (4th Cir. 2011). And the threat of violating constitutional rights "will easily outweigh whatever burden the injunction may impose." *St. Michael's Media, Inc. v. Mayor & City Council of Balt.*, 566 F. Supp. 3d 327, 351 (D. Md. 2021) (cleaned up). In sum, the equities strongly favor issuance of an injunction restoring the *status quo ante litem*.[12]

## CONCLUSION

Plaintiffs respectfully request that the Court enter the relief requested in this Motion.

---

[12] For these same reasons, Plaintiffs also request that this Court not impose a security bond. *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 & n.3 (4th Cir. 1999).

Dated: May 14, 2025

Respectfully submitted,

*/s/ Jonathan I. Gleklen*
Jonathan I. Gleklen, Bar No. 21350
Karen Vincent (of counsel)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave, NW
Washington, DC  20001
Tel: (202) 942-5454
Fax: (202) 942-5999
jonathan.gleklen@arnoldporter.com
karen.vincent@arnoldporter.com

Lori Leskin*
Mindy Gorin (of counsel)
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019
Tel: (212) 836-8541
Fax: (212) 836-8689
lori.leskin@arnoldporter.com
mindy.gorin@arnoldporter.com

Allissa Pollard*
Hannah Sibiski (of counsel)
Arnold & Porter Kaye Scholer LLP
700 Louisiana Street, Ste. 4000
Houston, TX 77002
Tel.: (713) 576-2451
Fax: (713) 576-2499
allissa.pollard@arnoldporter.com
hannah.sibiski@arnoldporter.com

Liz Lindquist (of counsel)
Arnold & Porter Kaye Scholer LLP
1144 Fifteenth Street | Suite 3100
Denver, CO 80202-2848
Tel: (303) 863-2387
Fax: (303) 863-2301
Liz.Lindquist@arnoldporter.com

Carl S. Charles*
Lambda Legal Defense
and Education Fund, Inc.
1 West Court Square, Suite 105
Decatur, GA 30030
Tel: (404) 897-1880
Fax: (855) 535-2236
ccharles@lambdalegal.org

Karen L. Loewy*
Lambda Legal Defense
and Education Fund, Inc.
815 16th Street NW, Suite 4140
Washington, DC 20006
Tel: (202) 804-6245
Fax: (855) 535-2236
kloewy@lambdalegal.org

Peter Renn*
Lambda Legal Defense
and Education Fund, Inc.
800 South Figueroa Street, Suite 1260
Los Angeles, CA 90017
Tel: (213) 382-7600
Fax: (855) 535-2236
prenn@lambdalegal.org

Omar Gonzalez-Pagan*
Lambda Legal Defense
and Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY 10005
Tel: (212) 809-8585
Fax: (855) 535-2236
ogonzalez-pagan@lambdalegal.org

* Counsel for Plaintiffs admitted *pro hac vice*

## **CERTIFICATE OF SERVICE**

Plaintiffs have served the documents they are moving to seal via electronic mail on all counsel of record. Plaintiffs also filed those sealed documents pursuant to Local Rule 105.11 and the District of Maryland Electronic Case Filing Procedures.

    */s/ Jonathan I. Gleklen*
Jonathan I. Gleklen