**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

ZANDER SCHLACTER, et al.

      Plaintiffs,

  v.

U.S. DEPARTMENT OF STATE, et al.

      Defendant.

Case No. 1:25-cv-01344

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

I.     The Policy. ............................................................................................................... 3

II.    Procedural History. ................................................................................................ 6

LEGAL STANDARD............................................................................................................ 6

ARGUMENT ........................................................................................................................ 6

I.     Plaintiffs Are Unlikely to Succeed on the Merits. ........................................... 6

     A.   Plaintiffs Are Unlikely to Succeed on their Constitutional Claims. .......................... 6

        1. Plaintiffs Are Unlikely to Succeed on Their Equal Protection Claim (Count I). ... 6

          i.  Rational Basis Review Applies............................................................................ 6

          ii. The Policy Does Not Discriminate on the Basis of Sex. .................................... 7

          iii.   The Policy Does Not Classify Based on "Transgender Status," Which the Supreme Court Has Never Recognized as a Quasi-Suspect Class. ........................ 9

          iv.   The Policy is Not Animus-Driven. .............................................................. 11

2. Plaintiffs Lack a Constitutional Right to International Travel............................. 12

  i.  Plaintiffs Lack Standing................................................................................... 12

  ii. There is No Fundamental Right to International Travel.................................. 14

  iii. The Policy Does Not Violate Any Right to Privacy........................................ 17

3. The Policy Passes Constitutional Muster................................................................ 18

  i.  The Policy Passes Rational Basis Scrutiny...................................................... 18

  ii. The Policy Passes Intermediate Scrutiny........................................................ 211

B.    Plaintiffs Cannot Demonstrate Irreparable Harm. .................................................... 21

C.    The Balance of the Equities and Public Interest Favor the Government.................. 23

II.    Plaintiffs Are Unlikely to Succeed on Their APA Claim (Counts Five and Six)............ 25

A. The Court Should Not Consider Plaintiffs' Extra-Record Evidence. .......................... 25

B.  The Policy is Not Reviewable. ....................................................................................... 26

C. The Policy is Not Arbitrary or Capricious................................................................... 29

III.    The Court Should Not Grant Universal Relief. ................................................................ 34

CONCLUSION.................................................................................................................................. 399

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

ZANDER SCHLACTER, et al.

      Plaintiffs,

v.

U.S. DEPARTMENT OF STATE, et al.

      Defendant.

Case No. 1:25-cv-01344

## DEFENDANTS' OPPOSITION TO PLAINTIFFS'
## MOTION FOR PRELIMINARY INJUNCTION

Defendants, by and through undersigned counsel, and pursuant Fed. R. Civ. P. 65 and Local Rule 105.2, oppose Plaintiffs' Motion for Preliminary Injunction (ECF Nos. 31-32),[1] and state:

### INTRODUCTION

At its core, a passport is "a letter of introduction in which the issuing sovereign vouches for the bearer and requests other sovereigns to aid the bearer." *Haig v. Agee*, 453 U.S. 280, 292 (1981). It has therefore long been the case that "the issuance of a passport [is] committed to the sole discretion of the Executive." *Id.* at 293. Under this broad discretion, administrations of both parties have for decades issued passports with only two options in the sex field: "M" (for male) or "F" (for female). And for many years, applicants seeking a passport with a sex marker that was inconsistent with their sex needed certain forms of evidence, such as proof of surgical interventions to one's sex characteristics or a physician's certification. Only a few years ago, consistent with an executive order issued by former President Biden, the Department of State ("Department") changed its policy to permit applicants to self-select their sex marker as "M," "F," or "X."

---

[1] Pin citations to docketed material refer to the CM/ECF numbers electronically stamped at the top of each page.

Shortly after inauguration, and with the concern that gender ideology has been replacing the immutable biological reality of sex and undermine "longstanding, cherished legal rights and values," President Trump issued Executive Order 14,168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, 90 Fed Reg. 8,615 (Jan. 20, 2025) (the "EO"), which sets forth the definitions of the terms "sex," "female," and "male" and requires that the definition shall apply across the federal government.  The EO instructs the Department to implement changes to passports consistent therewith.  To comply, further the goal of government-wide uniformity, and ensure that government documents reflect factual reality, the Department ceased issuing passports with "X" markers and began issuing passports with only "M" or "F" markers reflecting the holder's sex, relying on birth certificates or other documentation issued at or close to birth (the "Policy").

Plaintiffs, who are individuals who assert varying gender identities, are at varying stages of applying (or not) for a passport, and who seek to travel internationally, ask the Court to enjoin the Policy.  ECF Nos. 1, 31-32.  Plaintiffs' request should be denied, as they are unlikely to succeed on their Fifth Amendment claims (Counts One through Four)[2] or their Administrative Procedure Act ("APA") claims (Counts Five and Six).  As to the constitutional claims, the Policy does not violate the equal protection guarantees of the Constitution or substantive due process: it does not classify based on a constitutionally protected class or burden any fundamental right, and it satisfies constitutional scrutiny.  As to the APA claims, judicial review is unavailable because the President has sole discretion over issuing passports or the issue has been committed to the Agency's

---

[2] Plaintiffs allege violations of the Equal Protection Clause (Count One); Right to Travel (Count Two); Right to Privacy (Count Three); and, the First Amendment Right to Free Speech (Count Four).  Plaintiffs do not seek a preliminary injunction on their First Amendment claim.  ECF No. 32, p. 11 n.3.

discretion.  Even if the Policy were reviewable under the APA's highly deferential standard of review, the Policy is the product of reasoned decision-making.

Plaintiffs also cannot show that they will be irreparably harmed without an injunction, as they can all freely travel.  Finally, the balance of the equities and public interest favor the Government.  This issue concerns a core Executive function to communicate with foreign sovereigns and the Government needs uniformity and accuracy in the way it verifies identities to foreign nations.  Plaintiffs' motion should be denied.

## BACKGROUND

### I.     The Policy.

"The Secretary of State may grant and issue passports . . . under such rules as the President shall designate and prescribe for and on behalf of the United States."  22 U.S.C. § 211a (the "Passport Act").  Under this "broad rule-making authority," *Zemel v. Rusk*, 381 U.S. 1, 12 (1965), the Department has promulgated regulations that govern the issuance of passports.  22 C.F.R. §§ 51.1–51.74.  A passport is "a travel document regardless of format issued under the authority of the Secretary of State attesting to the identity and nationality of the bearer," *id.* § 51.1(d), and "at all times remains the property of the United States" and "must be returned to the U.S. Government upon demand."  *Id.* § 51.7(a).  "An application for a passport . . . must be completed using the forms the Department prescribes[,]" and "[t]he applicant has the burden of establishing his or her identity."  *Id.* §§ 51.20(a), 51.23(a).

For decades, U.S. passports and passport applications adopted factual reality, having "sex" as a required field, with "M" or "F" as the only options.  *See* Declaration from Matthew Pierce, Deputy Assistant Secretary for Passport Services of the U.S. Department of State, Bureau of Consular Affairs, Passport Services Directorate, attached hereto as Exhibit A, ¶¶ 4-5.  Beginning

in 1992, applicants could submit evidence of surgical interventions to sex characteristics to choose a "sex marker" inconsistent with their sex. *Id.*, ¶ 6. In 2010, the Department eliminated this requirement and instead accepted a physician's certification. Starting in 2022, passport application forms began to include "X" as sex-marker and a checkbox for the applicant to indicate a change in sex, even though a person cannot actually change their sex. *Id.*, ¶ 8. But even with this change, passports have consistently and continuously used the term "Sex." *Id.*, ¶ 5.

On January 20, 2025, the President issued Executive Order 14,168, declaring that the "policy of the United States" is "to recognize two sexes, male and female." 90 Fed. Reg. 8,615. "These sexes are not changeable and are grounded in fundamental and incontrovertible reality." *Id.* The EO provides that certain definitions "shall govern all Executive interpretation of and application of Federal law and administration policy[,]" including:

> (a) "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity."
>
> ***
>
> (d) "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.
>
> (e) "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell.
>
> ***
>
> (g) "Gender identity" reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

*Id.* at 8,615–16; Ex. A, ¶ 10.

