IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ZANDER SCHLACTER, et al,                  *

     Plaintiffs,                          *

v.                                        *        Civil Action No. GLR-25-1344

UNITED STATES, et al,                     *

     Defendants.                          *

***

<u>**MEMORANDUM OPINION**</u>

THIS MATTER is before the Court on Plaintiffs' Zander Schlacter, Jill Tran, Lia Hepler-Mackey, David Doe, Robert Roe, Peter Poe, and Kris Koe's Motion for Preliminary Injunction. (ECF No. 31).[1] The Motion is ripe for disposition, and no hearing is necessary. <u>See</u> Local Rule 105.6 (D.Md. 2025). For the reasons outlined below, the Court will grant the Motion in part and deny it in part.

## I.    INTRODUCTION

On January 20, 2025, President Trump issued Executive Order 14168. The Executive Order declares it is the policy of the United States to recognize two sexes, male and female. It claims these sexes are not changeable. It also offers its own definition of "sex," "women," "men," "male," "female," "gender ideology," and "gender identity." The Executive Order instructs the Secretary of State to require government-issued identification documents, including passports, to reflect the holder's sex, as defined by the Executive

---

[1] Plaintiffs are proceeding with pseudonyms. (<u>See</u> July 22, 2025 Order, ECF No. 60).

Order. Following this directive, the State Department announced it would only issue passports with an "M" or "F" sex marker that matches an individual's "biological sex at birth" (the "Passport Policy" or the "Policy"). Plaintiffs are seven transgender[2] United States citizens who challenge this Policy on constitutional and statutory grounds.

## II.    BACKGROUND[3]

### A.    <u>Statutory and Regulatory Framework</u>

#### 1.    General Background

Passports are government-issued identification documents necessary for travel abroad and for reentry into the United States. <u>See</u> 8 U.S.C. § 1185(b). Before a U.S. passport can be issued, the applicant "shall subscribe to and submit a written application which shall contain a true recital of each and every matter of fact which may be required by law or by any rules authorized by law to be stated as a prerequisite to the issuance of any such passport." 22 U.S.C. § 213. A passport application must be signed under penalty of perjury. (Compl. ¶ 57, ECF No. 1). An applicant applying for a passport for the first time must submit a Form DS-11, while an applicant filing for renewal of an existing

---

[2] "Transgender people have a gender identity that differs from their sex assigned at birth. Cisgender people have a gender identity that aligns with their sex assigned at birth. Approximately 1.6 million (or 0.6% of) Americans are transgender. Within the umbrella of transgender people are nonbinary people. The term 'nonbinary' refers to people whose gender identity falls outside the gender binary of male or female. Nonbinary people are a subset of transgender people because their gender identity does not conform to the sex they were assigned at birth. According to an analysis of population surveys, approximately one third (32.1%) of transgender people identify as nonbinary." (Compl. ¶¶ 28–29, ECF No. 1 (citation modified)).

[3] Unless otherwise noted, the Court takes the following facts from the Complaint (ECF No. 1) and accepts them as true. <u>See</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007).

passport must submit a Form DS-82. (Id. ¶ 58). An applicant seeking to make changes or corrections to their passport must submit a Form DS-5504. (Id.).

### 2.    Passport Sex Markers

As early as 1971, the State Department allowed individuals to change their name to indicate a change of sex on their passport so long as applicants submitted certain evidence. (See May 4, 1971 U.S. Passport Office Guidance at 10, ECF No. 32-11; Compl. ¶ 60).[4] In 1976, the State Department "first introduced sex as a required identity attribute" on passports. (See Pls.' Mem. L. Supp. Mot. Prelim. Inj. ["Mot."] at 19, ECF No. 32 (citation modified)). In 1992, the State Department began permitting applicants to select a sex marker that differed from their sex assigned at birth; the applicant, however, had to submit evidence of surgical reassignment in support of a sex indicated on their application form that differed from the sex listed on their birth certificate or other form of identification along with a photograph reflecting the applicant's current appearance. (Oct. 1, 1992 Passport Bulletin 92-22 at 3, ECF No. 32-12; 2010 Gender Change Passport Policy Dep't State Foreign Affairs Manual at 2, ECF No. 32-13; Matthew Pierce Decl. ¶ 6, ECF No. 46-1). In 2010, the State Department ended the requirement of documentation of surgical reassignment for issuance of a passport with a different sex marker, and instead accepted a doctor's certification. (Matthew Pierce Decl. ¶ 6).

In 2021, consistent with Executive Order 13985, the State Department further revised its policy concerning passport markers, making two substantive changes: (1)

---

[4] Citations to page numbers refer to the pagination assigned by the Court's Case Management/Electronic Files ("CM/ECF") system.

applicants would no longer be required to submit medical certification if their self-selected gender did not match the gender on their other citizenship or identity documents; and (2) applicants would be permitted to select a third gender marker, "X," in lieu of an "M" or "F" marker—the X gender marker would be defined as an "Unspecified or another gender identity." (June 30, 2021 State Dep't Press Release at 2–3, ECF No. 32-15; Mar. 31, 2022 State Dep't Press Release at 2–3, ECF No. 32-16; Matthew Pierce Decl. ¶¶ 7–8).

### 3.    Executive Order 14168

On January 20, 2025, President Trump signed Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." (Jan. 20, 2025 Executive Order 14168 ["Gender Order"], ECF No. 32-2). The first section, titled "Purpose," asserts that "ideologues" are engaged in a protracted effort to undermine "the biological reality of sex" to the detriment of "women." (Id. at 2). The first few paragraphs of this section read in full:

> Across the country, ideologues who deny the biological reality of sex have increasingly used legal and other socially coercive means to permit men to self- identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers. This is wrong. Efforts to eradicate the biological reality of sex fundamentally attack women by depriving them of their dignity, safety, and well- being. The erasure of sex in language and policy has a corrosive impact not just on women but on the validity of the entire American system. Basing Federal policy on truth is critical to scientific inquiry, public safety, morale, and trust in government itself.
>
> This unhealthy road is paved by an ongoing and purposeful attack against the ordinary and longstanding use and understanding of biological and scientific terms, replacing the immutable biological reality of sex with an internal, fluid, and

subjective sense of self unmoored from biological facts. Invalidating the true and biological category of ''woman'' improperly transforms laws and policies designed to protect sex-based opportunities into laws and policies that undermine them, replacing longstanding, cherished legal rights and values with an identity-based, inchoate social concept.

Accordingly, my Administration will defend women's rights and protect freedom of conscience by using clear and accurate language and policies that recognize women are biologically female, and men are biologically male.

(Id.). The Executive Order then asserts that "[i]t is the policy of the United States to recognize two sexes, male and female," which "are not changeable and are grounded in fundamental and incontrovertible reality." (Id.). It then sets forth the following definitions:

(a) "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity."