The EO directs the Secretary of Health and Human Services (HHS) to "provide to the U.S. Government, external partners, and the public clear guidance expanding on the sex-based

definitions set forth in this order," *id.* at 8,616, which HHS did, on February 19, 2025.  Sex-Based Definitions, HHS (*Defining Sex*) (Feb. 19, 2025).   As defined by HHS, "***Sex*** is a person's immutable biological classification as either male or female"; "***Female*** is a person of the sex characterized by a reproductive system with the biological function of producing eggs (ova)"; and "***Male*** is a person of the sex characterized by a reproductive system with the biological function of producing sperm."  *Id.*; Ex. A, ¶ 13.  HHS recognized that "[h]aving the biological function to produce eggs or sperm does not require that eggs or sperm are ever produced" and that "[s]ome females or males may not or may no longer produce eggs or sperm due to factors such as age, congenital disorders or other developmental conditions, injury, or medical conditions that cause infertility."  *Id.*

These definitions apply Government-wide.  Each agency must "give the terms 'sex', 'male', 'female', 'men', 'women', 'boys' and 'girls' the meanings set forth in section 2 of th[e] [EO] when interpreting or applying statutes, regulations, or guidance and in all other official agency business, documents, and communications."  90 Fed. Reg. 8,616.  Further, "[w]hen administering or enforcing sex-based distinctions, every agency and all Federal employees acting in an official capacity on behalf of their agency shall use the term 'sex' and not 'gender' in all applicable Federal policies and documents."  *Id.*  And the Department must "implement changes to require that government-issued identification documents, including passports, . . . accurately reflect the holder's sex, as defined under section 2 of this order."  *Id.*  "Agency forms that require an individual's sex shall list male or female, and shall not request gender identity." *Id.*

To implement EO 14,168 and ensure the accuracy of government documents, the Department, starting on January 22, 2025, stopped issuing passports with an "X" and held all non-urgent applications seeking an "X" or sex marker other than the applicant's sex to ensure consistent

adjudication. Ex. A, ¶ 15. On February 7, 2025, the Department resumed processing affected applications with guidance on how to adjudicate sex. *Id.* ¶ 17.

## II.    Procedural History.

Plaintiffs filed the instant Complaint for Declaratory and Injunctive Relief on April 25, 2025 and a Motion for Preliminary Injunction on May 15, 2025.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right[,]" but only "upon a clear showing" that the movant is entitled to such relief. *Maryland v. United States Dep't of Agric.*, 2025 WL 973159, at *35 (D. Md. Apr. 1, 2025); *Winter v. Nat. Res. Def. Counsel, Inc.*, 555 U.S. 7, 22 (2008). The party seeking this drastic relief must establish four factors: likelihood of success on the merits; likelihood of irreparable harm in the absence of preliminary relief; that the balance of equities tips toward the movant; and, that an injunction is in the public interest. *Id.* at 555. The balance of equities and the public interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). A plaintiff must also show that this drastic relief is necessary "to preserve the court's ability to render a meaningful judgment on the merits." *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013).

## ARGUMENT

## I.    Plaintiffs Are Unlikely to Succeed on the Merits.

### A.    Plaintiffs Are Unlikely to Succeed on their Constitutional Claims.

#### 1.    Plaintiffs Are Unlikely to Succeed on Their Equal Protection Claim (Count I).

##### i.    Rational Basis Review Applies.

Contrary to Plaintiffs' assertion, the Policy does not classify based on sex or "transgender status" and was not motivated by animus.[3]  The Policy is subject only to rational basis review, which it satisfies.  ECF No. 32, pp. 27-29.

### ii.    The Policy Does Not Discriminate on the Basis of Sex.

The Policy is not a "sex-based" classification that triggers heightened scrutiny because it "does not impose any special restraints on, and does not provide any special benefits to, applicants due to their sex." *Gore v. Lee*, 107 F.4th 548, 555 (6th Cir. 2024).  It does not "impose one rule for males and another for females," "prefer one sex over the other[,]" nor "include one sex and exclude the other."  *Id.*; *see also L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 480 (6th Cir. 2023), *cert. granted*, 144 S. Ct. 2679 (2024).  "There thus is no reason to apply skeptical, rigorous, or any other form of heightened review[.]"  *Id.* at 481 (declining to apply heightened scrutiny to law that limited certain sex-reassignment interventions for minors); *Gore*, 107 F.4th at 555 (rational basis applies when a policy "treats the sexes equally").

Though the Policy relates to sex, "the Equal Protection Clause does not proscribe all laws and regulations that relate to or implicate sex in their subject matter." *Corbitt v. Sec'y of the Ala. Law Enf't Agency*, 115 F.4th 1335, 1346 (11th Cir. 2024) (policy that applied to *all* individuals wishing to have their sex changed on their driver license "does not impose a sex-based classification" because the policy covers all individuals wishing to have their sex designation changed from male to female or female to male); *see Skrmetti*, 83 F.4th at 482 (mere "mention" of "sex" does not trigger heightened scrutiny). "If any reference to sex in a statute dictated heightened review, virtually all abortion laws would require heightened review."  *Id.*

---

[3] Even if it were, rational basis would still apply because, as set forth below, the Policy has a "legitimate grounding, quite apart from any [] hostility."  *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 706 (2018).

Plaintiffs nonetheless maintain that the Policy classifies based on sex because it "enforces sex stereotypes and gender conformity," and treats a man who asserts a "gender identity" inconsistent with their sex differently than it treats a man who does not.  ECF No. 32, p. 28.  Not so.  The Policy merely requires passports to reflect the sex designations on Plaintiffs' original birth certificates/documents.  It does not "distribut[e] benefits and burdens between the sexes in different ways" or "reflect outmoded notions of the relative capabilities of men and women," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985), but treats men and women equally.  "[L]aws on their face [that] treat both sexes equally, as these laws do[,]" are subject to rational basis.  *Skrmetti*, 83 F.4th at 483.

Nor does the Policy reflect "overbroad generalizations about the way men and women are," such that heightened scrutiny is appropriate.  ECF No. 32, p. 28 (quoting *Sessions v. Morales-Santana*, 582 U.S. 47, 57 (2017)).  In *Sessions*, heightened scrutiny applied to the at-issue statutory scheme because it created one rule for unwed mothers and another for unwed fathers, thereby perpetuating the "obsolescing view" that unwed fathers were "less qualified and entitled than mothers[.]"  *Id.* at 62-63.  But here, the Policy passes no comment about the nature of men and women and does not "ascribe different benefits and burdens to the sexes[.]"  No person, "male or female[,]" may receive a passport that conflicts with a "historical fact:" their sex.  *Gore*, 107 F.4th at 556.

Thus, *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024),[4] on which Plaintiffs rely, is inapposite.  ECF No. 32, pp. 27-29.  In that case, which concerned medical cross-sex interventions,

---

[4] The Government respectfully submits that *Kadel* and *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 607 (4th Cir. 2020), upon which Plaintiffs also rely, ECF No. 32, pp. 28-29, were wrongly decided.  Petitions for certiorari in *Kadel* are currently pending before the Supreme Court.  The Supreme Court's disposition of those petitions may be affected by its forthcoming decision in *United States v. Skrmetti*, No. 23-477 (U.S.), concerning whether other state laws regarding similar interventions violate the Equal Protection Clause.  The Supreme Court's decision in *Skrmetti* is expected by the end of next month.  Given that Supreme Court guidance is imminent on these constitutional issues, this Court should not rule on Plaintiffs' preliminary-injunction motion until the Supreme Court issues *Skrmetti*.

the Fourth Circuit held that certain funding restrictions on certain interventions triggered heightened scrutiny because the questions were framed in a way that turned on sex–*e.g.*, allowing a woman to remove a breast for cancer treatment but not to remove a healthy breast to try to conform one's appearance with a different gender, 100 F.4th at 134, or allowing a woman to receive vaginoplasty and breast reconstruction but not men.  *Id.* at 153.  But here, the Policy requires that all passports accurately reflect the applicants' sex and treats everyone alike.  Thus, the Policy does not classify based on sex and heightened scrutiny is inapplicable.

> ### iii.    The Policy Does Not Classify Based on "Transgender Status," Which the Supreme Court Has Never Recognized as a Quasi-Suspect Class.

Plaintiffs also claim that the Policy discriminates based on trans-identifying status.  ECF No. 32, pp. 28-29.  Though the Fourth Circuit has found that individuals who assert a gender identity inconsistent with their sex "constitute a quasi-suspect class," *see Kadel*, 100 F.4th at 143 and *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 607 (4th Cir. 2020), *as amended* (Aug. 28, 2020), the Supreme Court has never so held.  *See Skrmetti*, 83 F.4th at 486 (The "Supreme Court" has not "recognized transgender status as a suspect class. Until that changes, rational basis review applies").

Nor has the Supreme Court recognized any new constitutionally protected classes in nearly half a century, *see*, *e.g.*, *Craig v. Boren*, 429 U.S. 190 (1976) (recognizing sex as a quasi-suspect class), and instead has repeatedly declined to do so.  *See*, *e.g.*, *Cleburne*, 473 U.S. at 442 (mental disability); *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313–14 (1976) (age); *San Antonio Indep.*, *Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28–29 (1973) (poverty); *see also Obergefell v. Hodges*, 576 U.S. 644 (2015) (declining to address whether gay people are a quasi-suspect class).