(b) "Women" or "woman" and "girls" or "girl" shall mean adult and juvenile human females, respectively.

(c) "Men" or "man" and "boys" or "boy" shall mean adult and juvenile human males, respectively.

(d) "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.

(e) "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell.

(f) "Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true. Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

(g) "Gender identity" reflects a fully internal and subjective sense of self, disconnected from biological reality and sex

> and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

(Id. at 2–3). It directs the "Secretaries of State and Homeland Security, and the Director of the Office of Personnel Management, [to] implement changes to require that government-issued identification documents, including passports . . . accurately reflect the holder's sex," as that term is defined in the Executive Order. (Id. at 3).

### 4.     The Passport Policy

In light of the President's Executive Order, sometime in late January 2025, Secretary of State Marco Rubio directed the State Department to recognize that "[t]he policy of the United States is that an individual's sex is not changeable"; to recognize that "sex, and not gender, shall be used" on passports; to "suspend any application where the applicant is seeking to change their sex marker" from the definition provided in Executive Order 14168; and to "suspend[] any application requesting an 'X' sex marker." (Jan. 23, 2025 Guardian News Rep. at 3–4, ECF No. 32-42; see also Jan. 24, 2025 ABC News Rep. at 3, ECF No. 32-41.).

Shortly thereafter, the State Department removed existing passport application forms, DS-11 (new passport application), DS-82 (renewal application), and DS-5504 (data corrections form), from its website and replaced them with older versions that do not offer an X sex marker. (Mot. at 23–24). On February 8, 2025, an internal State Department communication to all employees and consular offices further ordered that all passport issuances and renewals comply with Executive Order 14168. (Id. at 24). The State Department's website stated that, "under the Executive Order, we will no longer issue U.S.

passports or Consular Reports of Birth Abroad (CRBAs) with an X marker. We will only issue passports with an M or F sex marker that match the customer's biological sex at birth." (Feb. 11, 2025 State Dep't Webpage at 3, ECF No. 32-4). The Notice goes on to say that "[w]e will issue you a new passport that matches your biological sex at birth, based on your supporting documents and our records about your previous passports." (Id.).

**B.    Factual Background**

**1.    Zander Schlacter**

Plaintiff Zander Schlacter identifies as a twenty-nine year-old man and lives in New York. (Compl. ¶ 96; Zander Schlacter Decl. ¶ 2, ECF No. 32-56). He is a United States Citizen. (Zander Schlacter Decl. ¶ 2). He works as a textile artist and designer and owns a small business where he works on commission for various clients and creates and sells his work to the public. (Compl. ¶ 96).

Schlacter is a transgender man; he was assigned female at birth but now has a male gender identity and uses the pronouns "he" and "him." (Compl. ¶ 97; Zander Schlacter Decl. ¶¶ 4–5). He was diagnosed with gender dysphoria[5] in 2018 when he was twenty-three years old. (Compl. ¶ 97; Zander Schlacter Decl. ¶ 7). Since 2018, Schlacter has taken steps to bring all aspects of his life into conformity with his male gender identity, including steps to socially and medically transition. (Zander Schlacter Decl. ¶ 8). This includes

---

[5] "Gender dysphoria refers to clinically significant distress that can result when a person's gender identity differs from the person's sex assigned at birth. Treatment for gender dysphoria is governed by evidence-based, well-established clinical guidelines considered authoritative by medical organizations. If left untreated, gender dysphoria may result in serious consequences including depression, self-harm, and even suicide." (Compl. ¶ 26).

completing a legal name and gender change in New York, updating his driver's license, updating his legal name with the Social Security Administration, and updating his sex designation on his passport to reflect "M." (Id. ¶ 9).

On January 14, 2025, hoping to also update his legal name on his passport to reflect his male gender identity, Schlacter sent an expedited application to update his legal name on his passport using form DS-5504. (Id. ¶ 12). In February 2025, Schlacter received an updated passport. (Id. ¶ 14). The State Department granted Schlacter's request to update his name, but also reverted Schlacter's sex designation from "M" to "F" on his passport. (Id.). This new passport, which expires in 2035, identifies Schlacter's sex as female, despite Schlacter identifying as a male and despite the gender marker on all of his other federal identification documents identifying him as male. (Id.). Schlacter received a letter from the State Department notifying him that "the date of birth, place of birth, name, or sex was corrected on your passport application," with "sex" circled in red. (Id. ¶ 15). The stated reason was "to correct your information to show your biological sex at birth." (Id.).

Schlacter fears that possessing a passport that fails to match his gender identity increases the chance that he will be subjected to invasions of privacy, prejudice, discrimination, distress, harassment, or violence while traveling, which he does often for work. (Id. ¶¶ 13, 17). He is also concerned that the "F" sex designation on his passport could be used as a basis to question, or at worst, fail to recognize his marriage, as the sex designation on his spouse's passport is "F." (Id. ¶ 18). This fear is particularly relevant for countries that do not recognize same-sex marriage. (Id.). He further attests that being

denied a passport that reflects his sex, as determined by his gender identity, is psychologically and emotionally harmful to him. (Id. ¶ 21).

### 2. Jill Tran

Plaintiff Jill Tran identifies as a twenty-seven-year-old woman who lives in Maryland and works at a hair salon. (Compl. ¶ 107; Jill Tran Decl. ¶¶2–4, ECF No. 32-58). She is a United States Citizen. (Jill Tran Decl. ¶ 2). Tran is a transgender woman; she was assigned male at birth but now has a female gender identity and uses the pronouns "she" and "her." (Compl. ¶ 108; Jill Tran Decl. ¶ 5). She was diagnosed with gender dysphoria in 2022 when she was twenty-four years old. (Compl. ¶ 108; Jill Tran Decl. ¶ 7). Since 2022, she has taken steps to bring all aspects of her life into conformity with her female gender identity, including steps to socially and medically transition. (Jill Tran Decl. ¶ 8).

To that end, in January 2023, Tran legally updated her Maryland driver's license with her new legal name and sex designation and updated her legal name and sex designation with the Social Security Administration. (Id. ¶ 9). She is in the process of updating her Maryland birth certificate to change her legal name and to update it to reflect a female sex marker. (Id.). Hoping to also have a passport with an "F" sex marker, Tran applied to renew her passport in February 2025 to reflect her legal name and self-identified sex marker. (Id. ¶¶ 12–13). The State Department sent Tran an updated passport with her legal name, but still with a sex designation of "M." (Id. ¶ 14). Tran attests that the passport reflecting an "M" sex marker now makes travel outside the Unites States nearly impossible. (Id. ¶ 16). Tran further attests that being denied a passport that reflects her sex, as

determined by her gender identity, is psychologically and emotionally harmful to her. (Id. ¶ 20).