Contrary to the Fourth Circuit's analysis in *Grimm*, 972 F.3d at 610, Plaintiffs cannot show that they are a "discrete group[,]" defined by "immutable" characteristics; who are "politically powerless[;]" and have suffered a history of discriminatory treatment. *See*, *e.g.*, *Lyng v. Castillo*, 477 U.S. 635, 638 (1986). "It is difficult to see" how Plaintiffs "fit[] this description." *Skrmetti*, 83 F.4th at 487. "Unlike existing suspect classes[,]" Plaintiffs' "gender identity" inconsistent with their the sex is not "definitively ascertainable at the moment of birth." *Id*. Plaintiffs are not defined by "immutable" characteristics, because there are "detransitioners." *Id*. Nor is the purported class characterized by a specific defining feature; rather, it includes "a huge variety" of gender identities and expressions, is incapable of accurate description, and can sweep in anyone who is not cabined by their sex stereotype. *Gore*, 107 F.4th at 558. Plaintiffs' supposed group is simply not ascertainable and hence is not an immutable characteristic.

Plaintiffs are also not "political[ly] powerless[]." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28; *but see Grimm*, 972 F.3d at 613 ("transgender people constitute a minority lacking political power"). As *Skrmetti* explains, "a national anti-discrimination law, Title VII, protects transgender individuals in the employment setting," and many "States have passed laws specifically allowing some of the treatments sought here." 83 F.4th at 487. "These are not the hallmarks of a skewed or unfair political process -- and they offer no explanation for inviting a greater political dysfunction problem: the difficulty of amending the Constitution if the federal courts err in choosing to occupy the field." *Id*.

Further, the purported class is not without the "ability to attract the attention of lawmakers[.]" *Cleburne*, 473 U.S. at 445. The mere fact that Plaintiffs may not be able to "themselves mandate the desired legislative responses," and may "claim some degree of prejudice from at least part of the public at large," is insufficient. *Id.* (explaining that any "minority can be

said to be powerless to assert direct control over the legislature, but if that were a criterion for higher level scrutiny by the courts, much economic and social legislation would now be suspect"). Claims of historical injustice are likewise insufficient.  *See, e.g., Cleburne*, 473 U.S. at 442-46; *Eknes-Tucker v. Governor of Alabama*, 114 F.4th 1241, 1266 (11th Cir. 2024) (Lagoa, J., concurring) (recognizing that the Supreme Court rejected the argument that mental disability is a suspect classification "despite a history of compulsory sterilization, exclusion from public schools, and a system of state-mandated segregation and degradation").  "Since *Cleburne*," the Supreme Court has "never recognized a new suspect or quasi-suspect classification." *Id*.  Despite the rulings in *Kadel* and *Grimm*, "[n]either the Plaintiffs" nor the Supreme Court "have provided a basis" for this Court "to do so here."  *Id*.; *see Skrmetti*, 83 F.4th at 486 (applying rational basis review).

### iv.    The Policy is Not Animus-Driven.

Plaintiffs have also failed to show that animus drives this law.[5]  ECF No. 32, p. 29. Assessing "motives or purposes" for a law "is a hazardous matter" and, in any event, "not the point of the inquiry."  *Skrmetti*, 83 F.4th. at 487.  "Instead of asking judges to read the hearts and minds of [policy-makers], the inquiry asks whether the law is 'inexplicable by anything but animus.'" *Id.* (quoting *Trump v. Hawaii*, 585 U.S. 667, 706 (2018)).  The Court can only infer "a bare . . . desire to harm a politically unpopular group" when there is no legitimate government interest to justify the challenged law.  *Cleburne*, 473 U.S. at 450.

---

[5] Though *Orr v. Trump*, 2025 WL 1145271 (D. Mass. Apr. 18, 2025), recognized that "Americans are engaged in robust conversations about sex, gender, and identity that are characteristic of a free and open society[,]" it nonetheless concluded that the Policy "targeted a politically unpopular group." *Id*. at *14.  The Government contends that *Orr*, an out-of-Circuit case without precedential value, was wrongly decided.

The Policy "does not fit this pattern"; it "cannot be said that it is impossible to discern a relationship to legitimate state interests" or that it is "inexplicable by anything but animus." *Hawaii*, 585 U.S. at 706.  As explained above and below, the Policy serves the legitimate government interest of having a consistent, uniform, and accurate approach to identifying individuals throughout the federal government.  This government interest is especially pronounced for passports because a passport is a "letter of introduction in which the issuing sovereign [here the United States] vouches for the bearer and requests other sovereigns to aid the bearer[.]"  *Haig*, 453 U.S. at 292-93.  The United States needs a consistent way to communicate historical facts about its citizens with foreign governments.

Because the Policy does not discriminate based on a suspect or quasi-suspect classification, the Policy is subject to rational basis review.  Since there is a rational basis for the Policy, Plaintiffs cannot show likely success on their equal-protection claims.

### 2. Plaintiffs Lack a Constitutional Right to International Travel.

Plaintiffs are unlikely to succeed on their right to travel claim (Count Two) because they lack standing, and the Policy satisfies rational basis review.

### i. Plaintiffs Lack Standing.

Plaintiffs fail to meet their burden of showing Article III standing for their international-travel-based claim.  To show standing, Plaintiffs must establish that they present an injury in fact fairly traceable to the challenged Policy that is likely redressable by the Court.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  A plaintiff seeking injunctive relief must show that he faces a "real and immediate" threat of ongoing or future harm.  *El Ali v. Barr*, 473 F. Supp. 3d 479, 519 (D. Md. 2020).  To establish redressability, a plaintiff must show that it is "likely, as opposed to

merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Here, Plaintiffs lack standing because they have not shown an actual or imminent direct injury resulting from the Policy. *Id.* at 575. Plaintiffs admit that the Department sent passports to any Plaintiff who applied for one, and there is no allegation that the Department will deny any Plaintiff a passport upon a receipt of a proper application, even if the application contains a sex designation different from the applicants' evidence. *See* ECF No. 1, ¶103 ("In February 2025, Mr. Schlacter received a passport, which expires in 2035"); ¶ 112 ("In late February 2025, Ms. Tran received a passport"); ¶ 122 ("In late February 2025, Hepler-Mackey received a passport"); ¶ 133 ("On February 13, 2025, Mr. Doe received a passport, which expires in 2035"); ¶¶ 139-147 (Roe has a diplomatic passport and does not allege that he cannot apply for or obtain the passport he seeks); ¶ 153 (Poe "applied for a passport" and does not allege that it was or will be denied); ¶ 164 ("On February 14, 2025, Mx. Koe received a passport back"). Plaintiffs cannot show that their ability to travel internationally has been restricted by the Government; nor can Plaintiffs show that a passport accurately reflecting their sex hinders their international travel. They lack standing to challenge the Policy.

Plaintiffs have also not shown a sufficient risk of future injury. *See*, *e.g.*, *El Ali*, 473 F. Supp. at 519. In *El Ali*, this Court rejected the Government's standing challenge because the plaintiffs alleged "not only historic and repeated illegal searches and seizures but particular needs or desires to travel in the future." *Id.* at 519. But here, Plaintiffs do not allege, let alone show through evidence, that they have been subject to any illegal conduct, only that they fear some increase of inconvenience and scrutiny. *See*, *e.g.*, ECF No. 1, ¶¶ 99, 106 (despite having traveled internationally "on many past occasions" and having a valid passport, Schlacter "has determined

that . . . he cannot travel internationally"); ¶ 116 ("Tran has determined that she will not be able to travel internationally"); ¶ 125 (same for Hepler-Mackey); ¶ 138 (same for Doe); ¶ 157 ("Poe wants to travel to Europe . . . but fears traveling"); ¶ 168 (Koe is "concerned" about the potential for increased scrutiny by government officials); ¶ 145 (Roe's sex designation on the diplomatic passport "*may*" frustrate attempts to receive a visa) (emphasis added).[6]  Such subjective and "[s]peculative claims" and "concerns" of future injury do not "suffice to establish ongoing or future injury in fact for purposes of injunctive relief." *El Ali*, 473 F. Supp. 3d at 519; *see Elhady v. Kable*, 993 F.3d 208, 221 (4th Cir. 2021) ("[M]inor delays in airports of an hour or less" "do not rise to the level of constitutional concern."  Such "burdens are not dissimilar from what many travelers routinely face, whether in standard or enhanced screenings, particularly at busy airports"). Plaintiffs' personal decision to avoid international travel because of difficulties that they may or may not encounter, such as extra screening or additional questions, does not create standing. Accordingly, Plaintiffs are unlikely to succeed on Count Two.