### 3.    Lia Hepler-Mackey

Plaintiff Lia Hepler-Mackey identifies as a 24-year-old woman. (Compl. ¶ 117). She is a United States Citizen who lives in California and teaches middle school and high school-aged students how to code. (Compl. ¶¶ 118; Lia Hepler-Mackey Decl. ¶¶ 2–3, ECF No. 32-57). Hepler-Mackey is a transgender woman; she was assigned male at birth, but now has a female gender identity. (Lia Hepler-Mackey Decl. ¶¶ 4–5). She was diagnosed with gender dysphoria in 2022 when she was twenty-two years old. (Compl. ¶ 118, Lia Hepler-Mackey Decl. ¶ 7). She has taken steps to bring all aspects of her life into conformity with her female gender identity, including steps to socially and medically transition. (Lia Hepler-Mackey Decl. ¶ 8). This includes changing her legal name, updating her birth certificate to reflect her new name and female sex designation, updating her name and sex marker on her California driver's license, and updating her name and sex designation with the Social Security Administration. (Id. ¶9).

Since moving to her current city after completing her undergraduate degree, Hepler-Mackey has lived openly as a woman. (Id. ¶ 10). Her students know her as a woman. (Id.). She is involved in her local swing dancing community where people know and accept her as a woman. (Lia Hepler-Mackey Decl. ¶ 10; Compl. ¶ 120).

The last identification documents Hepler-Mackey needed to reflect her gender identity was a passport, so on January 21, 2025, she submitted a DS-11 form for her first passport and chose to have the application expedited. (Lia Hepler-Mackey Decl. ¶¶ 12–

13). When she submitted her application, she did not yet have her updated birth certificate, so she included her old birth certificate with a copy of her name and gender change court order. (Lia Hepler-Mackey Decl. ¶ 13; Compl. ¶ 121). In late February 2025, the State Department sent Hepler-Mackey a passport, which expires in 2035, with a sex marker of "M." (Lia Hepler-Mackey Decl. ¶ 16). The State Department also sent Hepler-Mackey a letter notifying her that "the date of birth, place of birth, name, or sex was corrected on your passport application," with "sex" circled in red. (Id.). The stated reason was "to match our records." (Compl. ¶ 122; Lia Hepler-Mackey Decl. ¶ 16). Hepler-Mackey has determined that for her safety, she will not be able to travel until her passport sex marker is "F." (Lia Hepler-Mackey Decl. ¶ 18). She additionally fears that having a passport that fails to match her gender identity increases the chance that she will be subjected to invasions of privacy, prejudice, discrimination, distress, harassment, or violence while traveling. (Id.).

### 4.    David Doe

Plaintiff David Doe identifies as a 55-year-old man. (Compl. ¶ 126). He is a United States Citizen who lives in Pennsylvania with his wife and children and is employed as an attorney. (Compl. ¶ 126, David Doe Decl. ¶¶ 2–4, ECF No. 32-63). David Doe is a transgender man; he was assigned female at birth but has a male gender identity and uses the pronouns "he" and "him." (Compl. ¶ 127; David Doe Decl. ¶ 5). He was diagnosed with gender dysphoria in 2004 when he was 35 years old. (David Doe Decl. ¶ 7; Compl. ¶ 127). He has been married to his wife since 2006. (David Doe Decl. ¶ 11).

Doe has taken steps to bring all aspects of his life into conformity with his male gender identity, including steps to socially, legally, and medically transition. (David Doe Decl. ¶ 8). This includes undergoing a medical transition more than fifteen years ago, updating his sex designation on his Pennsylvania driver's license, updating his name and sex designation with the Social Security Administration, updating his birth certificate, and updating his name and sex designation on his passport. (Compl. ¶ 128; David Doe Decl. ¶¶ 8, 11–12). To that end, he has had a male designation on his passport for nineteen years. (David Doe Decl. ¶ 12). Doe is an accomplished attorney and is known as male to his clients, colleagues, and in the courts in which he practices. (Compl. ¶ 129; David Doe Decl. ¶ 8).

On January 28, 2025, Doe applied to renew his passport using Form DS-84; his last passport issued in 2017. (Compl. ¶ 133). Instead of receiving a passport with an "M" designation, as he has had since 2006, on February 13, 2025, the State Department issued him a passport with an "F" designation that expires in 2035. (Compl. ¶ 133; David Doe Decl. ¶ 19). The State Department also issued Doe a letter that stated it changed his sex designation to reflect his sex assigned at birth. (David Doe Decl. ¶ 19). Doe has many concerns about his passport with an "F" sex marker, including harassment, discrimination, privacy violations, and even physical violence. (Id. ¶ 22). At worst, Doe fears that the "F" sex designation could be used as a basis to question his marriage to his wife, or his relationship to his children. (Id. ¶ 24). As a result of these concerns caused by the "F" sex marker on his recently issued passport, Doe has determined it is in his best interest not to

travel internationally until the State Department changes his passport sex marker back to male. (David Doe Decl. ¶ 21; Compl. ¶ 138).

**5.    Robert Roe**

Plaintiff Robert Roe identifies as a 42-year-old man. (Compl. ¶ 139). He is a United States citizen who lives in Europe and is employed as a Foreign Service Officer for the Department of State. (Compl. ¶ 139; Robert Roe Decl. ¶¶ 2–3, ECF No. 32-65). Robert Roe is a transgender man; he was assigned female at birth, but has a male gender identity. (Compl. ¶ 140; Robert Roe Decl. ¶ 5). He was diagnosed with gender dysphoria in 2022 when he was 39 years old. (Robert Roe Decl. ¶ 7).

Roe has taken steps to transition to his male identity legally, socially, and medically. (Id. ¶ 8). Specifically, between 2023 and 2024, Roe updated his name and sex marker on his driver's license, residency card, personal use U.S. passport, and with the Social Security Administration. (Id. ¶ 11). Roe is known exclusively as a male to his colleagues, friends, and acquaintances in the community in which he lives. (Id. ¶ 9).

In 2010, Roe was issued a diplomatic passport, an official government identification document that all foreign service officers must possess to travel as employees of the State Department. (Compl. ¶ 143). Roe's current diplomatic passport expires in July 2025, and he has orders for a new assignment beginning in August 2026. (Id.). Roe needs to renew his diplomatic passport in order to report to his new assignment and to secure a visa and a diplomatic ID in the country where he will be stationed next. (Id.).