### ii.    There is No Fundamental Right to International Travel.

Even if Plaintiffs had standing, Count Two is still likely to fail because Plaintiffs do not have a Fifth Amendment right to travel internationally.[7]  *See, e.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (fundamental rights are the right to marry, have children, direct the education and upbringing of one's children, marital privacy, use contraception, bodily integrity, and abortion).  In deciding whether an asserted right enjoys substantive due process protections, the Supreme Court considers whether it is a "fundamental right[] [or] libert[y] which [is], objectively,

---

[6] The Department cannot verify Roe's alleged need for a diplomatic passport and official visa without specification of the country of Roe's new diplomatic assignment. Ex. A, ¶ 21.

[7] In contending otherwise, Plaintiffs appear to ignore the reality that some countries deny entry to individuals with passports displaying an "X" marker, like the United Arab Emirates. Ex. A, ¶ 22.

deeply rooted in this Nation's history and tradition . . . and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if the[] [right] w[as] sacrificed." *Glucksberg*, 521 U.S. at 720–21.  The Supreme Court "has always been reluctant to expand the concept of substantive due process" because "guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).

Plaintiffs confuse the right to *interstate* travel (which can be fundamental) with a right to *international* travel (which is not fundamental).  *See Agee*, 453 U.S. at 307 (describing "[t]he constitutional right of interstate travel" as "virtually unqualified[,]" but the "right" to international travel as "no more than an aspect of the 'liberty' protected by the Due Process Clause of the Fifth Amendment").  As such, international travel "can be regulated within the bounds of due process." *Id*.; *see Califano v. Aznavorian*, 439 U.S. 170, 176-77 (1978).  Since the Policy does not infringe on Plaintiffs' exercise of a "fundamental right[,]" it is subject to rational basis review.  *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

The cases upon which Plaintiffs principally rely, *Zemel v. Rusk*, 381 U.S. 1, 14 (1965), and *Aptheker v. Sec'y of State*, 378 U.S. 500, 507 (1964), ECF No. 32, pp. 36-37, are unpersuasive because they were decided before the Supreme Court distinguished between "the freedom to travel outside the United States" and "the right to travel within the United States."  *Agee*, 453 U.S. at 306 (recognizing that the "freedom to travel" with a passport "issued by the sovereign" is "subordinate to national security and foreign policy considerations" and may therefore be subject to "reasonable governmental regulation"); *Regan v. Wald*, 468 U.S. 222, 241 (1984) (observing that *Kent v. Dullus*, on which Plaintiffs also rely, ECF No. 32, p. 35, was decided when "the constitutional

right to travel within the United States and the right to travel abroad were treated indiscriminately[,]" which the Supreme Court has since "rejected").

*Elhady*, ECF No. 32, p. 35, is similarly unhelpful to Plaintiffs because, in that case, the Fourth Circuit observed that the Government has long "regulated international travel[,]" including through the issuance of passports, which have been "mandatory for certain periods as early as the War of 1812." 993 F.3d at 221. As in *Elhady*, Plaintiffs' "allegations boil down to an asserted constitutional right to convenient travel. But as any experienced airport traveler knows, that wish finds little support in reality." *Id*. at 222.

This case also materially differs from *El Ali*, where this Court applied heightened scrutiny to claims about placement on a "No Fly List[,]" because the same burdened "plaintiff's fundamental right to *interstate* travel[,]" but did not reach the same conclusion with respect to plaintiffs' alleged deprivation of their right to travel *internationally*. 473 F. Supp. at 514 (emphasis added); *see Elhady*, 993 F.3d at 222 ("[m]any courts have held that individuals do not have a protected liberty interest to travel via a particular mode of transportation"). *Dunn v. Blumstein*, 405 U.S. 330 (1972), ECF No. 32, p. 37, where the Supreme Court held that Tennessee's "durational residence requirement" for voting violated the Equal Protection Clause, is similarly unhelpful to Plaintiffs because the Court merely confirmed that the "[f]reedom to travel throughout the United States has long been recognized as a basic right under the Constitution," but said nothing about international travel. *Id*. at 338.

Since "the right to [international] travel is qualified, not absolute," rational basis review applies to Plaintiffs' travel claims. *Kashem v. Barr*, 941 F.3d 358, 378 (9th Cir. 2019) (the right to international travel is "not accorded the same stature as the freedom" to travel between states); *Abuhajeb v. Pompeo*, 531 F. Supp. 3d 447, 459 (D. Mass. 2021) (applying rational basis review to

Government's passport revocation in part because "[r]estrictions on the liberty interest in traveling internationally can be regulated" and are not subject to strict scrutiny); *Jacob v. Curt*, 721 F. Supp. 1536, 1539 (D.R.I. 1989) (the National Cancer Institute's closing of a foreign clinic did not deprive plaintiff who sought certain treatment at the clinic any fundamental right to international travel because there is none).

### iii.    The Policy Does Not Violate Any Right to Privacy.

Plaintiffs are also unlikely to succeed on their "informational privacy" claim (Count Three). The right to a passport "conforming to one's gender identity is not 'deeply rooted' in our history and 'implicit in the concept of ordered liberty.'" *Gore*, 107 F.4th at 562 (rejecting substantive due process challenge to Tennessee law requiring that birth certificates conform to sex). "The concept of 'gender identity' did not enter the English lexicon until the 1960s." *Id.* And as discussed above, passport applicants could not even amend the sex marker on their passport without certain evidence until 1992, and "X" markers were not permitted until three decades later. "On this historical record, the claimed right to change an individual's sex on a [passport] to reflect the person's gender identity is not deeply rooted in our history." *Id.*

Plaintiffs try to avoid this conclusion by claiming that they have a broad right to "informational privacy," ECF No. 32, pp. 38-39, but that label is too general and "does not alter the history just described." *Gore*, 107 F.4th at 562. "[T]hat history shows that, however important individuals may perceive the designation of their sex on a [passport], it is only recently that" the Department permitted applicants to self-select sex on their passports. *Id.* Plaintiffs' claim "does not turn on the kind of deeply rooted value that substantive due process protects."[8] *Id.*

---

[8] That must be true. Passports contain various factual information that could lead to embarrassment. For example, passports disclose the individual's age, which can reveal that the individual has had cosmetic surgery, among other things, that could cause embarrassment for the passport holder. But of course, the passport holder or applicant could not assert a privacy right in that information that triggers heightened scrutiny.

In contending otherwise, Plaintiffs rely on outdated and nonbinding precedent that does not account for the Supreme Court's most recent pronouncements. For example, *Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327 (D.P.R. 2018), cited *Roe v. Wade*, 410 U.S. 113 (1973), in support of a broad "constitutional right to privacy" that encompassed a right not to disclose one's "transgender status." ECF No. 32, p. 39; 305 F. Supp. 3d at 332–33. But *Roe* was overruled by *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022). The cited cases also lack a *Glucksberg* analysis for recognizing new, unenumerated substantive due process rights. *See*, *e.g.*, *Arroyo Gonzalez*, 305 F. Supp. 3d at 332–33 (no discussion of *Glucksberg*); *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999) (same). And yet still, other cases radically differ to the facts here that they should be given short shrift. *See*, *e.g.*, *Anderson v. Blake*, 469 F.3d 910, 914 (10th Cir. 2006) (concluding that a rape victim had a "constitutionally protected privacy interest in the video" or her rape "because it depict[ed] the most private of matters: namely her body being forcibly violated"); *United States v. Kravetz*, 706 F.3d 47, 63 (1st Cir. 2013) (recognizing a potential privacy interest in "peripheral" medical or character information that may serve to "gratify private spite or promote public scandal"). Plaintiffs cannot show any constitutional right to privacy that has been unlawfully violated, and they are unlikely to succeed on Count Three.

### 3. The Policy Passes Constitutional Muster.

#### i. The Policy Passes Rational Basis Scrutiny.

Because the Passport Policy "neither burdens a fundamental right nor targets a suspect class," the Court should uphold it because it "bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996).