Roe was not previously eligible to renew and update the sex marker on his diplomatic passport until January 2025 because he was previously on leave and did not

have an active assignment. (Compl. ¶ 144; Robert Roe Decl. ¶ 13). Under the new Passport Policy, Roe knows that he will not be able to obtain a diplomatic passport with an "M" sex marker. (Robert Roe Decl. ¶ 14). This presents a problem, Roe attests, because to be present in the country of his new assignment, he needs to secure an official visa. (Id.). Officials in that country will review his diplomatic passport for accuracy and reference it when issuing his visa. (Compl. ¶ 145). If Roe's diplomatic passport lists his sex as female, it will out him as transgender and may also frustrate or prevent him from receiving an official visa. (Id.). If he cannot receive an official visa, then Robert Roe attests that he will be unable to fulfill his employment obligations. (Compl. ¶¶ 145–147).

###### 6.    Peter Poe

Plaintiff Peter Poe is a 22-year-old who identifies as a man. (Compl. ¶ 148, Peter Poe Decl. ¶¶ 2–4, ECF No. 32-61). He lives in Maryland where he attends college studying environmental science and entomology. (Peter Poe Decl. ¶¶ 2–3). Poe is a transgender man; he was assigned female at birth, but has a male gender identity. (Id. ¶ 5). He was diagnosed with gender dysphoria in 2021, when he was 19 years old. (Id. ¶ 7).

Poe has taken steps to transition to his male identity legally, socially, and medically. (Id. ¶ 8). This includes changing his legal name and gender on his Maryland driver's license, birth certificate, and updating his records with the Social Security Administration. (Id. ¶ 13). To continue on his journey of updating his identification documents, Poe recently applied to renew his passport. (Id. ¶ 16). Specifically, he requested an update to his legal name, and requested that the sex designation be changed to "M." (Id.). Poe attests that obtaining a Passport with the "M" sex marker would enable him to travel

internationally to his father's birthplace with his whole family. (Id. ¶ 15). On May 2, 2025, however, the State Department sent him a passport with an "F" sex designation, despite his request to the contrary. (Id. ¶ 16). Poe fears that possessing a passport that fails to match his gender identity will subject him to invasions of privacy, prejudice, and discrimination and harassment while traveling. (Id. ¶¶ 16–17).

### 7.    Kris Koe

Plaintiff Kris Koe is a nonbinary transgender person who uses "they" and "them" pronouns. (Compl. ¶ 159; Kris Koe Decl. ¶ 5, ECF No. 32-59). Koe is 23 years old and lives in Connecticut where they attend college fulltime and work part-time as a tutor, babysitter, and grocery co-op clerk. (Kris Koe Decl. ¶¶ 2–4). Koe is a United States citizen. (Id. ¶ 2). For eight years, Koe has understood their gender identity to lie outside of the male or female binary and they do not identify with their birth-assigned sex. (Id. ¶ 7). They came out as nonbinary to their friends and family in 2022. (Id.).

Koe has taken steps to affirm their identity legally, socially, and medically. (Id. ¶ 8). Specifically, in the summer of 2022, Koe updated the sex marker on their Connecticut driver's license to an "X" to reflect their sex as nonbinary, consistent with their gender identity, and updated their Connecticut birth certificate to reflect an "X" sex designation as well. (Id. ¶ 9). Koe hopes to attend graduate school in Germany and will have to secure a student visa to do so, which will require their birth certificate and U.S. passport. (Id. ¶ 11). To that end, Koe applied to renew their passport on January 10, 2025 using form DS-84, and requesting a sex designation of "X" on their passport. (Id. ¶ 13). A few weeks later, however, the State Department sent Koe a passport with the sex designation of "F" along

with a letter that states the sex was corrected on Kris Koe's passport to match the Department's records. (Id. ¶ 14). Koe's passport with an "F" designation, they attest, will prevent them from applying for graduate education abroad, traveling internationally, and generally instills a sense of incredible distress in them about their future. (Id. ¶¶ 15–17).

## C.    **Procedural History**

On April 25, 2025, Plaintiffs Peter Poe, Lia Hepler-Mackey, Kris Koe, Jill Tran, David Doe, Zander Schlacter, and Robert Roe filed a Complaint against the United States Department of State, Marco Rubio in his official capacity as Secretary of State, and the United States. (ECF No. 1). The six-count Complaint alleges violations of the Fifth Amendment Equal Protection Clause (Count I); Fifth Amendment Right to Travel (Count II); Fifth Amendment Right to Privacy (Count III); First Amendment Right to Free Speech (Count IV); Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500 et seq., 706, contrary to constitutional right, power, privilege, or immunity (Count V); and Administrative Procedure Act, 5 U.S.C. §§ 500 et seq., 706, Arbitrary, Capricious, and Abuse of Discretion (Count VI). (Compl. ¶¶ 169–222).

Plaintiffs seek a declaratory judgment that (1) the Passport Policy and Gender Order as applied to passports violate Plaintiffs' constitutional rights; and (2) the Passport Policy is arbitrary, capricious, an abuse of discretion, and otherwise contrary to law in violation of the APA. (Compl. at 41). Plaintiffs additionally seek preliminary and permanent injunctive relief enjoining Defendants and their agents, employees, representatives, successors, and any other person acting directly or indirectly in concert with them, from enforcing the Gender Order as applied to passports or the Passport Policy. (Id.).

On May 14, 2025, Plaintiffs filed a Motion for Preliminary Injunction. (ECF Nos. 31–32). Plaintiffs seek a preliminary injunction on all claims except for their First Amendment claim. (Mot. at 11 n.3). Plaintiffs move this Court to preliminarily enjoin Defendants from implementing the State Department's Passport Policy to only issue passports with male or female sex designations and to require Defendants Department of State and Secretary Marco Rubio to issue passports to them with sex designations that match their gender identity, including the issuance of passports bearing an "X" designation for "unspecified or another gender identity." (Mot. at 1). Plaintiffs filed thirty-three Exhibits in support of their Motion. (ECF Nos. 32-1–32-66). The Government filed an Opposition on May 28, 2025, with one supporting exhibit. (ECF Nos. 46–46-1). Plaintiffs filed a Reply on June 11, 2025. (ECF No. 53).

### III.    DISCUSSION

#### A.    <u>Standard of Review</u>

A preliminary injunction "is an 'extraordinary and drastic remedy.'" <u>See</u> <u>Munaf v. Geren</u>, 553 U.S. 674, 689–90 (2008) (quoting 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, <u>Federal Practice & Procedure</u> § 2948, at 129 (2d ed. 1995)). A party seeking a preliminary injunction must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) that the injunction is in the public interest. <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 20 (2008); <u>Frazier v. Prince George's Cnty</u>, 86 F.4th 537, 543 (4th Cir. 2023).