Rational basis review "is a paradigm of judicial restraint." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–14 (1993). It is "the most relaxed and tolerant form of judicial scrutiny" under

the Equal Protection Clause. *City of Dallas v. Stanglin*, 490 U.S. 19, 26 (1989). Under rational basis review, the challenged law enjoys "a strong presumption of validity," even if the classification is "both underinclusive and overinclusive." *Beach*, 508 U.S. at 314–15; *Heller v. Doe*, 509 U.S. 312, 321 (1993) (rational basis "compel[s]" Courts to "accept a legislature's generalizations even when there is an imperfect fit between means and ends"). "[P]erfection is by no means required." *Vance v. Bradley*, 440 U.S. 93, 108 (1979). "Given this low bar, invalidating a statute subject to rational basis review is a tall order: the plaintiff must negate every conceivable basis which might support the legislation." *Just Puppies*, *Inc. v. Frosh*, 565 F. Supp. 3d 665, 727 (D. Md. 2021), *aff'd sub nom. Just Puppies*, *Inc. v. Brown*, 123 F.4th 652 (4th Cir. 2024). Rational basis does not permit the Court to consider the strength of the plaintiffs' interest or the extent to which the challenged law intrudes on that interest. *Id*. ("it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature"). The focus is entirely on the rationality of the Government's reason for enacting the law. *Id*. at 727-28 (so long as the classification "rationally advances a reasonable and identifiable governmental objective, [judges] must disregard the existence of other methods of allocation that we, as individuals, perhaps would have preferred").

Under these unquestionably deferential standards, the Policy does not violate any equal protection guarantees. Instead, it reflects a legitimate choice by the President implemented by the Department. The Policy furthers the Government's important and legitimate goal in maintaining consistent definitions of sex throughout the executive branch, in maintaining accurate historical facts about individuals that reflect biological reality, and in communicating to foreign sovereign accurate information. *See*, *e.g.*, *Zzym v. Pompeo*, 958 F.3d 1014, 1023 (10th Cir. 2020) (the Government "could reasonably conclude that use of a third sex designation would impede at least

19

some other systems that classify everyone as either male or female" where most agencies' systems "accommodate only two sexes" and allowing "a third sex designation could complicate searches"); *Gore*, 107 F.4th at 561 (the Government "has an interest in maintaining a consistent, historical, and biologically based definition of sex"). Maintaining a consistent definition, based on sex, "protect[s] the integrity and accuracy of" Government records. *Id*. Based on the Government's stated goal and the Policy's provisions, the Policy is rationally related to furthering the Government's legitimate interest.

To the extent Plaintiffs argue that the Policy fails to account for individuals who are intersex or who want to identify with a different sex, ECF No. 32, pp. 45-46, a classification does not fail rational basis review simply because it "is not made with mathematical nicety or because in practice it results in some inequality." *Dandridge v. Williams*, 397 U.S. 471, 485 (1970); *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 70 (2001) ("None of [the Supreme Court's] gender-based classification equal protection cases have required that the statute under consideration [] be capable of achieving its ultimate objective in every instance"). Given the prior long history of a binary sex policy across the Government, reverting to that policy to ensure prospective uniformity is rational. The Department implemented the Policy to ensure that passports, like all government-issued identification documents, reflect the sex of the holder as defined by the EO. Since a passport is a document issued and owned by the Government, which verifies and vouches for the identity of a person who travels internationally, the Government has advanced legitimate interests to justify the Policy.

### ii.    The Policy Passes Intermediate Scrutiny.

Even if it were applicable, the Policy also passes intermediate review because it "substantially further[s] an important government interest." *City of Cleburne*, 473 U.S. at 435; *Kadel*, 100 F.4th at 143; *Grimm*, 972 F.3d at 607.

The Government's interest in consistency, uniformity, and accuracy of basic historical facts about an individual so that federal agencies can verify an individual's identity and so that the United States communicates accurate and useful identification information to foreign sovereigns is important. *See Corbitt*, 115 F.4th at 1349 (consistently defining sex across government is an important government interest); *Gore*, 107 F.4th at 561 (same). And the Policy is substantially related to achieving those objectives. *See Corbitt*, 115 F.4th at 1349. Passport data would not be useful for other agencies if the Department adopted definitions of sex inconsistent with the rest of the federal government. Nor would passport data that does not accurately reflect biology be useful to foreign sovereigns. Contra Plaintiffs, passports are not expressive documents but identification documents that discloses facts. The Policy substantially serves the Government's important interests. Under either rational basis or heightened scrutiny, Plaintiffs' constitutional claims are unlikely to succeed.[9]

### B.    Plaintiffs Cannot Demonstrate Irreparable Harm.

Plaintiffs will not be irreparably harmed in the absence of a preliminary injunction because their alleged anticipated harm is not "actual and imminent," but rather "remote and speculative."

---

[9] In reaching the opposite conclusion in *Orr*, the Court relied on *Bostock v. Clayton County*, 590 U.S. 644 (2020). In *Bostock*, the Supreme Court concluded that Title VII's statutory prohibition on employment discrimination "because of . . . sex" covers individuals who identify with a gender contrary to their sex. *Id.* at 1743; 42 U.S.C. § 2000e-2(a)(1). The text of the Equal Protection Clause does not contain any similar language, and for that reason, Title VII's "text-driven reasoning applies only to Title VII," not to constitutional equal protection claims. *Skrmetti*, 83 F.4th at 484–85; *see, e.g.*, *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880, at *2 (6th Cir. July 17, 2024) (collecting cases); *Eknes-Tucker*, 114 F.4th at 1263 (11th Cir. 2024) (collecting analyses of the issue).

*Does 1-26 v. Musk*, 2025 WL 840574, at *26 (D. Md. Mar. 18, 2025); *Sterling Com. Credit--Michigan, LLC v. Phoenix Indus. I, LLC*, 762 F. Supp. 2d 8, 14 (D.D.C. 2011) (the irreparable injury "must be both certain and great; it must be actual and not theoretical").   A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's "unsubstantiated fears[.]" *Williams v. Maryland*, 2011 WL 3422825, at *9 (D. Md. Aug. 3, 2011). A mere "possibility" is "too lenient[;]" Plaintiffs must instead establish that irreparable harm is "likely." *Winter*, 555 U.S. at 22.

Plaintiffs do not clear this high bar.  *But see Orr*, 2025 WL 1145271, at *22.  At the outset, the Court should reject Plaintiffs' argument that the denial of their alleged constitutional rights constitutes irreparable harm because the Government has not denied any Plaintiffs the ability to travel.  ECF No. 32, pp. 46-47.  Further, instead of providing any proof that harm is "imminent," *Does 1-26*, 2025 WL 840574, at *26, Plaintiffs' allegations and declarations illustrate that their claims are purely speculative.  *See*, *e.g.*, ECF No. 32-56, ¶ 18 (Plaintiff Zander Schlacter has "concerns" that the sex-designation "*could*" be used as a basis for questions) (emphasis added); ECF No. 32-63, ¶ 22 (Plaintiff David Doe believes that the "sex designation . . . *could* result in harassment, discrimination, privacy violations and at worst, physical violence") (emphasis added); ECF No. 32.59, ¶ 15 (stating "*I don't know* how I will be treated by foreign officials processing student visa applications"); ECF No. 32-61, ¶¶ 12, 17 (expressing "worry" about "what it will be like" to travel based on *one* interaction with a poll worker and "stories" about documents being confiscated).  Thus, this case is nothing like *Doe v. Jaddou*, 2024 WL 2057144 (D. Md. May 8, 2024) and *PFLAG, Inc. v. Trump*, 2025 WL 685124, at *28 (D. Md. Mar. 4, 2025), where this Court found a likelihood of irreparable harm and upon which Plaintiffs rely.  ECF No. 32, p. 38. Unlike in those cases, there is no allegation here that Plaintiffs have been subject to "verbal threats,

threats with guns, and physical assaults[,]" have "scars and bruises" on their bodies "after an attack[,]" are forced to live in hiding, or have diminished access to high-quality health care needed to address mental health disorders.  *Doe*, 2024 WL 2057144 at *16; *PFLAG*, 2025 WL 685124, at *29.  Plaintiff's speculations about what *might* happen or how their travel *might* be affected by the Policy do not establish the type of imminent, irreparable harm needed to support emergency injunctive relief.  *See Elhady*, 993 F.3d at 221 (enhanced screenings are not an injury of "constitutional concern").

### C. The Balance of the Equities and Public Interest Favor the Government.

Passport administration is a matter of foreign policy, which is "rarely [a] proper subject[ ] for judicial intervention." *Agee*, 453 U.S. at 292.  The administration and issuance of passports is an important function of the Department, and interference with those processes during litigation would impair the Department's ability to effectively operate.  The Department's interest in the orderly administration of passports greatly outweighs Plaintiffs' speculative allegations of harm. If an injunction is issued, the Department could face a proliferation of applications by individuals seeking sex markers inconsistent with those listed on supporting documentation, the EO definitions, and HHS guidance, creating complex administrative and legal interference with the Department's ability to issue passports.  Moreover, by granting Plaintiffs passports in their preferred sex marker, the Court would effectively be granting them final relief in this preliminary posture, which is strongly disfavored. *See*, *e.g.*, *Ramalingam v. U.S. Citizenship & Immigr. Servs.*, 2021 WL 9385839, at *2 (D. Colo. Sept. 30, 2021) (plaintiffs' request for preliminary relief "falls into the disfavored category" in part because the relief would "constitute[e] the bulk of the final relief").  And even assuming the Department could ultimately unwind the issuance of such

passports, the Government's administrative burden in doing so further counsels against issuing an injunction.