**B.**    <u>**Analysis**</u>

Plaintiffs argue that they are entitled to a preliminary injunction on multiple constitutional and statutory grounds. (Mot. at 11-12). Before turning to the merits of Plaintiffs' arguments, the Court will first address the Government's standing challenge. (<u>See</u> Gov.'t's Opp'n Mot. Prelim. Inj. ["Opp'n"] at 14-16, ECF No. 46).

Article III of the United States Constitution limits the jurisdiction of federal courts to "cases" and "controversies," so plaintiffs in federal civil actions must demonstrate standing "for each claim [they] seek [] to press." <u>DaimlerChrysler Corp. v. Cuno</u>, 547 U.S. 332, 335 (2006); <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum" requirements of standing consist of three elements: (1) the plaintiff must have suffered an "injury in fact"; (2) the injury must be fairly traceable to the actions of the defendant; and (3) it must be "likely" that the injury will be "redressed by a favorable decision." <u>Lujan</u>, 504 U.S. at 560–61 (citations omitted). An injury in fact must be "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." <u>Spokeo, Inc. v. Robins</u>, 578 U.S. 330, 339 (2016) (quoting <u>Lujan</u>, 504 U.S. at 560). If a plaintiff lacks Article III standing, a court does not have subject matter jurisdiction over their claims. <u>Ali v. Hogan</u>, 26 F.4th 587, 595–96 (4th Cir. 2022). "The plaintiff bears the burden of establishing standing to sue as of the time he commenced the litigation." <u>Id.</u>

The Government argues that "Plaintiffs lack standing because they have not shown an actual or imminent direct injury resulting from the Policy." (Opp'n at 15).[6] It asserts that "Plaintiffs admit that the Department sent passports to any Plaintiff who applied for one, and there is no allegation that the Department will deny any Plaintiff a passport upon a receipt of a proper application, even if the application contains a sex designation different from the applicants' evidence." (Id.). Plaintiffs counter that "Plaintiffs are harmed, and face continued future injury, from passports that do not match their lived sex, and, though technically valid, are unusable." (Pl.'s Reply Mem. Supp. Mot. Prelim. Inj. ["Reply"] at 12, ECF No. 53).

Here, the Court finds that all Plaintiffs, with the exception of Robert Roe, have demonstrated standing. First, six of the Plaintiffs—Zander Schlacter, Lia Hepler-Mackey, Jill Tran, Peter Poe, and Davie Doe—have adequately alleged an "injury in fact" through the State Department denying them passports that match their gender identity. (See Schlacter Decl. ¶ 14; Hepler-Mackey Decl. ¶ 16; Tran Decl. ¶ 14; Kris Koe Decl. ¶ 14; Peter Poe Decl. ¶ 16; David Doe Decl. ¶ 19). Second, the actions are fairly traceable to the Defendants because Plaintiffs adequately allege that the State Department, acting to implement the President's Executive Order, issued passports to them that are inconsistent with their gender identity. (See Schlacter Decl. ¶ 14; Hepler-Mackey Decl. ¶ 16; Tran Decl. ¶ 14; Kris Koe Decl. ¶ 14; Peter Poe Decl. ¶ 16; David Doe Decl. ¶ 19). Third, the injury

---

[6] Although the Government only challenges standing in the context of Plaintiffs' international travel argument (Opp'n at 14–15), the Court finds it proper to address standing before turning to any of Plaintiffs' claims because standing is a threshold issue.

will likely be redressed in the event that the Court issues the preliminary relief Plaintiffs seek.

Plaintiff Robert Roe fails to clear this hurdle. He has not yet applied for a diplomatic passport "in light of the of the futility of doing so under current policy." (Mot. at 12). Roe does not yet have an injury in fact that is traceable to Defendants and that can be remedied by this Court. Accordingly, the Court declines to issue any preliminary relief as to Robert Roe and must dismiss his claims but finds that all of the six other named Plaintiffs have adequately alleged standing.

### 1.    Equal Protection Claim

#### a.    Likelihood of Success on the Merits

Plaintiffs argue that the Passport Policy violates their Right to Equal Protection as guaranteed by the Fifth Amendment to the United States Constitution. (Mot. at 27). Defendants counter that Plaintiffs are unlikely to succeed on their constitutional claims. (Opp'n at 8). At bottom, the Court agrees with Plaintiffs.

The Equal Protection Clause provides: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. In simpler terms, "all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (citing Plyler v. Doe, 457 U.S. 202, 216 (1982)). Likewise, the state must avoid distinguishing between classes of people in an "arbitrary or irrational" manner or out of a "bare . . . desire to harm a politically unpopular group." Id. at 446–47 (quoting USDA v. Moreno, 413 U.S. 528, 534 (1973)); see also Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam) (prohibiting "intentional and

arbitrary discrimination" (quoting <u>Sioux City Bridge Co. v. Dakota Cnty.</u>, 260 U.S. 441, 445 (1923))). "Put another way, state action is unconstitutional when it creates 'arbitrary or irrational' distinctions between classes of people out of 'a bare . . . desire to harm a politically unpopular group.'" <u>Grimm v. Gloucester Cnty. Sch. Bd.</u>, 972 F.3d 586, 607 (4th Cir. 2020) (quoting <u>City of Cleburne</u>, 473 U.S. at 446–47), <u>as amended</u> (Aug. 28, 2020).

Generally, courts presume state action to be lawful, and so, uphold classifications as long as they are "rationally related to a legitimate state interest." <u>Cleburne</u>, 473 U.S. at 440. This is known as "rational basis review." <u>See, e.g.</u>, <u>Clark v. Jeter</u>, 486 U.S. 456, 461 (1988) (explaining rational basis standard). "When a state law regulates on the basis of something other than a protected characteristic, we apply rational-basis review and will uphold the law if it rationally relates to a legitimate government objective." <u>Kadel v. Folwell</u>, 100 F.4th 122, 142 (4th Cir. 2024) (quoting <u>Cleburne</u>, 473 U.S. at 440), <u>cert. granted, judgment vacated,</u> No. 24-99, 2025 WL 1787687 (U.S. June 30, 2025).

Conversely, when the state classifies a "suspect" or "quasi-suspect" group of people, courts apply "heightened scrutiny." <u>Cleburne</u>, 473 U.S. at 440–41. Heightened scrutiny, unlike rational basis review, is "a more exacting standard of judicial review." <u>Id.</u> at 442. Classifications along racial lines, for example, are inherently suspect and subject to strict scrutiny. <u>Id.</u> Classifications based on sex are suspect and subject to intermediate, or "quasi-suspect," scrutiny. <u>Grimm</u>, 972 F.3d at 607–08. With respect to transgender status, the Supreme Court recently declined to consider whether classifications based upon transgender status warrant a heightened level of scrutiny under the Equal Protection Clause. <u>See</u> <u>United States v. Skrmetti</u>, 145 S. Ct. 1816, 1831–34 (2025). But the Fourth Circuit has

held that "heightened scrutiny applies to . . . sex-based classifications" and "transgender people constitute at least a quasi-suspect class." Grimm, 972 F.3d at 607.