The equitable factors and public interests further weigh in favor of allowing the Government to continue enjoying permissible government speech. *See*, *e.g.*, *Doe v. Kerry*, 2016 WL 5339804, at \*16 (N.D. Cal. Sept. 23, 2016) (the "information contained in a passport is unquestionably government speech. The United States – not the passport holder – controls every aspect of the issuance and appearance of a U.S. passport"); 22 C.F.R. § 51.9 (other than "for the convenience of the Government, no passport may be amended"); 18 U.S.C. § 1543 (imposing criminal penalties on individuals who "makes, forges, counterfeits, mutilates, or alters any passport. . . with the intent" to use that passport).

In analyzing the balance of the equities, the Court must consider the "risk of chilling legal government speech." *Storms v. Shinseki*, 319 F. Supp. 3d 348, 356 (D.D.C. 2018), *aff'd*, 777 F. App'x 522 (D.C. Cir. 2019). And here, the Government "undoubtedly has the authority to control its own message when it speaks or advocates a position it believes is in the public interest," *Chiras v. Miller*, 432 F.3d 606, 612 (5th Cir. 2005), because without that ability, "government would not work." *Walker v. Texas Div.*, *Sons of Confederate Veterans*, *Inc.*, 576 U.S. 200, 207 (2015). How could the Government implement the uniformity it seeks "if officials also had to voice the perspective of those who oppose" the Government's message? *Id.* "[I]t is not easy to imagine how government could function if it lacked th[e] freedom to select the messages it wishes to convey." *Id.* Plaintiffs' requested injunction would encroach on the "very business of government" by purporting to restrict how the Executive communicates and the channels available for such communications. *Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring). Such interference with the Executive Branch's core prerogative to "advocate[] a

24

position it believes is in the public interest," *Chiras*, 432 F.3d at 612, weighs significantly against an injunction under any circumstance, but especially so here, where Plaintiffs have failed to show a non-speculative harm to them from the Government's speech.

Plaintiffs' asserted public interest rests simply on their claim that the Policy is unconstitutional, which it is not.  The public interest is not served if granting the requested relief would not uphold any rights.  *Cf. Steakhouse*, *Inc. v. City of Raleigh*, *N.C.*, 166 F.3d 634, 642 (4th Cir. 1999); *Orkin v. Albert*, 579 F. Supp. 3d 238, 246 (D. Mass. 2022) (rejecting argument that the public interest favored an injunction because "the Court cannot be certain that granting [the plaintiffs'] requested relief would properly uphold any rights"); *but see Orr*, 2025 WL 1145271 at *22.  These factors tilt toward the Government.

In any event, "'[t]he traditional office of a preliminary injunction is . . . to preserve the court's ability to render a meaningful judgment on the merits."  *South Carolina*, 720 F.3d at 524. At no point does Plaintiffs argue that this Court would be unable to rule on the merits of their claims if a preliminary injunction does not issue.  Because a preliminary injunction is an "equitable remedy [that] is never automatic" and "always involves a district court's sound discretion," this Court should use its discretion and deny Plaintiffs' preliminary-injunction motion because Plaintiffs fail to show this "[k]ey [consideration] to that discretion."  *Delaware State Sportsmen's Ass'n*, *Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 197 (3d Cir. 2024).

## II.    Plaintiffs Are Unlikely to Succeed on Their APA Claim (Counts Five and Six).

### A.    The Court Should Not Consider Plaintiffs' Extra-Record Evidence.

In assessing the likelihood of success on the merits of Plaintiffs' APA claim, the Court should disregard the numerous exhibits and declarations Plaintiffs submitted in support of their Motion and instead focus on the materials underpinning the Policy.  In determining whether agency

action may be set aside under the APA, "the court shall review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. This means that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). To go beyond the administrative record, plaintiffs must demonstrate that the record is incomplete or make a "strong preliminary showing" of "bad faith or improper behavior." *Outdoor Amusement Bus. Ass'n*, *Inc. v. Dep't of Homeland Sec.*, 2017 WL 3189446, at \*18 (D. Md. July 27, 2017). Plaintiffs have done neither. As such, the Court should not consider their purported extra-record evidence.

### B.    The Policy is Not Reviewable.

Plaintiffs' APA claim fails in the first instance because the APA only provides for judicial review of final *agency* actions, not *presidential* actions. *See*, *e.g.*, *Franklin v. Massachusetts*, 505 U.S. 788, 799–801 (1992); *Dalton v. Specter*, 511 U.S. 462, 469 (1994); *Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016) ("[T]he APA is not available to review presidential actions–*i.e.*, actions involving the exercise of discretionary authority vested in the President by law"), *aff'd*, 883 F.3d 895 (D.C. Cir. 2018); *but see Orr v. Trump*, 2025 WL 1145271, at \*15 (D. Mass. Apr. 18, 2025).

For example, in *Detroit International Bridge*, the Court rejected the plaintiff's APA challenge to the Department's approval of a permit to construct a bridge between Canada and the United States because Congress had given the President "broad discretionary authority" to approve the bridge's construction. 189 F. Supp. 3d at 100. "By delegating authority to the President, [] Congress recognized the importance of the President's role in the process and made a conscious decision to defer to the President's discretion and decision-making given the foreign policy

considerations inherent in deciding whether to approve the construction and maintenance of a new international bridge." *Id*. at 105.

So too here, Congress gave similarly broad discretionary authority to the President in the Passport Act to "designate and prescribe" rules for passports. *See* 22 U.S.C. § 211a (providing that the Department may issue passports "under such rules as *the President* shall designate and prescribe") (emphasis added). Likewise, as in *Detroit International Bridge*, Congress did not impose any limitations on the President's discretion. This is unsurprising, as the Executive has inherent constitutional authority to determine the content of passports. *See*, *e.g.*, *Agee*, 453 U.S. at 292–94. The rules for issuing passports also implicate "foreign policy considerations," because passports are instruments of foreign policy and national security. *Id.* at 292. That the President has directed the Department to implement the Policy does not change the analysis. *See Detroit Int'l Bridge*, 189 F. Supp. 3d at 105. The cases upon which Plaintiffs rely–*Am. Federtion of State*, *Cnty. & Mun. Emps.*, *AFL-CIO v. Soc. Sec. Admin.*, 2025 WL 1206246, at *42 (D. Md. Apr. 17, 2025), and *New York v. Trump*, 133 F.4th 51, 70 n.17 (1st Cir. 2025), ECF No. 32, p. 41–all reviewed *agency* actions under the APA, and are therefore consistent with the Government's position.

Even if the Policy were an agency action, the same would still be unreviewable because the APA limits judicial review "to situations in which . . . the agency action is not committed to agency discretion by law." *Webster v. Doe*, 486 U.S. 592, 599 (1988); *see also* 5 U.S.C. § 701(a)(2); *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993). Agency action is committed to agency discretion if "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

Review is also unavailable if the action is of a kind "traditionally regarded as committed to agency discretion," including categories of discretionary judgments.  *Lincoln*, 508 U.S. at 192–93.

Here, Congress committed the authority to establish rules for issuing passports to the President's discretion.  22 U.S.C. § 211a; *Agee*, 453 U.S. at 294 (characterizing the statute as using "broad and permissive language").  The President, in turn, directed the Department to implement his policy.  Neither the Passport Act nor Executive Order 11295 ("Rules Governing the Granting, Issuing, and Verifying of United States Passports, 31 Fed. Reg. 10,603 (Aug. 5, 1966)) restricts the Department's discretion in deciding what information must be contained in a passport and how to verify that information.  Nor do they provide any "meaningful standard against which to judge the [Department's] exercise of discretion."  *Heckler*, 470 U.S. at 830; *Detroit Int'l Bridge*, 189 F. Supp. 3d at 106 ("Given the broad discretion afforded to the President in the [statute] and to the Secretary of State in [the executive order], this Court cannot review the issuance of the . . . [p]ermit[.]  There is simply no law to apply"); *but see Orr*, 2025 WL 1145271, at *16.

The Policy is also unreviewable because it is "in the foreign affairs arena" and, therefore, "traditionally regarded as committed to agency discretion."  *Lincoln*, 508 U.S. at 192; *Detroit Int'l Bridge*, 883 F.3d at 903 ("[i]n the foreign affairs arena, the court lacks a standard to review the agency action"); *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1162 (D.C. Cir. 1999) ("When it comes to matters touching on . . . foreign affairs . . . the presumption of review [under the APA] runs aground"); *see also Legal Assistance for Vietnamese Asylum Seekers v. U.S. Dep't of State*, 104 F.3d 1349, 1353 (D.C. Cir. 1997) (Department's consular venue policy unreviewable because it implicated foreign policy).