The distinction between rational basis and intermediate scrutiny is significant. The Fourth Circuit has described rational-basis review as a "deferential standard" under which "the plaintiff bears the burden to negate every conceivable basis which might support" the differential treatment. Giarratano v. Johnson, 521 F.3d 298, 303 (4th Cir. 2008) (citation modified). By contrast, an intermediate-scrutiny analysis requires the proponent of the policy to produce an "exceedingly persuasive justification" for treating individuals differently based on quasi-suspect characteristics. Miss. Univ. for Women v. Hogan, 458 U.S. 718, 724 (1982) (citation and quotations omitted).

### i.   Proper Level of Scrutiny

As a preliminary matter, the parties disagree over whether rational basis review or heightened scrutiny applies to the Policy. Defendants insist that the more deferential rational basis review applies (Opp'n at 9–13), while Plaintiffs assert that intermediate scrutiny applies, (Mot. at 27). Based on binding Fourth Circuit precedent and recent decisions issued by sister United States District Courts and Courts of Appeal, the Court concludes that the Policy warrants intermediate scrutiny because it classifies on the basis of sex.

The Government purports that rational basis review applies because the Policy applies to everyone equally. (Opp'n at 10). That is, the Government asserts it will assign all passport applicants with a sex marker that matches their sex assigned at birth, and as such, the Policy does not discriminate based on sex or transgender status. (Id. at 10–11).

The Fourth Circuit has squarely rejected this logic. When evaluating a policy that prohibited transgender students from using a bathroom that aligns with their gender identity, the Fourth Circuit explained that "when a 'School District decides which bathroom a student may use based upon the sex listed on the student's <u>birth certificate</u>,' the policy necessarily rests on a sex classification." <u>Grimm</u>, 972 F.3d at 608 (emphasis added). So too here. When the "[State Department] decides which [sex marker to designate on a passport] based upon the sex listed on the [applicant]'s birth certificate,'" the policy necessarily rests on a sex classification.

The Government insists that the Policy at issue here "merely requires passports to reflect the sex designations on Plaintiffs' original birth certificates/documents" which renders the Policy neutral. (Opp'n at 10). That misses the point for two reasons. First, as the Supreme Court explained in <u>Bostock v. Clayton County</u>, 590 U.S. 644 (2020), in the employment context under Title VII, "[a]n employer who fires an individual for being homosexual or transgender fires that person for traits or actions it would not have questioned in members of a different sex. Sex plays a necessary and undisguisable role in the decision." <u>Id.</u> at 651–52. Here too, sex plays a necessary role in the Government's decision to deny passports to individuals that match their gender identity. A transgender man like Schlacter, whose gender identity is male, cannot obtain a male-designated passport, whereas a cisgender man, whose gender identity is also male, can do so. The only difference in this example is the sex assigned at birth of these two individuals.

Second, the Government's assertion that the Policy merely requires passports to reflect the sex designations on Plaintiffs' original birth certificates takes a narrow view of

the Equal Protection clause that the Fourth Circuit has rejected. In Grimm, when rejecting

a school board's argument that its bathroom policy discriminating against transgender

students treats all students the same, the Court reasoned "that is like saying that racially

segregated bathrooms treated everyone equally, because everyone was prohibited from

using the bathroom of a different race." 972 F.3d at 609.

That is what is happening here. A policy that requires passports to reflect the sex

designations on an individual's original birth certificate would apply to cisgender and

transgender individuals equally but would only affect transgender individuals, because

cisgender people typically would not apply for a gender on their passport that does not

match their sex assigned at birth. Instead of engaging with binding circuit caselaw, the

Government states that it disagrees with the Fourth Circuit's decisions in these cases.

(Opp'n at 10 n.4). Regardless of the Government's disagreements with Fourth Circuit

decisions, this Court is so bound. The Fourth Circuit recently reaffirmed this irrefutable

principle, explaining:

> Grimm remains the law of this Circuit and is thus binding on
> all the district courts within it. Gibbons v. Gibbs, 99 F.4th 211,
> 213 (4th Cir. 2024) ("When a panel of this Court decides a
> legal issue in a published opinion, that ruling is binding on all
> future panels and district courts within this circuit unless it is
> abrogated by the Supreme Court or an en banc decision of this
> Court.")
>
> . . .
>
> For example, it argues Grimm is not the analogous precedent
> Doe purports it to be, raising a host of subtle factual
> distinctions and new arguments for why the Proviso operates
> differently or is based on additional interests than the policy at
> issue in Grimm. In large part, these arguments ignore Grimms'

holding, straining for a reason not to be bound by what it said.
<u>Gibbons</u>, 99 F.4th at 213 (recognizing the rule that published
decisions of this Court are binding unless abrogated by the
Supreme Court or an <u>en banc</u> decision of this Court, and the
controlling nature of a published opinion "does not disappear
just because a future litigant identifies a fact, theory, or line of
argument the previous panel could have but did not consider").

. . .

Last, although this concern will no doubt be taken up more
fully by the panel to consider Doe's appeal on the merits, we
briefly note that the State discounts <u>Grimm</u>'s presently binding
effect on Doe's claims by forecasting that it—or its premises—
will be overruled by the Supreme Court's decision in B.P.J.
Indeed, a similar rationale motivated the district court to deny
Doe an injunction pending the appeal. Dist. Ct. ECF No. 103.
Such speculation is not the proper basis for denying a
preliminary injunction pending appeal when currently binding
caselaw compels the conclusion that the movant has satisfied
his burden. We do not know what the Supreme Court will
say—or not say—in any future decision in B.P.J. Thus, we
have no reason to know how or in what way its holding will
impact <u>Grimm</u>'s precedential value or any future analysis of
Doe's claims.

<u>Doe by Doe v. South Carolina</u>, No. 25-1787, 2025 WL 2375386, at *8–*9 (4th Cir. Aug.

15, 2025). The Policy, therefore, is subject to heightened scrutiny.

### ii.        The Policy Under Heightened Scrutiny

Having concluded that the Court must examine the Policy by applying an

intermediate form of heightened scrutiny, the question remains whether the Policy

withstands this review. At bottom, the Court concludes that, for the purpose of deciding

the pending Motion for Preliminary Injunction, the Policy fails heightened scrutiny.