The Department's rules for issuing passports directly implicate specific foreign affairs decisions by the Government.  The Supreme Court recognizes passports as instruments of

diplomacy through which the President, on behalf of the United States, "in effect request[s] foreign powers to allow the bearer to enter and to pass freely and safely, recognizing the right of the bearer to the protection and good offices of American diplomatic and consular officers." *United States v. Laub*, 385 U.S. 475, 481 (1967); *Agee*, 453 U.S. at 292-93 (a passport is an official communication, "addressed to foreign powers[,]" "by which the Government vouches for the bearer and for his conduct[.]" A passport is "considered rather in the character of a political document"); *Kent v. Dulles*, 357 U.S. 116, 129 (1958) ("the issuance of the passport carries some implication of intention to extend the bearer diplomatic protection" and to "'request all whom it may concern to permit safely and freely to pass, and in case of need to give all lawful aid and protection to this citizen of the United States"). And contrary to Plaintiffs' contention, this case does not involve "passport refusals based on the character of the particular applicant" as there is no allegation that the Government has denied or will deny any of the Plaintiffs' passport applications. ECF No. 1; No. 32, p. 34 (citing *Zemel*, 381 U.S. at 13). The Policy is unreviewable under the APA, and Plaintiffs are unlikely to succeed on their claims. *Id.*; *see also Ancient Coin Collectors Guild v. CBP*, 801 F. Supp. 2d 383, 401–04 (D. Md. 2011) (holding that seizure of coins was unreviewable as presidential action), *aff'd*, 698 F.3d 171 (4th Cir. 2012);[10] *but see Orr*, 2025 WL 1145271, at *16.

### C.    The Policy is Not Arbitrary or Capricious.

Even if the Policy were reviewable, Plaintiffs' APA claim is unlikely to succeed because this Court has only a "narrow" role to play. *See*, *e.g.*, *Nat'l Fed'n of the Blind v. U.S. Abilityone Comm'n*, 421 F. Supp. 3d 102, 115 (D. Md. 2019) (the APA's "standard of review is a narrow one.

---

[10] The D.C. Circuit in *Detroit International Bridge* and the Fourth Circuit in *Ancient Coin Collectors Guild* did not consider whether the challenged actions were presidential actions unreviewable under the APA, but instead assumed they were reviewable agency actions. *See* 883 F.3d at 903; 698 F.3d at 184.

The court is not empowered to substitute its judgment for that of the agency"). Review under the APA is "highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009). So long as the presumptively valid agency action has a rational connection to the record, it must be upheld. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) ("a reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute"); *Zzyym*, 958 F.3d at 1027 (under APA review, "the agency need not select a perfect solution–just a rational one").

The Court's deferential review is especially narrow here, because Congress authorized the President to exercise broad discretion to "designate" rules governing passport issuance. 22 U.S.C. § 211a. Contrary to Plaintiffs' contention, ECF No. 32, pp. 43-44, changes in administration/agency position–even when it there is a perceived "about-face"–does not compel a more searching judicial review. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). The Agency needs only to "display awareness that it is changing position" and show that it has "good reasons" for doing so. *Id.* at 515. While an agency may need to provide a "more detailed justification" when its "new position rests upon factual findings that contradict those which underly [its] prior position" or when the prior position "has engendered serious reliance interests[,]" further justification is not required by, as here, the "mere fact of a policy change." *Housatonic River Initiative*, 75 F.4th at 270. Rather, the agency need only provide a "reasoned explanation" for disregarding the facts and circumstances that supported the prior policy. *Fox*, 556 U.S. at 515-16.

30

The Government has done just that.  The Policy implements the President's directive and is consistent with the Passport Act.  22 U.S.C. § 221a (the Department "may grant and issue passports, and cause passports to be granted, issued, and verified . . . under such rules as the President shall designate and prescribe on behalf of the United States").  The President declared that the "policy of the United States" is to "recognize two sexes," and that those "sexes are not changeable."  90 Fed. Reg. 8,615.  The President set forth uniform definitions of *sex*, *male*, and *female*, and instructed the entire Government to adhere to those definitions, including an instruction to the Department to "implement changes to require that" "passports . . . accurately reflect the holder's sex" as defined by and with guidance from HHS.  90 Fed. Reg. 8,616.  Under these circumstances, it is reasonable for the Department to follow the President's directive and implement a policy under which passports are issued with a sex marker based on birth certificates/other documents issued close in time to the applicant's birth.  As the Department explains, "the Executive Order indicates a government-wide shift to using one uniform definition of 'sex,' so a change in the Department's policies was also needed to support the goal of uniformity."  Ex. A, ¶ 18.

Despite *Orr's* conclusion, 2025 WL 1145271, at *19, an agency "may not simply disregard an Executive Order.  To the contrary, as an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law."  *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012).  "Bound as it [was] to carry out the President's directives[,]" the Department thus reasonably "implement[ed] changes" to require that passports reflect the holder's sex as defined by the EO and HHS.  90 Fed. Reg. 8,616.  Because the EO's entire thrust is to create uniformity in government-issued identification, "it was not arbitrary or capricious" for the Department to issue the Policy.  *See*, *e.g.*, *Zzyym*, 958 F.3d at 1025 (a "binary

sex policy" can be used to justify binary sex markers on passports because it "helpfully matches how other federal agencies record someone's sex").

Courts have recognized that the Government has a legitimate interest "in maintaining a consistent, historical, and biologically based definition of sex," and inconsistent passport data would clearly not further this interest or be useful for other agencies. *Gore*, 107 F.4th at 561; *Corbitt*, 115 F.4th at 1348 (recognizing a "State's interest in ensuring consistency with the State's existing requirements for amending a birth certificate" by "'objectively defining sex for purposes of driver's license designations"); Ex. A, ¶ 18.  The Department introduced sex as a required identity attribute on passport application forms in 1976. *Id*., ¶¶ 5-6.  Under APA review, the United States is permitted to adopt a policy that had previously been in place and is currently in place in most of the countries around the world, Ex. A, ¶ 4, particularly when it concerns a Government-issued and owned document that is "addressed to foreign powers" and "considered rather in the character of a political document." *Agee*, 453 U.S. at 292.

Plaintiffs' arguments do not compel a different result.  Plaintiffs argue that the Policy is arbitrary and capricious because it does not account for "problems" that will be created "when the sex designation on a person's passport conflicts with their gender identity[.]"  ECF No. 32, p. 45. But Plaintiffs' concern is core to the Policy.  The EO explains that because "'[g]ender identity' reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum," it "does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex." 90 Fed. Reg. 8,616.  Moreover, a passport is intended to be "a letter of introduction in which the issuing sovereign vouches for the bearer and requests other sovereigns to aid the bearer." *Agee*, 453 U.S. at 292.  Though Plaintiffs seek a

different result, the Department has reasonably chosen to make the sex-designation on Plaintiffs' passports reflect their sex.

To that end, the Court should reject Plaintiffs' arguments that the Policy is arbitrary and capricious because it conflicts with some state-issued identification documents or policies from some other countries. ECF No. 32, p. 45. The laws of states and foreign countries have little to do with the issuance of U.S. passports, and only some states/foreign countries use identification documents that are inconsistent with the Policy. Others do not. Since a passport is an instrument of diplomacy and an official communication "by which the Government vouches for the bearer and for his conduct[,]" the President -- not states, other countries, or the Plaintiffs -- decides how to identify the bearer in communicating with foreign sovereigns. *Agee*, 453 U.S. at 293; 22 U.S.C. § 211a.

Plaintiffs' argument that the Policy is arbitrary and capricious because it is based on an allegedly unscientific EO is also unpersuasive. ECF No. 32, p. 46 (arguing that the terms "male" and "female" "ignores" that zygotes are created at conception and do not have sex chromosomes). The EO provides that sex is determined based on whether a person *belongs* to a sex that produces a large or small reproductive cell. HHS provided "clear guidance expanding on the sex-based definitions set forth in" the EO, 90 Fed. Reg. 8,616, stating that "[t]he sex of a human, female or male, is determined genetically at conception (fertilization), and is observable before birth." Defining Sex, *supra*. The Policy is consistent with that guidance from the agency the President charged with assisting federal offices to comply with the EO. Regardless, Plaintiffs' focus on defining sex is beside the point; the Department determines sex based on documents produced at or close in time to birth because those are the only documents that are ascertainable. *See* Ex. A, ¶ 17.