As mentioned above, sex-based classifications require an intermediate form of

heightened scrutiny, which requires the state to show that the justification for the

classification is "exceedingly persuasive." <u>United States v. Virginia</u>, 518 U.S. 515, 532–33 (1996). An exceedingly persuasive justification requires the state to demonstrate that the "classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." <u>Id.</u> at 533 (quoting <u>Hogan</u>, 458 U.S. at 724) (citation modified). "The justification must be genuine," and one that is "hypothesized or invented post hoc in response to litigation" is not sufficient. <u>Id.</u> Nor can the justification rely on "overbroad generalizations about the different talents, capacities, or preferences of males and females." <u>Id.</u>

The Government asserts that the Policy "passes intermediate review because it 'substantially further[s] an important governmental interest.'" (Opp'n at 23). To determine the purported interest at stake, the Court turns to the text of the Executive Order. There, the President explains "[i]t is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality. Under my direction, the Executive Branch will enforce all sex-protective laws to promote this reality[.]" (Executive Order 14168 at 8615). The Purpose of this directive is then described in Section 1 of the Executive Order, helpfully labeled "Purpose," which provides that "ideologues who deny the biological reality of sex have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate singlesex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers. This is wrong." (<u>Id.</u>). From the irrefutable text of the Executive Order, then, the purpose of the Passport

Policy is summed up by its title: "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." (Id.).

Like every other court that has considered this Executive Order, the Court finds its stated purpose does not serve an important governmental interest that is exceedingly persuasive; further, the discriminatory means employed are not substantially related to the achievement of those objectives. See San Francisco A.I.D.S. Found. v. Trump, No. 25-CV-01824-JST, 2025 WL 1621636, at *15 (N.D.Cal. June 9, 2025) ("[T]he Gender Order's express purpose is to disapprove of transgender people and declare their existence as 'unmoored from biological facts' and 'false.' . . . This facially discriminatory objective . . . is not a legitimate government interest, let alone one that justifies the overt discrimination practiced here.); PFLAG, Inc. v. Trump, 769 F.Supp.3d 405, 444 (D.Md. 2025) (same).

More critically, as Judge Kobick astutely observed in the context of the State Department's implementation of the Executive Order, "[i]t is obvious that the Passport Policy, which denies some applicants passports that reflect their gender identity, has no relation to any claimed interest in keeping transgender women out of women's domestic abuse shelters, women's workplace showers, and other intimate single-sex places." Orr v. Trump, 778 F.Supp.3d 394, 413 (D.Mass. 2025). Judge Kobick further explained, and this Court agrees, that "there is no connection between the State Department's prior policy— which allowed applicants to obtain personal-use passports consistent with their gender identity—and any deprivation of cisgender women's 'dignity, safety, and well-being.'" Id.

In its briefing, the Government takes a different tune. It asserts that the Purpose of the Passport Policy is not what the Executive Order says it is. Rather, it asserts that the Passport Policy creates "consistency, uniformity, and accuracy of basic historical facts about an individual so that federal agencies can verify an individual's identity and so that the United States communicates accurate and useful identification information to foreign sovereigns is important." (Opp'n at 23). It further asserts that the Policy is substantially related to achieving those objectives because "Passport data would not be useful for other agencies if the Department adopted definitions of sex inconsistent with the rest of the federal government. Nor would passport data that does not accurately reflect biology be useful to foreign sovereigns." (Id.).

The Court finds these rationales, at this stage of the litigation, fail to survive intermediate scrutiny. First, these post-hoc rationalizations are untethered from the Executive Order. See Virginia, 518 U.S. at 533 ("The [Government's] justification must be genuine, not hypothesized or invented post hoc in response to litigation"). Second, even if the Court were to accept these post hoc rationalizations—that the denial of the existence of an entire group of people from government-issued identification documents was necessary to "ensure consistency across the Federal government"—the "Constitution recognizes higher values than speed and efficiency." McNeill v. Butz, 480 F.2d 314, 323 (4th Cir. 1973) (quoting Stanley v. Illinois, 405 U.S. 645, 656 (1972)). Further, "[s]ettled precedent instructs that a mere claim that a discriminatory policy is justified by an administrative convenience, like a desire for uniformity in data, cannot justify sex- and gender-based classifications." Orr, 778 F.Supp.3d at 413–14 (citation omitted). Far from

28

surviving intermediate scrutiny, these rationales also fail to pass the most deferential standard of rational basis review. See id. at 418 ("[U]nder any standard of review, such targeting of a politically unpopular group runs afoul of our Nation's constitutional commitment to equal protection."). Accordingly, Plaintiffs have shown that they are likely to succeed on the merits of their equal protection claim.[7]

### b.    Irreparable Harm

Having determined that the Plaintiffs are likely to succeed upon the merits of their Equal Protection claims, the Court next considers whether Plaintiffs meet the second element necessary for preliminary injunction—whether they have shown a likelihood of suffering irreparable harm in the absence of preliminary relief. To establish irreparable harm, the Plaintiffs must show they are likely to suffer harm that is "actual and imminent" and that the harm "cannot be fully rectified by the final judgment after trial." Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, 915 F.3d 197, 216 (4th Cir. 2019) (citations omitted).

Here, Plaintiffs have met their burden to show they will suffer irreparable harm in the absence of a preliminary injunction for several reasons. First, as the Fourth Circuit recently explained in blocking the enforcement of a bathroom policy that denied transgender students from using a bathroom matching their gender identity, "[Plaintiffs

---

[7] The Court declines, at this juncture, to also consider whether the Passport Policy and Executive Order were motivated by discriminatory animus, which Plaintiffs allege in their Complaint (Compl. ¶¶ 185–86). The question of animus may require a more fulsome factual record not yet present, and Plaintiffs have already shown a likelihood of success on their equal protection claim on other grounds.

have] shown—based on <u>Grimm</u>—'that irreparable injury is likely in the absence of an injunction.' . . . . That's so because state action infringing constitutional rights generally constitutes irreparable harm." <u>Doe</u>, 2025 WL 2375386, at *8. As Chief Judge Diaz emphasized in his concurrence, "[t]he constitutional violation is reason enough to grant relief." <u>Id.</u> at *10 (Diaz, J., concurring). That is, "a deprivation of a constitutional right, for even minimal periods of time, unquestionably constitutes irreparable injury." <u>Miranda v. Garland</u>, 34 F.4th 338, 365 (4th Cir. 2022) (citation modified); <u>Leaders of a Beautiful Struggle v. Baltimore Police Dep't</u>, 2 F.4th 330, 346 (4th Cir. 2021) ("Because there is a likely constitutional violation, the irreparable harm factor is satisfied.").

In addition to the likely constitutional violation at issue here, however, "the record teems with other harms," including the denial of dignity and the Government branding Plaintiffs "with a scarlet 'T.'" <u>Doe</u>, 2025 WL 2375386, at *12 (Diaz, J., concurring). Additionally, Plaintiffs raise a host of other serious objections to the stated purposes of the Passport Policy, including three uncontested expert declarations attached to their Motion for Preliminary Injunction. (<u>See</u> ECF Nos. 32-53–32-55).