Finally, and contrary to Plaintiffs' position, the Policy is not arbitrary and capricious because it allegedly fails to account for "some intersex individuals" who "do not, and may never, produce either a large or small reproductive cell, or could produce both." ECF No. 32, p. 46.  HHS explained that having the ability to produce eggs or sperm "does not require" that they are ever produced, and further concluded that "[r]are disorders of sexual development do not constitute a third sex because these disorders do not lead to the production of a third gamete."  *Defining Sex*, *supra*.  But again, Plaintiffs' definitional concern is beside the point: until recently, the Department has historically issued passports to intersex individuals without offering an "X" marker, *see*, *e.g.*, *Zzyym*, 958 F.3d at 1018, and continues to do so now, using the applicant's documented sex at or close to birth.  Ex. A, ¶ 17.  As a result, Plaintiffs' APA claim is not likely to succeed, and they are not entitled to injunctive relief.

## III.    The Court Should Not Grant Universal Relief.

To the extent the Court grants any relief, the same should be limited to only the named Plaintiffs.  Universal remedies exceed "the power of Article III courts," conflict with "longstanding limits on equitable relief," and impose a severe "toll on the federal court system."  *Hawaii*, 585 U.S. at 713 (Thomas, J., concurring); *see Dep't of State v. AIDS Vaccine Advocacy Coal.*, 145 S. Ct. 753, 756 (2025) (Alito, J., dissenting); *Labrador v. Poe*, 144 S. Ct. 921, 923-924 (2024) (Gorsuch, J. concurring); *DHS v. New York*, 140 S. Ct. 599, 599-601 (2020) (Gorsuch, J., concurring); *see Trump v. CASA*, *Inc.*, *et al.*, No. 24A (U.S.) (considering the validity of nationwide injunctions).[11]

Start with the constitutional problem: Article III authorizes federal courts to exercise only "judicial Power," which extends only to "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl.

---

[11] The Supreme Court heard argument on *Trump v. Casa* on May 15, 2025, and the Government anticipates a ruling in the near future.

1. Under that power, courts can adjudicate "claims of infringement of individual rights," "whether by [the] unlawful action of private persons or by the exertion of unauthorized administrative power." *Lujan*, 504 U.S. at 577 (citation omitted). Courts that sustain such claims may grant the challenger appropriate relief–for instance, an injunction preventing the enforcement of a challenged law or policy against that individual–but cannot grant relief to strangers to the litigation. Article III does not empower federal courts to "exercise general legal oversight of the Legislative and Executive Branches." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021). To reach beyond the litigants and to enjoin the Executive Branch's actions toward third parties "would be not to decide a judicial controversy, but to assume a position of authority over the governmental acts of another and co-equal department, an authority which plainly [courts] do not possess." *Massachusetts v. Mellon*, 262 U.S. 447, 489 (1923).

Universal injunctions also contravene this Supreme Court's precedents on Article III standing. "[S]tanding is not dispensed in gross," so plaintiffs must establish standing "for each form of relief that they seek." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (citations omitted). And a plaintiff 's remedy must be "limited to the inadequacy that produced his injury in fact." *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (brackets and citation omitted). Even if Plaintiffs have standing to seek relief for themselves, they lack standing to seek relief for third parties, as to whom Plaintiffs cannot "sufficiently answer the question: 'What's it to you?'" *TransUnion*, 594 U.S. at 423.

Universal injunctions also transgress restrictions on courts' equitable powers. Federal courts sitting in equity must apply "traditional principles of equity jurisdiction" and may award only those remedies that were "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Congress may by statute authorize new remedies, but courts may not on their own authority "create remedies previously

35

unknown to equity jurisprudence." *Id.* at 332; *see Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) (new remedies "must be created by Congress").

American courts of equity traditionally "did not provide relief beyond the parties to the case." *Hawaii*, 585 U.S. at 717 (Thomas, J., concurring). They have instead long followed the "rule that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Unsurprisingly, then, there appear to have been "no national injunctions against federal defendants for the first century and a half of the United States." Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 428 (2017).

Instead, in a 19th-century case where a lower court issued a universal injunction against the enforcement of a *state* statute, the Supreme Court agreed that the challenged statute violated the Constitution, *see Scott v. Donald*, 165 U.S. 58, 99-101 (1897), but nonetheless held in a separate opinion that the universal injunction was unlawful and that relief should have been "restricted to the part[y] named as plaintiff." *Id.* at 117. And in a similar modern-day precedent, the Supreme Court agreed that a statute prohibiting federal employees from accepting honoraria violated the First Amendment, but held that the injunction protecting "any Executive Branch employee" was overbroad and had to be "limited to the parties before the Court." *United States* v. *National Treasury Employees Union*, 513 U.S. 454, 462, 477 (1995). The Court considered it inappropriate "to provide relief to nonparties when a narrower remedy will fully protect the litigants." *Id.* at 478.

Universal injunctions also subvert the Article III hierarchy of judicial review. Ordinarily, the coercive effect of a court's judgment extends only to the case at hand, but the *stare decisis* effect of the court's opinion may extend to other cases, depending on the court's position in the

Article III hierarchy.  A district court's opinion has no binding precedential effect at all, even in the same district or on the same judge in a different case.  *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011).  A court of appeals' published opinion, in turn, constitutes controlling precedent throughout the relevant circuit, though not in other circuits.  *See Poe*, 144 S. Ct. at 932 (Kavanaugh, J., concurring).  And, of course, the Supreme Court's decisions constitute controlling precedent throughout the Nation.  If the Supreme Court were to hold a challenged statute or policy unconstitutional, the government could not "successfully enforce [it] against anyone, party or not, in light of *stare decisis*."  *Griffin v. HM Florida-ORL*, *LLC*, 144 S. Ct. 1, 1 (2023) (statement of Kavanaugh, J.).  When district courts grant universal injunctions, they upend that system, imbuing the orders of courts of first instance with the type of nationwide effect usually reserved for the precedents of the court of last resort.

Further, universal injunctions "render meaningless rules about joinder and class actions." *United States v. Texas*, 599 U.S. 670, 703 (2023) (Gorsuch, J., concurring in the judgment).  They can "sweep up nonparties who may not wish to receive the benefit of the court's decision." *Id.*; *see Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring) ("Nationwide injunctions . . . sometimes give States victories they do not want").

Universal injunctions cause significant harm to the Government.  They invite forum shopping because different challengers need not file different challenges in different courts if one challenger who files one suit in one court can secure victory nationwide.  *See Poe*, 144 S. Ct. at 927 (Gorsuch, J., concurring).  They force the Government "to seek immediate relief from one court and then the next, with the finish line in [the Supreme] Court." *Id*.  They countermand the principle that the government is not subject to non-mutual issue preclusion–*i.e.*, that the government may relitigate an issue against one party even if it has lost that issue against another

party in another case.  *See United States v. Mendoza*, 464 U.S. 154, 162-63 (1984).  And they operate asymmetrically, granting relief to strangers everywhere whenever a single plaintiff prevails, but not precluding continued litigation by others if some plaintiffs lose.  *See DHS*, 140 S. Ct. at 601 (Gorsuch, J., concurring).

Finally, universal injunctions harm the courts.  "By their nature, universal injunctions tend to force judges into making rushed, high-stakes, low-information decisions." *Id.* at 601.  They exert substantial pressure on the Supreme Court's emergency docket, forcing the Court to confront difficult issues without "the airing of competing views" among "multiple judges and multiple circuits." *Id.*  And they needlessly encourage "[r]epeated and essentially head-on confrontations between the life-tenured branch and the representative branches." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State*, *Inc.*, 454 U.S. 464, 474 (1982) (citation omitted).

Consistent with these principles, any injunctive relief in this case should not extend beyond the seven individual plaintiffs who brought this case.  Plaintiffs' prayer for affirmative injunctive relief "exceeds the scope of relief made available" by the APA.  *Orr*, 2025 WL 1145271, at *24. Granting a universal injunction would also add confusion and uncertainty as other agencies/parts of the Government implement policies pursuant to Executive Order 14168, like the Passport Policy was intended to do.  Inconsistent policies burden the Government's interest in uniformity.  In addition, if a universal injunction is granted, then the Government will be burdened with issuing/reissuing passports with certain sex-designations that it may ultimately unwind.  Plaintiffs have not demonstrated any bases for the Court to enter a universal injunction and, indeed, there are none.  Any request for universal relief should be denied.

**CONCLUSION**

Defendants respectfully request that the Court deny Plaintiffs' Motion for a Preliminary Injunction.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

 /s/ Melissa E. Goldmeier
Melissa E. Goldmeier (Bar number: 18769)
Assistant United States Attorney
36 S. Charles Street, 4th Fl.
Baltimore, MD 21201
(410) 209-4855
melissa.goldmeier@usdoj.gov
*Counsel for Defendants*

39