For example, Dr. Deanna Adkins, Fellowship Program Director of Pediatric Endocrinology at Duke University School of Medicine and current Director of the Duke Center for Child and Adolescent Gender Care and Clinical Director of the Duke Gender Health and Wellness Program, opines that the "Executive Order presents a simplistic and scientifically and medically inaccurate notion of sex," including its failure to account for individuals with a gender identity that differs from their sex assigned at birth. (Expert Decl. Deanna Adkins, MD ¶¶ 57–60, ECF No. 32-53). Dr. Adkins further explains that "a key

aspect of social transition is having one's identity documentation match their gender identity" and that "[i]t undermines this treatment and in particular social transition – a critical part of gender dysphoria treatment – to force a person with gender dysphoria to live in a manner that does not align with the person's gender identity." (Id. ¶¶ 80, 84); (see also Expert Decl. Dr. Randi C. Ettner, Ph.D. ¶ 67, ECF No. 32-54 ("Being unable to correct the gender marker on one's identity documents, including one's passport, forces transgender people to present documents that inaccurately reflect their sex as determined by their gender identity and their lived experience. This discordance generates profound psychological distress, increases vulnerability to discrimination and victimization, and undermines the therapeutic goals of gender-affirming treatment.")); (Expert Decl. Ayden Scheim, Ph.D. ¶ 22, ECF No. 32-55 ("Transgender persons experience discrimination and poor treatment due specifically to identity documents and records that do not accurately reflect the sex they know themselves to be, as determined by their gender identity. In the 2015 United States Transgender Survey ('2015 U.S. Trans Survey'), a survey of 27,715 transgender adults in the United States 32% of respondents who had presented an identity document that did not match their gender presentation had at least one negative experience, including verbal harassment (25%), denial of service (16%), being asked to leave a venue (9%), and assault (2%). Further, racial and ethnic minority respondents including Middle Eastern, American Indian, and Black individuals were more likely to report harassment or violence when presenting gender-incongruent identity documents.")). For all these reasons, Plaintiffs have shown they will suffer irreparable harm absent the requested preliminary injunctive relief.

c.     **Balance of Equities and Public Interest**

The balance of the equities and public interest, the final two factors, also favor awarding injunctive relief in this case. The balance of the equities and the public interest "merge when the Government is the opposing party." Garland, 34 F.4th at 365 (4th Cir. 2022) (quoting Nken v. Holder, 556 U.S. 418, 435 (2009)). To balance the equities, the Court considers "the relative harms to the applicant and respondent, as well as the interests of the public at large." Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan, 501 U.S. 1301, 1305 (1991) (citation modified).

Here, there is little harm to the Government to returning to the status quo as to these six named Plaintiffs. As for Plaintiffs and the public interest more broadly, the Fourth Circuit has recognized that protecting constitutional rights weighs in favor of the Court providing preliminary injunctive relief. See Leaders of a Beautiful Struggle, 2 F.4th 27 at 346 ("[I]t is well-established that the public interest favors protecting constitutional rights.") (en banc); see also Giovani Carandola, Ltd. v. Bason, 303 F.3d 507, 521 (4th Cir. 2002) ("[W]e agree with the district court that upholding constitutional rights surely serves the public interest."); Vitkus v. Blinken, 79 F.4th 352, 368 (4th Cir. 2023) ("[T]he public undoubtedly has an interest in seeing its governmental institutions follow the law." (citation modified)). The Court is satisfied that the balance of the equities weighs in favor of awarding preliminary injunctive relief in this case.

## 2.     Plaintiffs' Remaining Claims

Plaintiffs also seek relief under the Fifth Amendment's guarantee to the Right to Travel and Right to Privacy, First Amendment Right to Free Speech, and relief under the Administrative Procedure Act. (See Compl. ¶¶ 187–222). The Court declines to reach Plaintiffs' other claims for purposes of their Motion for a Preliminary Injunction because the Court finds that success on Plaintiffs' equal protection claim is likely.

## 3.     Scope of Relief and Nominal Bond

As discussed, Plaintiffs have established a likelihood of success on the merits of their claim that the Passport Policy as applied violates their Fifth Amendment equal protection rights. With the exception of Robert Roe, Plaintiffs are also likely to suffer irreparable harm absent a preliminary injunction, and the balance of the equities weighs in their favor. Citing a myriad of concerns, the Government argues that "any injunctive relief in this case should not extend beyond the seven individual plaintiffs who brought this case." (Opp'n at 40). The Court agrees, and by separate Order will enter narrowly tailored preliminary relief only as to six of the named Plaintiffs.[8] Finally, the Court will impose a

---

[8] Plaintiffs inform the Court that there is currently a class action entered by Judge Kobick of the District Court for the District of Massachusetts that grants preliminary relief from the Passport Policy but excludes the seven named Plaintiffs in the instant litigation. See Orr v. Trump, No. 1:25-CV-10313-JEK, 2025 WL 1695941, at *16 (D.Mass. June 17, 2025) ("Excluded from these classes are any judge presiding over this action and the plaintiffs in Schlacter v. U.S. Department of State, No. 25-cv-01344 (D.Md. filed Apr. 25, 2025)); (Notice Suppl. Authority at 1 n.1, ECF No. 62). The Court takes judicial notice of the class action litigation, Colonial Penn Ins. Co. v. Coil, 887 F.2d 1236, 1239 (4th Cir. 1989) (noting that "[t]he most frequent use of judicial notice of ascertainable facts is in noticing the content of court records"), and notes again that it grants relief here only as six of the named plaintiffs in this case. The Court further notes that, to date, there appears to be no conflicting orders arising from these two separate cases.

nominal bond of zero dollars in this matter, because Plaintiffs seek to protect their Fifth Amendment Rights. See Nat'l Assoc. of Diversity Offs. in Higher Educ. v. Trump, 767 F.Supp.3d 243, 291 (D.Md. 2025) (imposing a nominal bond of zero dollars under Fed. R. Civ. P. 65(c)).

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant Plaintiffs' Motion for a Preliminary Injunction on Count I (Equal Protection) as to all named Plaintiffs except Robert Roe. For the reasons stated in the Opinion, the Court will dismiss Roe's claims. A separate Order follows.

Entered this 9th day of September, 2025.

_____
/s/
George L. Russell, III
Chief United States District Judge

---

Further, with respect to Plaintiff Robert Roe, well-settled precedent makes clear that standing is a threshold issue that each plaintiff must establish. DaimlerChrysler, 547 U.S. at 335. Because the Court has found that, at this juncture, Roe has failed to meet this burden, the Court will deny the Motion for Preliminary Injunction as to Roe and dismiss his claims.